**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **CHRISTIAN FENICO,** ) | |
| **THOMAS YOUNG, THOMAS GACK,** ) | |
| **EDWARD McCAMMITT, TANYA** ) | |
| **GRANDIZO, ANTHONY ANZIDEO,** ) | |
| **ANTHONY ACQUAVIVA, KRISTINE** ) | |
| **AMATO, and JOSEPH PRZEPIORKA,** ) | **Case No. _____** |
| ) | |
| *Plaintiffs*, ) | **JURY DEMAND** |
| ) | |
| **-vs-** ) | |
| ) | |
| **CITY OF PHILADELPHIA,** ) | |
| ) | |
| *Defendant.* ) | |
| ) | |

# C O M P L A I N T

Speech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection.

---*Snyder v. Phelps*, 131 S.Ct. 1207, 1211, 562 U.S. 443, 444 (U.S. 2011).

## I.
### Introduction

1.   On June 1, 2019, an entertainment web publisher called <u>Buzzfeed News</u>, a left-leaning agency that has been widely criticized by several journalistic sources as unreliable, released a story headlined: "Cops Across the U.S. Have Been Exposed Posting Racist and Violent Thinks On Facebook. Here's the Proof". The article was published in collaboration with Injustice Watch, a self-described "nonprofit newsroom focused on exposing institutional failures that obstruct justice and equality." Injustice Watch and <u>Buzzfeed</u> relied, as their primary source for the article, on a database called the Plain View Project.

2.   The Plain View Project ("Plain View") was founded in 2016 by Emily Baker-White, a former Federal Community Defender staff attorney. In 2017, Baker-White and a team of other

attorneys conducted a witch-hunt investigation into social media activity by police officers in eight major cities spanning several years.  Plain View's stated goal was to publicly expose any social media posts by law enforcement officers which it subjectively found offensive or hinted of any bias or racism.   Plain View pooled these social media posts into a database which they then made available on-line publicly exposing officers and inviting public scrutiny and disciplinary action by their authorities.

3.    Christian Fenico, Thomas Young, Thomas Gack, Edward McCammitt, Tanya Grandizo, Anthony Anzideo, Anthony Acquaviva, Kristine Amato and Joseph Przepiorka ("Plaintiffs") are highly decorated officers who have served with distinction on the City of Philadelphia Police Department for many years.  They are among the officers whose Facebook posts were selectively chosen by Plain View for inclusion in its database where they are falsely maligned and effectively branded as racists.  They have since been disciplined, suspended or terminated from the City of Philadelphia Police Department for exercising their free speech rights as guaranteed by the First Amendment and expressing their personal views on issues of inherent public interest.

4.    During the relevant time period of the events described herein, the City of Philadelphia Police Department had in force and effect a policy known as Directive 6.10, Social Media and Networking which provided as follows:

**4.  Policy**

G.  Employees who are off-duty, and using privately-owned property to engage in the personal use of social media, do not represent the City of Philadelphia, the Philadelphia Police Department, or any official position maintained by either entity.  Under such conditions, employees represent only themselves and their personal interests.

5.      As a further consequence of the City's actions against them the Plaintiffs have suffered and continue to suffer irreparable injury to their professional reputations and, for many, an end to their careers in law enforcement.  The Plaintiffs have been black-listed and placed on a "Giglio List or Brady List" which is a list compiled usually by a prosecutor's office or a police department containing the names and details of law enforcement officers who have had sustained incidents placing their credibility into question, thereby impairing their ability to be called as a witness in the prosecution of any arrests or criminal investigations conducted by them.

6.       The Plaintiffs bring this action against the City of Philadelphia pursuant to 42 U.S.C. § 1983 for redress of wrongs committed by the Defendant, and for compensation for injuries arising out of the Defendant's intentional deprivation of their constitutionally protected rights under the First and Fourteenth Amendments to the United States Constitution as well as its violation of their rights under corollary provisions of the Constitution of the State of Pennsylvania.  Specifically, the Plaintiffs sue the Defendant for its retaliation against them for the exercise of their freedom of political expression as private citizens, for their commentary on social media, and their response to comments posted on their personal and private Facebook pages about a current events of inherent public concern and nationwide interest.

7.      The Plaintiffs allege that the City of Philadelphia has adopted an arbitrary and double standard by selectively enforcing its policies against the Plaintiffs singling them out based on the political views expressed in their social media. Despite the fact that the City of Philadelphia Police Department's own internal policy Directive 8.6 states that "the entire disciplinary procedure and outcomes shall be consistent and fair," the severity of the penalties varied based on the viewpoints expressed by the Plaintiffs and other officers within their department, and constitutes arbitrary viewpoint discrimination.   The Defendant's arbitrary practice, custom, usage and policy have the effect of intentionally, and without a rational basis,

treating the Plaintiffs differently from others who are similarly situated and constitutes a violation of their rights as guaranteed under the United States Constitution as well as the Constitution of the State of Pennsylvania.  The Defendant's actions were committed under color of state law and constitute a pattern, practice, custom and usage which violate the Plaintiffs' constitutional rights.

8.      Plaintiffs allege that the adverse actions imposed on them by the City were calculated to deter a public employee of reasonable firmness from exercising their constitutionally protected right of freedom of expression.

9.      Plaintiffs seek declaratory relief, nominal damages, compensatory damages and reasonable attorney's fees and costs as permitted by 42 U.S.C.§ 1988.

## II.
## Jurisdiction and Venue

10.      Jurisdiction is vested in this Court to hear and decide all issues presented in this case pursuant to 28 U.S.C. § 1331, 1343 and 1367, this case being predicated on a federal question and the enforcement of certain federal constitutionally protected rights as guaranteed under the First and Fourteenth Amendments of the United States Constitution.

11.      The Court has the authority to grant declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

12.      Venue is proper in this Court under 28 U.S.C.§ 1491(b), as the Plaintiffs and the Defendant reside or are situated within this federal district and the Defendant's wrongful conduct took place within this federal district.

### III.
### Parties

*Plaintiffs*

13.    Christian Fenico is an adult citizen and resident of the City of Feasterville, Pennsylvania.

14.    Thomas Young is an adult citizen and resident of the City of Philadelphia, Pennsylvania.

15.    Thomas Gack is an adult citizen and resident of the City of Philadelphia, Pennsylvania.

16.    Edward McCammitt is an adult citizen and resident of the City of Philadelphia, Pennsylvania.

17.    Tanya Grandizo is an adult citizen and resident of the City of Broomall, Pennsylvania.

18.    Anthony Anzideo is an adult citizen and resident of the City of Philadelphia, Pennsylvania.

19.    Anthony Acquaviva is an adult citizen and resident of the City of Philadelphia, Pennsylvania.

20.    Kristine Amato is an adult citizen and resident of the City of Philadelphia, Pennsylvania.

21.    Joseph Przepiorka is an adult citizen and resident of the City of Philadelphia, Pennsylvania.

*Defendant*

22.    The City of Philadelphia, Pennsylvania ("City") is a local body politic and municipality and exists under and by virtue of the laws of the State of Pennsylvania.

**IV.**
**Facts**

**Plaintiff Christian Fenico**

23.     Christian Fenico was employed by the City as a commissioned police officer in 2003.

24.     Officer Fenico was initially assigned to the 3rd District of the South Division from 2003 - 2008.  From 2008 – 2015, he was assigned to the 1st District of the South Division.

25.     From 2015 until his termination in 2019, Plaintiff Fenico was a member of the S.W.A.T. Unit.

26.     Officer Fenico is certified in Crisis Intervention, VIN trained, and Level B certified for hazmat/chemical entry. His skills and training include active shooter, suicide prevention, S.W.A.T. entry, raid and hostage rescue and many other S.W.A.T. skills.

27.     In addition, Officer Fenico is highly trained and certified in a multitude of firearms and non-lethal weapons.

28.     Officer Fenico is a highly decorated officer; during his seventeen-year career he received twenty-three awards and honors.

29.     In 2007, he received the ASIS International award for meritorious service to the Greater Philadelphia Area. He received one commendatory citation in 2003 and three in 2006 for his service. In 2003, he received the Expert Marksman Award. He was recognized by the Fraternal Order of Police for Outstanding Performance of Duties in 2006, 2007 and 2014. In 2015, he received the Medal of Lifesaving for saving a 6 year old little girl from a potentially fatal choking. He received the Medal of Merit for his work in 2006, 2011, 2012, 2013 and 2016. He was bestowed the Medal of Valor in 2006. He was Officer of the Month in April of 2005 and November of 2012. He received the Special Event Medal in 2015 for Pope Francis' visit to

Philadelphia, and in 2016 for the Democratic National Convention in Philadelphia. He also received the S.W.A.T. Pistol and Rifle Match Squad Champion in 2016, 2017 and 2018.

30.      During Officer Fenico's off duty time he utilized a Facebook account under the name of "Chris Joseph". Nowhere on his personal Facebook webpage or in his biographical hyperlink did he identify himself as an employee of the City of Philadelphia or as a police officer.

31.      On February 7, 2019, Officer Fenico received a post- marked letter from a group named "Injustice Watch". The letter stated that they, along with the *New York Times*, were investigating the use of Facebook by police officers, and Officer Fenico's name had come up during their investigation along with other officers. (A true and correct copy of this letter appears below).



32.    Upon receipt of this letter, Officer Fenico immediately contacted the Fraternal Order of Police and was advised not to respond this letter from Injustice Watch.

33.    Approximately one week later, Captain Sekou Kinebrew, the Commanding Officer of Media Relations called Officer Fenico. During that discussion Capt. Kinebrew advised that "Injustice Watch" was, in his words, a "cop hating, leftwing" group that "badmouthed cops". Capt. Kinebrew ordered Officer Fenico not speak with them.

34.    Following his conversation with Capt. Kinebrew, Officer Fenico received a notice instructing him to appear for an interview with Internal Affairs Bureau ("IAB") regarding "Injustice Watch".

35.    Officer Fenico and FOP attorney Tim Strange attended the IAB interview with Sergeant Joann Garvey. Sgt. Garvey reiterated that Injustice Watch appeared to be on a "witch hunt" and "fishing expedition" as an "anti-cop" group. They discussed in general what Officer Fenico posted on Facebook over the years; however, none of Plaintiff's Facebook postings or comments were viewed during this discussion.

36.    During the meeting, Sgt. Garvey produced a printed, text version of several comments from Facebook posts.   She had Officer Fenico read them aloud, but he could not recall any of these comments, or the context surrounding the posts.

37.     On June 1, 2019, Buzzfeed released a story entitled "Cops Across the U.S. Have Been Exposed Posting Racist and Violent Things on Facebook. Here's the Proof". The one-sided story specifically mentioned Officer Fenico and several other officers, by name, and boasted that these officers had been "exposed".

38.    The Buzzfeed article portrayed Officer Fenico's posts completely out of context.

39.    Upon information and belief, on June 6, 2019, the Commanders within the City of Philadelphia Police Department held a meeting regarding the Buzzfeed article. During that

meeting First Deputy Commissioner Myron Patterson, stated that Injustice Watch was going after what he termed "right wing posts". When another commander asked about left wing posts, Patterson replied: "I'm not worried about left wing posts, just the right wing. And God help you if I see any pro-life posts."

40.     After the Commanders meeting, Officer Fenico received a phone call from Captain John Przepiorka instructing him to surrender his firearm, and placing him on restrictive duty, pending an investigation by the IAB.

41.      A total of 72 officers within the Department were forced to surrender their service weapons and placed under investigation based on the misinformation published in the Buzzfeed article.

42.     In approximately June of 2019, while on restricted duty, Officer Fenico was instructed to attend an Employee Assistance Program (E.A.P.).

43.     Following the E.A.P., Officer Fenico was instructed to attend mandatory training at the Police Academy. This training covered social media directives, including, *inter alia*, First Amendment rights of police officers, domestic violence, police investigations, and various other topics.

44.     Officer Fenico also received a second notice to report to IAB Sgt. Garvey.

45.     During this second meeting, Sgt. Garvey showed Officer Fenico his actual eight posts from 2012-2015, that were deemed troublesome. This was the first time Officer Fenico was shown the allegedly offensive postings.  (True and correct copies of these posts are assembled in the Plaintiffs' Appendix to Complaint at pp 3 to 7 and are incorporated herein by reference.)

46.     On July 17, 2019 Officer Fenico was called into his Captain's office and summarily terminated.

47.     On July 18, 2019, the Police Commissioner signed a Commissioner's Directive Action, accusing Officer Fenico of the following charges/recommendations:

| Article Section/Spec. | Penalty Range | Commanding Officer's Recommendation | Deputy Commissioner's Recommendation |
|---|---|---|---|
| 1-§021-10 | 30 Days Suspension or Dismissal | | Dismissal |
| 5-§011-10 | Reprimand to 5 Days Suspension | | Dismissal |
| | | | |

48.     Prior to being fired, Officer Fenico had been reassured by his supervisors, "your posts weren't bad", "you only have a few posts", "you didn't say anything racist"; and assured him that he did not have anything to worry about.

49.     Officer Fenico had a near spotless record as an officer for seventeen years and had only received one counseling memo, which is not considered within the Department to be a form of punishment or discipline.

50.     On July 19, 2019, Officer Fenico returned to IAB, turned in his badge, identification and signed his termination papers.

51.     On the "Statement of Charges Filed and Action Taken" signed by Officer Fenico on July 19, 2019, the two bases for the City's disciplinary action were violation of:

**Article I- Conduct Unbecoming – Section 1-§021-10:** Any incident, conduct, or course of conduct which indicates that an employee has little or no regard for his/her responsibility as a member of the Police Department.

**Article V- Neglect of Duty – Section 5-§011-10:** Failure to comply with any Police Commissioner's orders, directives, memorandums, or regulations; or any oral or written orders of superiors.

52.     For the charge of Conduct Unbecoming the Specification given by the City was:

Internal Affairs initiated an internal investigation, IAD#19-1515, after receiving information alleging that employees of the Philadelphia Police Department were posting offensive and inappropriate materials and/or comments to social media, specifically on the Facebook social media site. As part of the investigation, an analysis was conducted of Facebook posts and/or comments collected in the Plainview Project database. The analysis displayed a course of conduct, where no fewer than four (4) times, you posted, shared, and/or commented on video, photographs/pictures, and articles, using racial slurs, profanity, dehumanizing, defamatory, and/or discriminatory language, and/or language that condoned, glorified, or encouraged violence, and/or language that was insensitive and mocked individuals, due process, and the criminal justice system. In addition, on April 4, 2013, you were formally counseled on an inappropriate post made on a social media site. As a member of the Philadelphia Police Department, you are expected to strive to maintain public trust and confidence, not only in your professional capacity but also in your personal and on-line activities. Your posts and comments in question are devoid of any professional expectations and standards.

53.    For the charge of Neglect of Duty the Specification given by the City was:

Internal Affairs investigation #19-1515 determined that you posted material, statements, or comments to on Facebook that are in direct violation of Directive 6.10, Social Media and Networking. An analysis of Facebook posts and/or comments collected in the Plainview Project database was conducted during this investigation. Results indicated that you posted, shared, and/or commented on video, photographs/pictures, and articles, using racial slurs, profanity; dehumanizing, defamatory, and/or discriminatory language; and/or language that condoned, glorified, or encouraged violence; and/or language that was insensitive and mocked individuals, due process, and the criminal justice system. In many instances, these posts and comments were directed at the same persons whom you have been swom to serve. Directive 6.10 specifically states that while engaging in social media, "Employees are prohibited from using ethnic slurs, profanity, personal insults; material that is harassing, defamatory, fraudulent, or discriminatory, or other content or communications that would not be acceptable in a City workplace under City or agency policy or practice." The Directive further states that "each member must strive to maintain public trust and confidence, not only in his or her professional capacity, but also in his or her personal and on-line activities. Moreover, as police personnel are necessarily held to a higher standard than general members of the public, the on-line activities of employees of the police department shall reflect such professional expectations and standards."

54.    The Philadelphia Police Department's Directive 6.10, Social Media and Networking, effective on May, 26, 2011, states as follows:

**4. Policy**

G. Employees who are off-duty, and using privately-owned property to engage in the personal use of social media, do not represent the City of Philadelphia, the

Philadelphia Police Department, or any official position maintained by either entity. Under such conditions, employees represent only themselves and their personal interests.

55.     The "Non-Criminal GNIOTEK Warnings" and the "Notice of Suspension Internal Affairs Division Suspension Form" signed on July 19, 2019 by Officer Fenico stated: "the Police Commissioner has ordered that you be suspended for 30 days with intent to dismiss."

56.     On August 15, 2019, Officer Fenico received his Notice of Dismissal, stating as grounds for this disciplinary action, Conduct Unbecoming, Sections 1-021-10.

> You are hereby notified that effective      8/15/19      , you are dismissed from your position with the City of Philadelphia as referred to above for the following reasons:
>
> **CONDUCT UNBECOMING, Section 1-§021-10:** (Any incident, conduct, or course of conduct which indicates that an employee has little or no regard for his/her responsibility as a member of the Police Department)

57.     As a result of the false accusations and labels given to Officer Fenico by the City claiming that he used "racial slurs" and "profanity", he has been unable to obtain unemployment benefits and is effectively barred from pursuing further employment in law enforcement.

58.     A simple Google search of Officer Fenico's name now lists him under a heading of "racist cop" headlines.

59.     As a further consequence of his termination, Officer Fenico has been unable to obtain health insurance for much needed healthcare to treat multiple injuries he suffered while a police officer, including: a broken right hand with plates and screws; four bulging disks in his lower back; a left shoulder with labral tears; and an umbilical hernia.

60.     As a consequence of the City's adverse actions against him, Officer Fenico has suffered and continues to suffer emotional injuries, including but not limited to, feelings of hopelessness, embarrassment and humiliation as well as anxiety and depression for which he has

received, and continues to receive, medical and psychiatric treatment.  In addition, he has incurred economic and pecuniary loss, forfeiture of benefits and lost earnings for which he is entitled to compensatory damages.

61.     Each of the comments posted by Officer Fenico which formed the basis for his termination were statements made in his personal capacity as a private citizen, and addressed matters of political, social or other concern to the community.

62.     The content, form and context of each of the comments posted by Officer Fenico which formed the basis of the City's adverse employment actions, involved matters of public concern.

63.     The Defendant's negative employment action against Officer Fenico was motivated in substantial part by the Plaintiff's speech activity.

64.     The Plaintiff's private speech in the form of comments on social media did not cause any disruption within the Department; nor did it negatively impact the ability of the City to maintain discipline and relationships in the workplace.

### Plaintiff Thomas Young

65.     Corporal Thomas Young entered the Police Academy on November 20,1989. He graduated on April 16, 1990, and was assigned to the 6th District.

66.     On May 14, 2011, Mr. Young was promoted to Corporal and assigned to the 22nd District.

67.     On March 10, 2013, he was transferred to the 6th District, and then on March 15, 2015, was transferred to the Philadelphia Criminal Information Center (PCIC).

68.     Corporal Young has received two bravery Commendations for arresting suspects armed with firearms without firing his weapon. One of these awards, was for an incident that happened on September 3, 2003, where the offender shot at Corporal Young with a 12 gauge

shotgun. Corporal Young was able to effect the arrest and recover the suspect's weapon, without firing his service weapon. Corporal Young also received a Heroism Commendation for saving several people in a fire at an apartment building. He received a Letter of Commendation  for outstanding police work. Corporal Young also received two Fraternal Order Of Police (FOP), awards for outstanding work. And over the course of his career Corporal Young has also received 28 Perfect Attendance Awards.

69.     Corporal Young received one reprimand in 2005, which is the mildest form of discipline in the Philadelphia Police Department.

70.     On June 5, 2019, Corporal Young was placed on restricted duty, and was told to surrender his service weapon to his commanding officer. He was summarily relieved of all police powers. The reason given for his restrictions was that he was the subject of an ongoing Internal Affairs Investigation regarding his Facebook posts.

71.     The Department released Corporal Young's name to the press. His name appeared in the newspaper and various other media outlets. He was vilified as a "racist cop" and an example of "what is unacceptable in law enforcement".

72.     Corporal Young's friends and acquaintances, even strangers have reacted with shock in response to the false, negative publicity branding him as a bigot and a racist.

73.     On June 17, 2019, Corporal Young was interviewed by Sergeant Saba from Internal Affairs. He was shown several Facebook posts and asked whether they were his posts and if anyone else had access to his computer. Corporal Young complied with the interview and acknowledged that the posts were his and no one had access to his home computer.

74.     On July 17, 2019, Corporal Young was contacted by Lieutenant Young of Internal Affairs who instructed him to report at 9:00 a.m. to the Internal Affairs Bureau.  There he was to be served with his disciplinary action consisting of a 30-day suspension with intent to dismiss.

75.     In 2019, Corporal Young had just under 30 years of service with the Police Department.

76.     Corporal Young was in the DROP program for 19 months, and so Corporal Young decided to retire.

77.     On July 19, 2019, Corporal Young went to Police Personnel and retired from the Philadelphia Police Department, rather than face involuntary termination and forfeiture of all his insurance benefits.

78.     Throughout his career in law enforcement, Corporal Young has taken great pride in being a police officer, and has always tried to conduct himself in a professional manner. He served the public well, at times even risking his own life to save others.

79.     Each of the comments posted by Corporal Young which formed the basis for his termination were statements made in his personal capacity as a private citizen, and addressed matters of political, social or other concern to the community.

80.     The content, form and context of each of the comments posted by Corporal Young which formed the basis of the City's adverse employment actions, involved matters of public concern.

81.     The Defendant's negative employment action against Corporal Young was motivated in substantial part by the Plaintiff's speech activity.

82.     The Plaintiff's private speech in the form of comments on social media did not cause any disruption within the Department; nor did it negatively impact the ability of the City to maintain discipline and relationships in the workplace.

**Plaintiff Thomas Gack**

83.     Thomas Gack was employed by the City as a commissioned police officer in 1993.

84.     Plaintiff Gack was initially assigned to 14th District in the Germantown section of the city, and then transferred to the 7th District in 2007.

85.     He is certified in in Major Incident Response Team capacity and holds several Federal certifications in Biohazard Response, Riot Training, and Radiological Detection.

86.     Officer Gack is a highly decorated officer, and over the course of his almost 25-year career he received many awards and honors for his service.

87.     During Officer Gack's off duty time he utilized a Facebook account.

88.     On June 1, 2019, Buzzfeed released a story entitled "Cops Across the U.S. Have Been Exposed Posting Racist and Violent Things on Facebook. Here's the Proof".

89.     On June 7, 2019, Officer Gack's Captain, came to his home to retrieve his service pistol and to inform him that he was being placed under investigation. Officer Gack's service weapon was in his locker at the 7th District, so he signed a document relinquishing the weapon to Captain Robert Ritchie. Officer Gack was placed on restrictive duty pending the investigation.

90.     On June 11, 2019, Officer Gack reported to Internal Affairs for an interview. During the interview, he was shown 37 Facebook posts dating between 2015-2016 that had been labeled as racist, homophobic, Islamophobic and/or violent by the Plain View Project. Officer Gack was required to initial all of the pages to confirm that they were his posts or comments. (True and correct copies of these posts are assembled in the Plaintiffs' Appendix to Complaint at pp 8 to 44 and are incorporated herein by reference.)

91.     During the interview, he was asked to disclose any screen names or social media accounts, and was told that if he did not surrender this private information, he would be cited with failure to cooperate in an internal investigation.

92.     Officer Gack was not allowed to explain the context surrounding his comments or posts.

93.     On June 25, 2019, Officer Gack left for a planned 3-week summer vacation with his family.  The following day his vacation was interrupted when he received a telephone call instructing him to report to Administrative Lieutenant Blackmon as soon as possible.

94.     Lieutenant Blackmon ordered Officer Gack to cancel his vacation, immediately return home and attend a class on social media training and accountability on June 28, 2019.

95.     On July 17, 2019, while Officer Gack was on duty, Captain Robert Ritchie, came to his home. When Mr. Gack's wife came to the door, Captain Ritchie proceeded to tell her that he had just come from a meeting with the Commissioner and it was not good news.  Officer Gack was able to hear and observe this communication remotely through a cell-phone application called "Ring App".  When he asked "Why are you at my house while I'm at work?", Captain Ritchie realized that he was being observed and heard through the Ring camera, he stopped talking and then requested that Officer Gack call him for a private conversation, not on City issued cellphones.

96.     When Captain Ritchie arrived at the police station, he refused to allow Officer Gack to have a private conversation with the FOP and instead he began to speak over Officer Gack, "Friday 9:00 a.m. Internal Affairs Office. I'll see you then, when you go in to surrender yourself for firing."

97.     On July 19, 2019, Officer Gack reported to Internal Affairs, where he was met by his FOP representatives and his Captain. He signed multiple copies of his paperwork and was read the conditions of his termination. He was given a set of documents to sign and informed that he was being placed on a 30 day suspension with intent to fire, commencing on August 15, 2019.

98.     Over the thirty-day suspension period Officer Gack was served with an additional two sets of dismissal documents: the first on August 5, 2019; and the second time on August 16, 2019.

99.     The basis cited for his termination was Conduct Unbecoming, Section 1-§021-10 and Neglect of Duty, Section 5-§011-10.

100.    Each of the comments posted by Officer Gack which formed the basis for his termination were statements made in his personal capacity as a private citizen, and addressed matters of political, social or other concern to the community.

101.    The content, form and context of each of the comments posted by Officer Gack which formed the basis of the City's adverse employment actions, involved matters of public concern.

102.    The Defendant's negative employment action against Officer Gack was motivated in substantial part by the Plaintiff's speech activity.

103.    The Plaintiff's private speech in the form of comments on social media did not cause any disruption within the Department; nor did it negatively impact the ability of the City to maintain discipline and relationships in the workplace.

**Plaintiff Edward McCammitt**

104.    Edward McCammitt was employed by City as a commissioned police officer in 1986.

105.    He was initially assigned to the 22nd District from 1986 -1991. And then the 2nd District from 1991- 2001, he then was assigned to the Traffic Division of the PPD from 2001 to 2019.

106.    Officer McCammitt is certified in Weapons, MPO, PA Municipal Police officer training, AIDS Training, Driver Training all phases, HazMat First Responder, Bio-chem

HazMat, Suicide Prevention, Riot Tactics, MACE training, Close combat, Narcotic Enforcement/Intervention, NCIC/PCIC Training, Mental Health Intervention, MDT(computer), Baton Training, Advance EVOC Training, Home Land Security Training, Open Carry Training and First Aid, CPR, and 6/28/19 Professionalism/Social Media Training. He also has had training in crowd control, traffic control, riot control, protest control special security for RNC, DNC and Papal visit, dignitary security, parade control.

107.    Officer McCammitt is a highly decorated officer, and over the course of his thirty-three (33) year career he has received several awards and honors for his service to the community.

108.    In 1989 and 1992 he received the Medal of Merit for his service. He received a Commendatory Citation in 1994 for his service. In 1996 he received the Medal of Heroism for entering a burning apartment building and evacuating the residents to safety until the fire department arrived. Officer McCammitt received the Official Citation for his work in 2000 during the Republican National Convention. He was awarded the Special Event Medal in 2015 for Pope Francis' visit to Philadelphia and in 2016 for the Democratic National Convention in Philadelphia. He also received an award for Honorable Service in 2016.

109.    During Officer McCammitt's off duty time he maintained a personal Facebook account.

110.    Following the release of the Buzzfeed article on June 1, 2019, and following the Mayor and Commissioner's press conference, Officer McCammitt was ordered to report to the Internal Affairs Bureau (IAB) for an interview. During the interview he was questioned regarding his personal Facebook account.

111.     On June 18, 2019, his regularly scheduled day off, Officer McCammitt was called into his Captain's office where he was informed that he was being placed on restricted duty.  He was instructed to turn in his service weapon and was stripped of all his police powers.

112.     On June 26, 2019, he was then ordered by his Captain's office to attend a mandatory training on June 28, 2019, for Social Media and Professionalism at 8:00 a.m. at the police training center.

113.     Officer McCammitt reminded his Captain that the next day, June 27, 2019, he was scheduled to have urgently needed surgery to remove a large infected cyst on his back.

114.     Despite his need to undergo surgery, Officer McCammitt was advised that this training was mandatory and that if he did not attend he would remain on restricted duty indefinitely.

115.     On June 28, 2019, Officer McCammitt did as ordered and attended the training.

116.     Officer McCammitt's annually scheduled vacation was June 30, 2019 - July 20, 2019.

117.     While in Washington D.C. vacationing with his family, Officer McCammitt received a phone call on the morning of July 17, 2019, from Lt. Lark instructing him to report to IAB on July 19, 2019. He was ordered to report with all of his equipment, and that he was being suspended for thirty days, with intent to be terminated, because of his Facebook posts. (True and correct copies of these posts are assembled in the Plaintiffs' Appendix to Complaint at pp. 45-64 and are incorporated herein by reference.)

118.     Officer McCammitt immediately left Washington D.C., cutting his family vacation short, and headed home to Philadelphia.

119.     On July 19, 2019, Officer McCammitt returned to IAB, turned in his badge, identification and his equipment.

120.     On the "Statement of Charges Filed and Action Taken", on July 19, 2019 the two

bases for the City's disciplinary action were violation of:

> **Article I- Conduct Unbecoming – Section 1-§021-10:** Any incident, conduct, or course of conduct which indicates that an employee has little or no regard for his/her responsibility as a member of the Police Department.

> **Article V- Neglect of Duty – Section 5-§011-10:** Failure to comply with any Police Commissioner's orders, directives, memorandums, or regulations; or any oral or written orders of superiors.

121.     For the charge of Conduct Unbecoming the Specification given by the City was:

> **ARTICLE I**          **: Conduct Unbecoming**

> **SECTION 1-§021-10: Any incident, conduct, or course of conduct which indicates that an employee has little or no regard for his/her responsibility as a member of the Police Department.**

> **SPECIFICATION** : Internal Affairs initiated an internal investigation, IAD#19-1077.327, after receiving information alleging that employees of the Philadelphia Police Department were posting offensive and inappropriate materials and/or comments to social media,

> specifically on the Facebook social media site. An analysis was conducted of Facebook posts and/or comments collected in the Plainview Project database. The analysis displayed a course of conduct, where no fewer than ten (10) times, you posted, shared, and/or commented on video, photographs/pictures, and articles, using racial slurs, profanity, dehumanizing, defamatory, and/or discriminatory language, and/or language that condoned, glorified, or encouraged violence, and/or language that was insensitive and mocked individuals, due process, and the criminal justice system. As a member of the Philadelphia Police Department, you are expected to strive to maintain public trust and confidence, not only in your professional capacity but also in your personal and on-line activities. Your posts and comments in question are devoid of any professional expectations and standards.

122.     For the charge of Neglect of Duty the Specification given by the City was:

**ARTICLE V**　　　　**: Neglect of Duty**

**SECTION 5-§011-10: Failure to comply with any Police Commissioner's orders, directives, memorandums, or regulations; or any oral or written orders of superiors.**

**SPECIFICATION**   : Internal Affairs investigation #19-1077.327 determined that you posted material, statements, or comments on Facebook that are in direct violation of Directive 6.10, Social Media and Networking.  An analysis of Facebook posts and/or comments collected in the Plainview Project database was conducted.  Results indicated that you posted, shared, and/or commented on video, photographs/pictures, and articles, using racial slurs, profanity; dehumanizing, defamatory, and/or discriminatory language; and/or language that condoned, glorified, or encouraged violence; and/or language that was insensitive and mocked individuals, due process, and the criminal justice system.  In many instances, these posts and comments were directed at the same persons whom you have been sworn to serve.  Directive 6.10 specifically states that while engaging in social media, "Employees are prohibited from using ethnic slurs, profanity, personal insults; material that is harassing, defamatory, fraudulent, or discriminatory, or other content or communications that would not be acceptable in a City workplace under City or agency policy or practice."  The Directive further states that "each member must strive to maintain public trust and confidence, not only in his or her professional capacity, but also in his or her personal and on-line activities.  Moreover, as police personnel are necessarily held to a higher standard than general members of the public, the on-line activities of employees of the police department shall reflect such professional expectations and standards."

123.     The Philadelphia Police Department's Directive 6.10, Social Media and Networking, effective on May, 26, 2011, states:

**4. Policy**

G. Employees who are off-duty, and using privately-owned property to engage in the personal use of social media, do not represent the City of Philadelphia, the Philadelphia Police Department, or any official position maintained by either entity. Under such conditions, employees represent only themselves and their personal interests.

124.     As a result of the adverse actions taken against him by the City, and in consultation with the F.O.P., Officer McCammitt decided that his only option was to resign as a police officer and take an early retirement.

125.     On July 23, 2019, Officer McCammitt went to the PAB and requested early retirement, under duress and in order to prevent a lapse in medical coverage for he and his family.

126.     Despite this request, the City has labeled Officer McCammitt as "resigned" in his personnel file as opposed to "retired". By doing this, the City has intentionally and deliberately impeded his ability to apply or obtain another position in law enforcement.

127.     Each of the comments posted by Officer McCammitt which formed the basis for his termination were statements made in his personal capacity as a private citizen, and addressed matters of political, social or other concern to the community.

128.     Each of the comments posted by Officer McCammitt which formed the basis of the City's adverse employment actions, involved matters of public concern.

129.     The Defendant's negative employment action against Officer McCammitt was motivated in substantial part by the Plaintiff's speech activity.

130.     The Plaintiff's private speech in the form of comments on social media did not cause any disruption within the Department; nor did it negatively impact the ability of the City to maintain discipline and relationships in the workplace.

**Plaintiff Tanya Grandizo**

131.     Officer Tanya Grandizo was employed with the City as a commissioned police officer starting in 1995.

132.     She served in the 18th District from 1995 until 2005.

133.     In 2005, she transferred to the 15th District, and worked there until she was promoted to the rank of Corporal in 2009.

134.     From 2009 until 2019, she was assigned to the 17th District.

135.     In 2012, while in the 17th District, she was assigned to the Training Bureau in the Driver Training Unit – Accident Reduction Unit. She is a Certified Advanced Emergency Vehicle Operations Course Instructor, a Certified Firearms Instructor, as well as a General Course Instructor.

136.   On October 18, 2019 Corporal Grandizo was transferred to the 14th District.

137.   Sometime in June of 2019, Corporal Grandizo was notified that she was under investigation for some questionable posts on Facebook and that she would be placed on restricted duty until the investigation was cleared.

138.   Once the investigation was concluded she was given her service weapon back and put on full duty.

139.   She was told by one of her supervisors, that there was still a possibility that she could receive a 30 – day suspension, and/or a transfer.

140.   Corporal Grandizo plead not guilty to the charges brought against her.

141.   On June 28, 2019, she was notified by the D.A.O. that she was placed on the Police Misconduct list.

142.   On July 18, 2019, she once again, had her service weapon returned and put back on full duty.

143.   Then in March of 2020, she received a 30 – day suspension.

144.   She was denied a hearing by the then Acting Commissioner Christine Coulter and given a Commissioners Direct Action.

145.   All of these disciplinary actions were imposed solely in retaliation for her personal Facebook posts on issues of inherent public concern.  (True and correct copies of Corporal Grandizo's Facebook posts which formed the basis of the City's disciplinary actions are contained in Plaintiffs' Appendix of Exhibits to the Complaint at pp 65 to 73 and are incorporated herein by reference.)  As a consequence of the City's adverse actions against her, Corporal Grandizo has suffered emotional injury, including feelings of hopelessness, embarrassment and humiliation as well as anxiety and depression.

**Plaintiff Anthony Anzideo**

146.    Detective Anthony Anzideo was employed by the City as a commissioned police officer on February 12, 2007.

147.    He was initially assigned to the 3rd District of the South Division from September 2007- November 2007. From November 2007 - November 2018 he was assigned to the 17th District of the South Division.

148.    From November 2018 until the present, Det. Anzideo has been a member of the South Detective Division.

149.    Most recently he was also assigned to the 17th District's 5 Squad Tactical Team, and the South Division's Gang Task Force overseen by the District Attorney's Office.

150.    He is certified and trained in the following skills: Long Gun/Shotgun certified; First Aid/CPR trained; NETS (Narcotics) trained; Crime Scene trained; Crisis Intervention Team trained; Vehicle Identification Number trained; and Detective Promotional trained.

151.    Det. Anzideo is a highly decorated officer and detective, and during his thirteen year career he has received 13 awards and honors.

152.    He has been awarded the following honors: Sharpshooter Marksman Award; Medal of Merit in January 2010, March 2012 and April 2013; Commendatory Citation in April 2011; Special Event Medal in 2015 and 2016; Perfect Attendance Award in 2008 and 2016; and Officer of the Month in April 2008, February 2010, April 2013 and March 2014.

153.    During Det. Anzideo's off duty time he maintained a personal Facebook account which he started in 2004 while in college.

154.     Following the release of the Buzzfeed article on June 1, 2019, he received a link to the Plain View Project from a friend on Facebook.  On the site he observed multiple posts

which included his name, and information regarding his rank, badge number, salary and how long he had been employed by the Defendant.

155.    The Buzzfeed article mischaracterized Det. Anzideo's posts completely out of context.

156.    On approximately June 7, 2019, between 7:00 a.m. and 8:00 a.m., Det. Anzideo received a phone call his superior, Lt. Biello.  Lt. Biello informed Det. Anzideo that he was sorry for having to make the call, expressing his anger and dissatisfaction for calling him, but that he was required to do it.  Lt. Biello said that he was instructed by Internal Affairs to place Det. Anzideo on restricted duty and take his service firearm.

157.    On approximately June 12, 2019, Det. Anzideo was called into Sergeant Greer's office and was instructed to report for an appointment with the Employee Assistance Program (E.A.P.) where he would be allowed to speak confidentially about his situation.

158.    Det. Anzideo had a spotless record as an officer and detective for thirteen years.

159.    While on restricted duty Det. Anzideo was tasked with working the front desk, answering the phones, assigning investigations, and other police tasks to his fellow officers.

160.    On June 13, 2019, he appeared for his Internal Affairs interview as part of the investigation accompanied by an attorney from F.O.P.  There he was interviewed by Lt. Mella with Internal Affairs, and shown for the first time his allegedly offensive Facebook posts dating back to 2010-2016. He was asked to initial each page, to acknowledge that he was shown the posts. Lt. Mella told Det. Anzideo that his "posts are not bad at all". There were 38 allegedly offensive Facebook posts made my Det. Anzideo on the Plainview Project. (True and correct copies of Detective Anzideo's Facebook posts which formed the basis of the City's disciplinary actions are contained in Plaintiffs' Appendix of Exhibits to the Complaint at pp. 74 to 77 and are incorporated herein by reference.)

161.     On June 28, 2019, Det. Anzideo attended a required mandatory training for the 72 officers who had been placed on restricted duty or suspended. The two training classes were titled "Professionalism Training" and "Social Media Guidance". Both classes were mainly geared toward Facebook and issues which may arise from posting on social media sites.

162.     On July 19, 2019, Det. Anzideo was notified that he was being placed back on full duty and he would be given his weapon back.

163.     On July 22, 2019, Det. Anzideo received his first set of "75-18s", disciplinary reports, as a result of the investigation into his Facebook activity.

164.     On the "Statement of Charges Filed and Action Taken", the bases for the City's disciplinary action against him were violation of:

> **Article V- Neglect of Duty – Section 5-§011-10:** Failure to comply with any Police Commissioner's orders, directives, memorandums, or regulations; or any oral or written orders of superiors.

165.     Captain Robert Zaffino informed Det. Anzideo that he was facing up to a five day suspension. In addition, he would not be able to utilize his vacation pay in lieu of receiving no pay. Capt. Zaffino also told Det. Anzideo that if it were up to him, he would receive a simple reprimand; however, the upper echelon of the department would not allow a more lenient punishment.

166.     Capt. Zaffino also explained that the department took each of his posts and graded them on a scale of one to four, with four being the "worst". The Captain explained that some of Det. Anzideo's posts were given "3's" and "4's". And there were a total of four or five posts with which the department took issue out of the thirty-eight posts reviewed.

167.    At the conclusion of this meeting Det. Anzideo signed a not guilty form and requested a Police Board of Inquiry (PBI) hearing. He explained to Capt. Zaffino that he felt he had done nothing wrong, and the Captain agreed with him.

168.    Several months later on January 31, 2020, Det. Anzideo was called into Captain Kearney's office, and was given a second set round of 75-18's. The documents recommended a suspension up to five days, without the possibility of utilizing vacation days in lieu of receiving no pay.

169.    Contained in the 2020 set of 75-18's, the documents specified the Facebook posts the City found offensive.  (True and correct copies of these posts are assembled in the Plaintiffs' Appendix to Complaint at pp 74 to 77 and are incorporated herein by reference.)

170.    Det. Anzideo signed a statement of "not guilty" and requested a PBI hearing.

171.    As a result of the Plain View Project and the City's retaliatory actions, Det. Anzideo deactivated his Facebook page he had maintained since 2004.

172.    In total, Det. Anzideo remained on restricted duty for approximately sixty (60) days. During this time he forfeited numerous hours of investigative overtime, and reimbursable overtime, and opportunities to work at public events such as the Philadelphia Phillies games.

173.    Det. Anzideo was also not allowed to carry a firearm while off duty, leaving him unable to protect himself or his family.

174.    Each of the comments posted by Det. Anzideo which formed the basis for his termination were statements made in his personal capacity as a private citizen, and addressed matters of political, social or other concern to the community.

175.    Each of the comments posted by Det. Anzideo which formed the basis of the City's adverse employment actions, involved matters of public concern.

-28-

176.     The Defendant's negative employment action against Det. Anzideo was motivated in substantial part by the Plaintiff's speech activity.

177.     The Plaintiff's private speech in the form of comments on social media did not cause any disruption within the Department; nor did it negatively impact the ability of the City to maintain discipline and relationships in the workplace.

178.     As a consequence of the City's adverse actions against him, Det. Anzideo has suffered emotional injury, including feelings of hopelessness, embarrassment and humiliation as well as anxiety and depression for which he has received, and continues to receive, medical and psychiatric treatment.  He also has suffered pecuniary and economic loss for which he is entitled to compensatory damages.

179.     The adverse actions taken against Det. Anzideo were in retaliation for his exercise of free speech as a citizen on issues of inherent public concern.

### Plaintiff Anthony Acquaviva

180.     Anthony Acquaviva was employed by City as a commissioned police officer in 1990.

181.     He was initially assigned to the 39th District of the Northwest Division from 1991-1995. In 1995, while in the 39th District of the Northwest Division, he was assigned to the graffiti squad. The graffiti squad was a specific group that worked to prevent and apprehend individuals who "tagged" or spray painted graffiti near Gratz High School. In 2003, Officer Acquaviva was assigned to the 2nd District of the Northeast Division 5 Squad, a special unit utilized by the Department.

182.     Throughout his tenure on the police department he has consistently received positive feedback on  Performance Reports.  He also received numerous letters of gratitude from

the public, including one from President Judge Frank Little, and one from the District Attorney's Office of Chester County.

183.     Officer Acquaviva is a highly decorated officer, during his thirty-year (33) career he received many awards and honors.

184.     Specifically, he received Commendatory Citations in 1992, 2000, three times in 2001, and in 2009 for his service. He received Officer of the Month in April of 2007 from the City Council, 2nd Police District and the 2nd Senatorial District, and again in November 2009 from the House of Representatives and the 2nd Police District. Officer Acquaviva received the Special Event Medal in 2000 for the Republican National Convention in Philadelphia, in 2015 for Pope Francis' visit to Philadelphia and in 2016 for the Democratic National Convention. Officer Acquaviva received a Certificate of Honorable Service in 2015. He received the honor of Police Officer of the Year in 2003 from the Steuben Lodge Knights of Pythias. He also received certificates of recognition from the Commonwealth of Pennsylvania and the American Missionary Fellowship for his outstanding service.

185.     During Officer Acquaviva's off duty time he maintained a personal a Facebook account.

186.     The June 1, 2019, Buzzfeed article specifically listed (17) Facebook postings made by Officer Acquaviva, and taken from the Plain View Project database. (True and correct copies of these posts are assembled in the Plaintiffs' Appendix to Complaint at pp 78 to 93 and are incorporated herein by reference.)

187.     On June 5, 2019, Officer Acquaviva was informed by his supervisor, Lieutenant Rutizer that the Department had decided to remove him from his normal duties and had to surrender his service weapon as well. Lt. Rutizer also told him to report the following morning,

June 6, 2019, to the DIVIC (Delaware Valley Intelligence Center). Officer Acquaviva was never specifically told why these actions were being taken against him.

188.    He was assigned to work at DVIC, as a security guard. DVIC is the agency of the police department that monitors the City's camera system and looks for criminal activity.

189.    On June 6, 2019, Officer Acquaviva learned that the reason for his assignment to DVIC, was because of his Facebook posts listed by the Plain View Project and discussed by Buzzfeed.

190.    On June 27, 2019, Officer Acquaviva's commanding officer, Captain Matthew Deacon told him that he had to sign what is known as a "Giglio Letter" from the District Attorney, which effectively barred Officer Acquaviva from ever testifying in court in the City of Philadelphia.

191.    The following day on June 27, 2019, Officer Acquaviva was ordered to report to the Police Academy to attend a Professionalism Training Course, given by Officer Sequitta Adams. He was told that this class was a requirement in order to return to work and have his service weapon returned.

192.    On or about July 17, 2019, Officer Acquaviva received a phone call from Capt. Deacon informing him that he was being terminated and to report to the Internal Affairs Unit, (I.A.U.) on July 19, 2019, at 9:00 a.m.

193.    Officer Acquaviva was compelled to retire in order to preserve medical insurance for his family, and more specifically for his 31 year old daughter, Christina, who suffered a brain hemorrhage at the age of two weeks old, never recovered and is bed ridden.

194.    On July 19, 2019, instead of reporting to I.A.U. Officer Acquaviva reported to the Police Administration Building (P.A.B.) to retire, or more accurately, accept his constructive discharge from the department.

195.    Officer Acquaviva never received any termination papers or charging papers.

196.    Following his constructive discharge, Officer Acquaviva obtained employment with Thomas Jefferson University Hospital as a security officer, taking a drastic cut in pay, and making approximately one-third to one-half of what he had been earning as a 30-year veteran of the police department. He was scheduled to commence his new employment on December 16, 2019; however, on December 18, 2019, after losing approximately eighty (80) pounds from the stress, he was admitted into the hospital for two weeks. During his hospitalization, he underwent five operations to deal with the diagnosis of Fournier's Gangrene, which is a rapidly progressing, tissue-destroying infection; and is a medical emergency that can be fatal without immediate treatment.

197.    As a consequence of the City's adverse actions against him, Officer Acquaviva has suffered, and continues to suffer emotional injuries, including feelings of hopelessness, embarrassment and humiliation as well as anxiety and depression for which he has received, and continues to receive, medical and psychiatric treatment.  He also has suffered pecuniary and economic loss for which he is entitled to compensatory damages.

**Plaintiff Kristine Amato**

198.     Officer Kristine Amato began employment with the City as a commissioned police officer in 1990.

199.    She was initially assigned to the City Center District from 1990 - 1993. From 1993-2007, she was assigned to the 9th District. In 2001-2011, where she worked in the Evidence Custodial Unit.

200.    In 2014, she was assigned back to the 9th District.

201.    Officer Amato is a highly decorated officer, during her thirty-year (30) career she has received multiple merit Awards.

202.     During Officer Amato's off duty time she maintained a personal Facebook account under the name of "Yo Stuff". Nowhere on her personal Facebook webpage or her biographical hyperlink did Officer Amato identify herself as an employee of the City of Philadelphia or as a police officer.

203.      On or about June 5, 2019, following the Buzzfeed article published on June 1, 2019, Officer Amato received a voicemail at approximately 7:00 p.m. ordering her to immediately return to work and meet with her superior, Captain Vales, where she would be surrendering her service weapon, and be assigned to desk duty pending further notice.

204.     When Officer Amato turned in her service weapon on June 5th, she had to sign a statement acknowledging that she was not allowed to carry any weapon while off duty.

205.     Officer Amato was assigned to desk duty for approximately 53 days, resulting in a loss of overtime wages and other opportunities to earn compensation.

206.     In mid-June of 2019, she was ordered to report to Internal Affairs to discuss her Facebook posts. During this interview, she was shown approximately twelve to fourteen posts that were found to be offensive by the Plainview Project. She was instructed to initial each post acknowledging that they were hers.  (True and correct copies of these posts are assembled in the Plaintiffs' Appendix to Complaint at pp 94 to 106 and are incorporated herein by reference.)

207.     On June 28, 2019, Officer Amato attended mandatory training regarding the department's Social Media Policy.

208.     By the end of the summer in 2019, she was given her service weapon back and placed on active duty. At that point she assumed that the investigation had been concluded.

209.     In early Fall of 2019, she was given a "75-18", or notice for Disciplinary Action. This time, the punishment for allegedly violating the Social Media Policy, was a thirty 30-day suspension to dismissal with the option to either plead guilty or request a PBI hearing.

210.     Officer Amato pleaded not guilty and requested a PBI hearing.

211.     While waiting for her PBI hearing, she was informed that she was going to be disciplined anyway, and given a thirty day suspension without pay. This summary action was taken by Commissioners Direct Action, and she was denied any right or opportunity for a hearing.

212.     Officer Amato served her thirty day suspension from February 19, 2020 through March 18, 2020.

213.     Prior to serving her thirty day suspension, Officer Amato was also informed that the she would not be allowed to her usual Monday through Friday assignment that she had held for two and half years.

214.     Each of the comments posted by Officer Amato which formed the basis for her termination were statements made in his personal capacity as a private citizen, and addressed matters of political, social or other concern to the community.

215.     The content, form and context of each of the comments posted by Officer Amato which formed the basis of the City's adverse employment actions, involved matters of public concern.

216.     The Defendant's negative employment action against Officer Amato was motivated in substantial part by the Plaintiff's speech activity.

217.     The Plaintiff's private speech in the form of comments on social media did not cause any disruption within the Department; nor did it negatively impact the ability of the City to maintain discipline and relationships in the workplace.

218.     As a consequence of the City's adverse actions against him, Officer Amato has felt feelings of hopelessness, embarrassment and humiliation as well as anxiety and depression for

which he has received, and continues to receive, medical and psychiatric treatment.  She also has

suffered pecuniary and economic loss for which she is entitled compensatory damages.

219.     The adverse actions taken against Officer Amato were in retaliation for her exercise

of free speech as a citizen on issues of inherent public concern.

### Plaintiff Joseph Przepiorka

220**.**      Joseph Przepiorka was employed by City as a commissioned police officer in 1989.

221.     Sgt. Przepiorka was initially assigned after the Police Academy to the 9th District

of the Central Division in 1989. He then worked a patrol wagon for seven (7) years from 1990

to 1997. In 1998 he was assigned to the homeless unit, working with issues surrounding the city's

homeless. In March of 2002, he was promoted to Sergeant and assigned to the 2nd District in the

Northeast Division. Until his forced retirement, Sgt. Przepiorka supervised hundreds of officers

for seventeen years.

222.     Sgt. Przepiorka is a highly decorated officer, during his thirty (30) year career he

received numerous awards and honors.

223.     In 2002, Officer Przepiorka was promoted to Sergeant. He received Commendatory

Citations in 2006 and twice in 2007 for his service. Sgt. Przepiorka received the Medal of Merit

for his work in 1991. The Special Event Medal in 2015 for Pope Francis' visit to Philadelphia

and in 2000 for the Republican National Convention in Philadelphia. He received a Certificate

of Appreciation in 1996. He was given a Commendatory Letter in 1998, and an Official

Commendation in 2003.

224.     Sgt. Przepiorka has received training from: FEMA at the National Fire Academy in

September 2011; New Mexico Tech for Prevention and Response to Suicide Bombing Incidents

in February 2009; LoJack for Stolen Vehicle Police Recovery System; the Authority completing

training for Identifying stolen, re-plated and cloned vehicles in March 2008; and FTAC for

Enhancing Officer and Community Safety: A Law Enforcement and Behavioral Health Partnership.

225.     During Sgt. Przepiorka's off duty time he maintained a personal a Facebook account.

226.     On June 4, 2019, Sgt. Przepiorka reported for duty at the Marine Unit for his 2:00 p.m. – 10:00 p.m. shift. At the beginning of his shift, he was advised that his Lieutenant wished to speak to him, and that he was being reassigned to the auto impound unit and his service weapon had to be surrendered. The Lieutenant only informed him that it had something to do with his Facebook posts, and that it came from the Commissioner's office.

227.     He was then instructed to go to the Employee Assistance Program and to speak confidentially with a counselor.

228.     Typically, when the department takes an officer's firearm and transfers them, it is for a serious infraction or criminal action. Sgt. Przepiorka could not believe this was happening over his Facebook posts.

229.     On June 5, 2019, he reported to the auto impound lot.

230.     Sgt. Przepiorka had planned an important family trip to Poland, from July 3, 2019 to July 22, 2019. The trip had been planned months in advance, and well before the City's reaction to the Plain View article.

231.     In the middle of his trip, Sgt. Przepiorka received a phone call from his brother, Captain John Przepiorka informing him that he was going to be fired due to his Facebook postings.

232.     Sgt. Przepiorka had a spotless record as an officer for more than thirty years. Every year his Performance Reports rated him as a valued asset to the police department.

233.    At the time, Sgt. Przepiorka was unaware of any investigation into his Facebook posts.

234.    Sgt. Przepiorka was never offered an opportunity to appeal the decision.

235.    There were 94 controversial Facebook postings made by Sgt. Przepiorka. (True and correct copies of these posts are assembled in the Plaintiffs' Appendix to Complaint at pp 107 to 207 and are incorporated herein by reference.)

236.    Immediately upon arriving home, Sgt. Przepiorka was instructed to report to Internal Affairs the following day and sign his thirty-day suspension with intent to dismiss.

237.    On July 25, 2019, Sgt. Przepiorka met with John McGrody from the F.O.P. and a lawyer to sign his termination paperwork. After discussing his options, Sgt. Przepiorka decided he had no choice but to retire in order to keep his benefits.

238.    On the "Statement of Charges Filed and Action Taken", signed by Sgt. Przepiorka on July 25, 2019 the two bases for the City's disciplinary action were violation of:

> **Article I- Conduct Unbecoming – Section 1-§021-10:** Any incident, conduct, or course of conduct which indicates that an employee has little or no regard for his/her responsibility as a member of the Police Department.

> **Article V- Neglect of Duty – Section 5-§011-10:** Failure to comply with any Police Commissioner's orders, directives, memorandums, or regulations; or any oral or written orders of superiors.

239.    For the charge of Conduct Unbecoming the Specification given by the City was:

> Internal Affairs initiated an internal investigation, IAD#19-1077.44, after receiving information alleging that employees of the Philadelphia Police Department were posting offensive and inappropriate materials and/or comments to social media, specifically on the Facebook social media site. An analysis was conducted of Facebook posts and/or comments collected in the Plainview Project database. The analysis displayed a course of conduct, where no fewer than forty-one (41) times, you posted, shared, and/or commented on video, photographs/pictures, and articles, using racial slurs, profanity, dehumanizing, defamatory, and/or discriminatory language, and/or language that condoned, glorified, or encouraged violence, and/or language that was insensitive and mocked individuals, due process, and the criminal justice system. As a member of the Philadelphia Police Department, you are expected to strive to maintain public trust and confidence, not only in your professional capacity but also in your personal and on-line activities. Your posts and comments in question are devoid of any professional expectations and standards.

240.    For the charge of Neglect of Duty the Specification given by the City was:

> Internal Affairs investigation #19-1077.44 determined that you posted material, statements, or comments on Facebook that are in direct violation of Directive 6.10, Social Media and Networking. An analysis of Facebook posts and/or comments collected in the Plainview Project database was conducted. Results indicated that you posted, shared, and/or commented on video, photographs/pictures, and articles, using racial slurs, profanity; dehumanizing, defamatory, and/or discriminatory language; and/or language that condoned, glorified, or encouraged violence; and/or language that was insensitive and mocked individuals, due process, and the criminal justice system. In many instances, these posts and comments were directed at the same persons whom you have been sworn to serve. Directive 6.10 specifically states that while engaging in social media, "Employees are prohibited from using ethnic slurs, profanity, personal insults; material that is harassing, defamatory, fraudulent, or discriminatory, or other content or communications that would not be acceptable in a City workplace under City or agency policy or practice." The Directive further states that "each member must strive to maintain public trust and confidence, not only in his or her professional capacity, but also in his or her personal and on-line activities. Moreover, as police personnel are necessarily held to a higher standard than general members of the public, the on-line activities of employees of the police department shall reflect such professional expectations and standards."

241.    On August 6, 2019, Sgt. Przepiorka reported to the Police Administration building and retired.

242.    Sgt. Przepiorka had planned on working an additional ten to fourteen years before retiring.

243.    In addition, at the time he retired, Sgt. Przepiorka was owed approximately $30,000.00 from his deferred compensation for his vacation and sick pay balance. The City took nine months to pay his deferred compensation. When Sgt. Przepiorka finally received his check, he only received $3,758.07.

244.    Each of the comments posted by Sgt. Przepiorka which formed the basis for his termination were statements made in his personal capacity as a private citizen, and addressed matters of political, social or other concern to the community.

245.    The content, form and context of each of the comments posted by Sgt. Przepiorka which formed the basis of the City's adverse employment actions, involved matters of public concern.

246.    The Defendant's negative employment action against Sgt. Przepiorka was motivated in substantial part by the Plaintiff's speech activity.

247.    The Plaintiff's private speech in the form of comments on social media did not cause any disruption within the Department; nor did it negatively impact the ability of the City to maintain discipline and relationships in the workplace.

248.    As a consequence of the City's adverse actions against him, Sgt. Przepiorka has suffered, and continues to suffer emotional injuries, including feelings of hopelessness, embarrassment and humiliation as well as anxiety and depression for which he has received, and continues to receive, medical and psychiatric treatment.  He also has suffered pecuniary and economic loss for which he is entitled to compensatory damages.

249.    The adverse actions taken against Sgt. Przepiorka were in retaliation for his exercise of free speech as a citizen on issues of inherent public concern.

**VI.**

**Causes of Action**

**COUNT I**

**42 U.S.C. § 1983**
**Violation of First Amendment of United States Constitution**

250.    Plaintiffs incorporate by reference herein as fully as though set forth verbatim the allegations set forth in the preceding numbered paragraphs and does further allege as follows.

251.    The Defendant's decision to take the adversary actions described herein against the Plaintiffs was retaliatory in nature and based, in whole or in part, on their personal exercise of their protected free speech activity on matters of inherent public concern.

252.     The Defendant's actions, as set forth herein, served to deprive the Plaintiffs of, and to infringe upon, their protected rights of freedom of expression as guaranteed by the First Amendment of the United States Constitution.

253.    As a proximate result of the Defendant's actions, each of the Plaintiffs have suffered, and continue to suffer, economic and pecuniary damages in the form of loss of earnings and the destruction of their professional and personal reputation and career in law enforcement. In addition, the Plaintiffs have suffered mental anguish, humiliation, embarrassment and emotional injury for which each of them is entitled to an award of compensatory damages.

**COUNT II**

**Violation of Pennsylvania Constitution**
**Article I, Section 7**

254.    Plaintiffs incorporate by reference herein as fully as though set forth verbatim the allegations set forth in the preceding numbered paragraphs and does further allege as follows.

255.    Article I § 7 of the Constitution of the State of Pennsylvania provides as follows:

**Freedom of press and speech**

> The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government, and no law shall ever be made to restrain the right thereof. ***The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject***, being responsible for the abuse of that liberty. No conviction shall be had in any prosecution for the publication of papers relating to the official conduct of officers or men in public capacity, or to any other matter proper for public investigation or information, where the fact that such publication was not maliciously or negligently made shall be established to the satisfaction of the jury; and in all indictments for libels the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases.

Emphasis added.

256.     The Defendant's decision to take the adversary actions described herein against the Plaintiffs was retaliatory in nature and based, in whole or in part, on their personal exercise of their protected free speech activity on a matter of inherent public concern.

257.     The Defendant's actions, as set forth herein, served to deprive the Plaintiffs of, and to infringe upon, their protected rights of freedom of expression as guaranteed by the Constitution of the State of Pennsylvania.

258.     As a proximate result of the Defendant's actions, the Plaintiffs have suffered, and continue to suffer economic and pecuniary damages in the form of loss of earnings.  In addition, the Plaintiffs have suffered mental anguish, humiliation, embarrassment and emotional injury for which they are entitled to an award of compensatory damages.

### Request for Relief

#### *Declaratory Judgment*

1.     An actual controversy exists between the parties as to whether the Defendant's policies, practices and customs with regard to the restrictions placed its employee's free speech activity as

expressed on the employee's personal social media are enforced in an arbitrary manner and therefore violate the Plaintiffs' constitutional rights.  Plaintiffs respectfully request a declaratory judgment that the actions of the City of Philadelphia, Pennsylvania violated the federal and state constitutional rights of the Plaintiffs.

### *Nominal Damages*

2.    Plaintiffs seek an order awarding nominal damages for the Defendant's violation of their federal and state constitutional rights.

### *Compensatory Damages*

3.    Plaintiffs each individually seek an order awarding compensatory damages to them for the Defendant's violation of their federal and state constitutional rights in the amount of $2,000,000.

### *Attorney's Fees and Costs*

4.    Plaintiffs seek an order awarding the costs of this cause, including attorney's fees, costs and expenses under 42 U.S.C. § 1988.

### *Jury Demand*

5.    Plaintiffs demand a jury of six to hear and try this case.

### *Other Relief*

6.    Plaintiffs additionally request such other relief as the Court deems just and proper.


Respectfully submitted,


 CRAIN LAW GROUP, PLLC

*/s Larry L. Crain*
Larry L. Crain
5214 Maryland Way, Suite 402
Brentwood, TN  37027
Tel.  615-376-2600

Fax. 615-345-6009
Larry@crainlaw.legal

*/s Emily A. Castro*
Emily A. Castro
5214 Maryland Way, Suite 402
Brentwood, TN  37027
Tel.  615-376-2600
Fax. 615-345-6009
Emily@crainlaw.legal

*/s/ Jonathan J. Sobel*
Jonathan J. Sobel
Law Offices of Jonathan J. Sobel
1500 Walnut Street, Suite 2000
Philadelphia, PA  19102
Tel. (215) 735-7535
Fax: (215) 269-2540
Email: mate89@aol.com

*Counsel for the Plaintiffs*