## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CHRISTIAN FENICO,** ) | |
| **THOMAS YOUNG, THOMAS GACK,** ) | |
| **EDWARD McCAMMITT, TANYA** ) | |
| **GRANDIZO, ANTHONY ANZIDEO,** ) | |
| **ANTHONY ACQUAVIVA, KRISTINE** ) | |
| **AMATO, JOSEPH PRZEPIORKA,** ) **Case No. _____** | |
| **WILLIAM BOWDREN, RAPHAEL** ) | |
| **McGOUGH, and FRANCIS T.** ) **JURY DEMAND** | |
| **SHERIDAN,** ) | |
| ) | |
| *Plaintiffs,* ) | |
| ) | |
| **-vs-** ) | |
| ) | |
| **CITY OF PHILADELPHIA,** ) | |
| | |
| *Defendant.* | |

## AMENDED COMPLAINT

The Plaintiffs hereby amend their complaint pursuant to Rule 15(a) Fed.R.Civ.P., and state as follows.

### Introduction

1.      On June 1, 2019, an entertainment web publisher called <u>Buzzfeed News</u>, a left-leaning agency that has been widely criticized by several journalistic sources as unreliable, released a story headlined: "Cops Across the U.S. Have Been Exposed Posting Racist and Violent Thinks On Facebook. Here's the Proof". The article was published in collaboration with Injustice Watch, a self-described "nonprofit newsroom focused on exposing institutional failures that obstruct justice and equality."  Injustice Watch and <u>Buzzfeed</u> relied, as their primary source for the article, on a database called the Plain View Project.

2.      The Plain View Project ("Plain View") was founded in 2016 by Emily Baker-White, a former Federal Community Defender staff attorney.  In 2017, Baker-White and a team of other

attorneys conducted a witch-hunt investigation into social media activity by police officers in eight major cities spanning several years.  Plain View's stated goal was to publicly expose any social media posts by law enforcement officers which it subjectively found offensive or hinted of any bias or racism.   Plain View pooled these social media posts into a database which they then made available on-line publicly exposing officers, inviting public scrutiny and disciplinary action by their authorities.

3.    Christian Fenico, Thomas Young, Thomas Gack, Edward McCammitt, Tanya Grandizo, Anthony Anzideo, Anthony Acquaviva, Kristine Amato, Joseph Przepiorka, William Bowdren, Raphael McGough, and Francis Sheridan ("Plaintiffs") are highly decorated officers who have served with distinction on the City of Philadelphia Police Department for many years. They are among the officers whose Facebook posts were selectively chosen by Plain View for inclusion in its database where they are falsely maligned and effectively branded as racists.  They have since been disciplined, suspended or terminated from the City of Philadelphia Police Department for exercising their free speech rights as guaranteed by the First Amendment and expressing their personal views on issues of inherent public interest.

4.    During the relevant time period of the events described herein, the City of Philadelphia Police Department had in force and effect a policy known as Directive 6.10, Social Media and Networking which provided as follows:

**Directive 6.10. Social Media and Networking**

 G.  Employees who are off-duty, and using privately-owned property to engage in the personal use of social media, do not represent the City of Philadelphia, the Philadelphia Police Department, or any official position maintained by either entity. Under such conditions, employees represent only themselves and their personal interests.

5.     As a further consequence of the City's actions against them the Plaintiffs have suffered and continue to suffer irreparable injury to their professional reputations and, for many, an end to their careers in law enforcement.  The Plaintiffs have been black-listed and placed on a "Giglio List or Brady List" which is a list compiled usually by a prosecutor's office or a police department containing the names and details of law enforcement officers who have had sustained incidents placing their credibility into question, thereby impairing their ability to be called as a witness in the prosecution of any arrests or criminal investigations conducted by them.

6.     The Plaintiffs bring this action against the City of Philadelphia pursuant to 42 U.S.C. § 1983 for redress of wrongs committed by the Defendant, and for compensation for injuries arising out of the Defendant's intentional deprivation of their constitutionally protected rights under the First and Fourteenth Amendments to the United States Constitution as well as its violation of their rights under corollary provisions of the Constitution of the State of Pennsylvania.  Specifically, the Plaintiffs sue the Defendant for its retaliation against them for the exercise of their freedom of political expression as private citizens, for their commentary on social media, and their response to comments posted on their personal and private Facebook pages about a current events of inherent public concern and nationwide interest.

7.     The Plaintiffs allege that the City of Philadelphia has adopted an arbitrary and double standard by selectively enforcing its policies against the Plaintiffs singling them out based on the political views expressed in their social media. Despite the fact that the City of Philadelphia Police Department's own internal policy Directive 8.6 states that "the entire disciplinary procedure and outcomes shall be consistent and fair," the severity of the penalties varied based on the viewpoints expressed by the Plaintiffs and other officers within their department, and constitutes arbitrary viewpoint discrimination.  The Defendant's arbitrary practice, custom, usage and policy have the effect of intentionally, and without a rational basis, treating the

Plaintiffs differently from others who are similarly situated and constitutes a violation of their rights as guaranteed under the United States Constitution as well as the Constitution of the State of Pennsylvania.   The Defendant's actions were committed under color of state law and constitute a pattern, practice, custom and usage which violate the Plaintiffs' constitutional rights.

8.     Plaintiffs allege that the adverse actions imposed on them by the City were calculated to deter a public employee of reasonable firmness from exercising their constitutionally protected right of freedom of expression.

9.     Plaintiffs seek declaratory relief, nominal damages, compensatory damages and reasonable attorney's fees and costs as permitted by 42 U.S.C.§ 1988.

## II.
## Jurisdiction and Venue

10.   Jurisdiction is vested in this Court to hear and decide all issues presented in this case pursuant to 28 U.S.C. § 1331, 1343 and 1367, this case being predicated on a federal question and the enforcement of certain federal constitutionally protected rights as guaranteed under the First and Fourteenth Amendments of the United States Constitution.

11.   The Court has the authority to grant declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

12.   Venue is proper in this Court under 28 U.S.C.§ 1491(b), as the Plaintiffs and the Defendant reside or are situated within this federal district and the Defendant's wrongful conduct took place within this federal district.

## III.
## Parties
### *Plaintiffs*

13.   Christian Fenico is an adult citizen and resident of the City of Feasterville, Pennsylvania.

14.   Thomas Young is an adult citizen and resident of the City of Philadelphia, Pennsylvania.

15.   Thomas Gack is an adult citizen and resident of the City of Philadelphia, Pennsylvania.

16.   Edward McCammitt is an adult citizen and resident of the City of Philadelphia, Pennsylvania.

17.   Tanya Grandizo is an adult citizen and resident of the City of Broomall, Pennsylvania.

18.   Anthony Anzideo is an adult citizen and resident of the City of Philadelphia, Pennsylvania.

19.   Anthony Acquaviva is an adult citizen and resident of the City of Philadelphia, Pennsylvania.

20.   Kristine Amato is an adult citizen and resident of the City of Philadelphia, Pennsylvania.

21.   Joseph Przepiorka is an adult citizen and resident of the City of Philadelphia, Pennsylvania.

22.   William Bowdren is an adult citizen and resident of the City of Philadelphia, Pennsylvania.

23.    Raphael McGough is an adult citizen and resident of the City of Philadelphia, Pennsylvania.

24.   Francis Sheridan is an adult citizen and resident of the City of Philadelphia, Pennsylvania.

*Defendant*

25.   The City of Philadelphia, Pennsylvania ("City") is a local body politic and municipality and exists under and by virtue of the laws of the State of Pennsylvania.

**IV.**
**Facts**

**Plaintiff Christian Fenico**

26.   Christian Fenico was employed by the City as a commissioned police officer in 2003.

27.   Officer Fenico was initially assigned to the 3rd District of the South Division from 2003 - 2008.  From 2008 – 2015, he was assigned to the 1st District of the South Division.

28.   From 2015 until his termination in 2019, Plaintiff Fenico was a member of the S.W.A.T. Unit.

29.   Officer Fenico is certified in Crisis Intervention, VIN trained, and Level B certified for hazmat/chemical entry. His skills and training include active shooter, suicide prevention, S.W.A.T. entry, raid and hostage rescue and many other S.W.A.T. skills.

30.   In addition, Officer Fenico is highly trained and certified in a multitude of firearms and non-lethal weapons.

31.   Officer Fenico is a highly decorated officer; during his seventeen-year career he received twenty-three awards and honors.

32.   In 2007, he received the ASIS International award for meritorious service to the Greater Philadelphia Area. He received one commendatory citation in 2003 and three in 2006 for his service. In 2003, he received the Expert Marksman Award. He was recognized by the Fraternal Order of Police for Outstanding Performance of Duties in 2006, 2007 and 2014. In 2015, he received the Medal of Lifesaving for saving a 6 year old little girl from a potentially fatal choking. He received the Medal of Merit for his work in 2006, 2011, 2012, 2013 and 2016. He was bestowed the Medal of Valor in 2006. He was Officer of the Month in April of 2005 and November of 2012. He received the Special Event Medal in 2015 for Pope Francis' visit to

Philadelphia, and in 2016 for the Democratic National Convention in Philadelphia. He also received the S.W.A.T. Pistol and Rifle Match Squad Champion in 2016, 2017 and 2018.

33.   During Officer Fenico's off duty time he utilized a Facebook account under the name of "Chris Joseph". Nowhere on his personal Facebook webpage or in his biographical hyperlink did he identify himself as an employee of the City of Philadelphia or as a police officer.

34.   On February 7, 2019, Officer Fenico received a post-marked letter from a group named "Injustice Watch". The letter stated that they, along with the *New York Times*, were investigating the use of Facebook by police officers, and Officer Fenico's name had come up during their investigation along with other officers. (A true and correct copy of this letter appears below).



35.   Upon receipt of this letter, Officer Fenico immediately contacted the Fraternal Order of Police and was advised not to respond this letter from Injustice Watch.

36.    Approximately one week later, Captain Sekou Kinebrew, the Commanding Officer of Media Relations called Officer Fenico. During that discussion Capt. Kinebrew advised that "Injustice Watch" was, in his words, a "cop hating, leftwing" group that "badmouthed cops". Capt. Kinebrew ordered Officer Fenico not speak with them.

37.    Following his conversation with Capt. Kinebrew, Officer Fenico received a notice instructing him to appear for an interview with Internal Affairs Bureau ("IAB") regarding "Injustice Watch".

38.    Officer Fenico and FOP attorney Tim Strange attended the IAB interview with Sergeant Joann Garvey. Sgt. Garvey reiterated that Injustice Watch appeared to be on a "witch hunt" and "fishing expedition" as an "anti-cop" group. They discussed in general what Officer Fenico posted on Facebook over the years; however, none of Plaintiff's Facebook postings or comments were viewed during this discussion.

39.    During the meeting, Sgt. Garvey produced a printed, text version of several comments from Facebook posts.   She had Officer Fenico read them aloud, but he could not recall any of these comments, or the context surrounding the posts.

40.    On June 1, 2019, Buzzfeed released a story entitled "Cops Across the U.S. Have Been Exposed Posting Racist and Violent Things on Facebook. Here's the Proof". The one-sided story specifically mentioned Officer Fenico and several other officers, by name, and boasted that these officers had been "exposed".

41.    The Buzzfeed article portrayed Officer Fenico's posts completely out of context.

42.    Upon information and belief, on June 6, 2019, the Commanders within the City of Philadelphia Police Department held a meeting regarding the Buzzfeed article. During that meeting First Deputy Commissioner Myron Patterson, stated that Injustice Watch was going after what he termed "right wing posts". When another commander asked about left wing posts,

Patterson replied: "I'm not worried about left wing posts, just the right wing. And God help you if I see any pro-life posts."

43.   After the Commanders meeting, Officer Fenico received a phone call from Captain John Przepiorka instructing him to surrender his firearm, and placing him on restrictive duty, pending an investigation by the IAB.

44.   A total of 72 officers within the Department were forced to surrender their service weapons and placed under investigation based on the misinformation published in the Buzzfeed article.

45.   In approximately June of 2019, while on restricted duty, Officer Fenico was instructed to attend an Employee Assistance Program (E.A.P.).

46.   Following the E.A.P., Officer Fenico was instructed to attend mandatory training at the Police Academy. This training covered social media directives, including, *inter alia*, First Amendment rights of police officers, domestic violence, police investigations, and various other topics.

47.   Officer Fenico also received a second notice to report to IAB Sgt. Garvey.

48.   During this second meeting, Sgt. Garvey showed Officer Fenico his actual eight posts from 2012-2015, that were deemed troublesome. This was the first time Officer Fenico was shown the allegedly offensive postings.  (True and correct copies of these posts are assembled in the Plaintiffs' Appendix to Complaint at pp 3 to 7 and are incorporated herein by reference.)

49.   On July 17, 2019 Officer Fenico was called into his Captain's office and summarily terminated.

50.   On July 18, 2019, the Police Commissioner signed a Commissioner's Directive Action, accusing Officer Fenico of the following charges/recommendations:

| Article Section/Spec. | Penalty Range | Commanding Officer's Recommendation | Deputy Commissioner's Recommendation |
|---|---|---|---|
| 1-§021-10 | 30 Days Suspension or Dismissal | | Dismissal |
| 5-§011-10 | Reprimand to 5 Days Suspension | | Dismissal |
| | | | |

51.

52.  Prior to being fired, Officer Fenico had been reassured by his supervisors, "your posts weren't bad", "you only have a few posts", "you didn't say anything racist"; and assured him that he did not have anything to worry about.

53.  Officer Fenico had a near spotless record as an officer for seventeen years and had only received one counseling memo, which is not considered within the Department to be a form of punishment or discipline.

54.  On July 19, 2019, Officer Fenico returned to IAB, turned in his badge, identification and signed his termination papers.

55.  On the "Statement of Charges Filed and Action Taken" signed by Officer Fenico on July 19, 2019, the two bases for the City's disciplinary action were violation of:

56.  **Article I- Conduct Unbecoming – Section 1-§021-10:** Any incident, conduct,                                                                                                    or course of conduct which indicates that an employee has little or no regard for his/her responsibility as a member of the Police Department.

57.  **Article V- Neglect of Duty – Section 5-§011-10:** Failure to comply with any Police Commissioner's orders, directives, memorandums, or regulations; or any oral or written orders of superiors.

58.  For the charge of Conduct Unbecoming the Specification given by the City was:

Internal Affairs initiated an internal investigation, IAD#19-1515, after receiving
information alleging that employees of the Philadelphia Police Department were
posting offensive and inappropriate materials and/or comments to social media,
specifically on the Facebook social media site.  As part of the investigation, an
analysis was conducted of Facebook posts and/or comments collected in the
Plainview Project database.  The analysis displayed a course of conduct, where no
fewer than four (4) times, you posted, shared, and/or commented on video,
photographs/pictures, and articles, using racial slurs, profanity, dehumanizing,
defamatory, and/or discriminatory language, and/or language that condoned, glorified,
or encouraged violence, and/or language that was insensitive and mocked individuals
due process, and the criminal justice system.  In addition, on April 4, 2013, you were
formally counseled on an inappropriate post made on a social media site.  As a
member of the Philadelphia Police Department, you are expected to strive to maintain
public trust and confidence, not only in your professional capacity but also in your
personal and on-line activities. Your posts and comments in question are devoid of
any professional expectations and standards.

59.   For the charge of Neglect of Duty the Specification given by the City was:

Internal Affairs investigation #19-1515 determined that you posted material,
statements, or comments to on Facebook that are in direct violation of Directive 6.10,
Social Media and Networking.  An analysis of Facebook posts and/or comments
collected in the Plainview Project database was conducted during this investigation.
Results indicated that you posted, shared, and/or commented on video,
photographs/pictures, and articles, using racial slurs, profanity; dehumanizing,
defamatory, and/or discriminatory language; and/or language that condoned, glorified,
or encouraged violence; and/or language that was insensitive and mocked individuals,
due process, and the criminal justice system.  In many instances, these posts and
comments were directed at the same persons whom you have been swom to serve.
Directive 6.10 specifically states that while engaging in social media, "Employees are
prohibited from using ethnic slurs, profanity, personal insults; material that is
harassing, defamatory, fraudulent, or discriminatory, or other content or
communications that would not be acceptable in a City workplace under City or
agency policy or practice."  The Directive further states that "each member must strive
to maintain public trust and confidence, not only in his or her professional capacity, but
also in his or her personal and on-line activities.  Moreover, as police personnel are
necessarily held to a higher standard than general members of the public, the on-line
activities of employees of the police department shall reflect such professional
expectations and standards."

60.   The Philadelphia Police Department's Directive 6.10, Social Media and Networking,

effective on May, 26, 2011, states as follows:

**4. Policy**

G. Employees who are off-duty, and using privately-owned property to engage
in the personal use of social media, do not represent the City of Philadelphia, the
Philadelphia Police Department, or any official position maintained by either

entity. Under such conditions, employees represent only themselves and their personal interests.

61.    The "Non-Criminal GNIOTEK Warnings" and the "Notice of Suspension Internal Affairs Division Suspension Form" signed on July 19, 2019 by Officer Fenico stated: "the Police Commissioner has ordered that you be suspended for 30 days with intent to dismiss."

62.    On August 15, 2019, Officer Fenico received his Notice of Dismissal, stating as grounds for this disciplinary action, Conduct Unbecoming, Sections 1-021-10.

> You are hereby notified that effective _____ 8/15/19 _____, you are dismissed from your position with the City of Philadelphia as referred to above for the following reasons:
>
> **CONDUCT UNBECOMING, Section 1-§021-10:** (Any incident, conduct, or course of conduct which indicates that an employee has little or no regard for his/her responsibility as a member of the Police Department)

63.    As a result of the false accusations and labels given to Officer Fenico by the City claiming that he used "racial slurs" and "profanity", he has been unable to obtain unemployment benefits and is effectively barred from pursuing further employment in law enforcement.

64.    A simple Google search of Officer Fenico's name now lists him under a heading of "racist cop" headlines.

65.    As a further consequence of his termination, Officer Fenico has been unable to obtain health insurance for much needed healthcare to treat multiple injuries he suffered while a police officer, including: a broken right hand with plates and screws; four bulging disks in his lower back; a left shoulder with labral tears; and an umbilical hernia.

66.    As a consequence of the City's adverse actions against him, Officer Fenico has suffered and continues to suffer emotional injuries, including but not limited to, feelings of hopelessness, embarrassment and humiliation as well as anxiety and depression for which he has received, and

continues to receive, medical and psychiatric treatment.  In addition, he has incurred economic and pecuniary loss, forfeiture of benefits and lost earnings for which he is entitled to compensatory damages.

67.   Each of the comments posted by Officer Fenico which formed the basis for his termination were statements made in his personal capacity as a private citizen, and addressed matters of political, social or other concern to the community.

68.   The content, form and context of each of the comments posted by Officer Fenico which formed the basis of the City's adverse employment actions, involved matters of public concern.

69.   The Defendant's negative employment action against Officer Fenico was motivated in substantial part by the Plaintiff's speech activity.

70.   The Plaintiff's private speech in the form of comments on social media did not cause any disruption within the Department; nor did it negatively impact the ability of the City to maintain discipline and relationships in the workplace.

**Plaintiff Thomas Young**

71.   Corporal Thomas Young entered the Police Academy on November 20,1989. He graduated on April 16, 1990, and was assigned to the 6th District.

72.   On May 14, 2011, Mr. Young was promoted to Corporal and assigned to the 22nd District.

73.   On March 10, 2013, he was transferred to the 6th District, and then on March 15, 2015, was transferred to the Philadelphia Criminal Information Center (PCIC).

74.   Corporal Young has received two bravery Commendations for arresting suspects armed with firearms without firing his weapon. One of these awards, was for an incident that happened on September 3, 2003, where the offender shot at Corporal Young with a 12 gauge shotgun. Corporal Young was able to effect the arrest and recover the suspect's weapon, without firing

his service weapon. Corporal Young also received a Heroism Commendation for saving several people in a fire at an apartment building. He received a Letter of Commendation for outstanding police work. Corporal Young also received two Fraternal Order Of Police (FOP), awards for outstanding work. And over the course of his career Corporal Young has also received 28 Perfect Attendance Awards.

75.   Corporal Young received one reprimand in 2005, which is the mildest form of discipline in the Philadelphia Police Department.

76.   On June 5, 2019, Corporal Young was placed on restricted duty, and was told to surrender his service weapon to his commanding officer. He was summarily relieved of all police powers. The reason given for his restrictions was that he was the subject of an ongoing Internal Affairs Investigation regarding his Facebook posts.

77.   The Department released Corporal Young's name to the press. His name appeared in the newspaper and various other media outlets. He was vilified as a "racist cop" and an example of "what is unacceptable in law enforcement".

78.   Corporal Young's friends and acquaintances, even strangers have reacted with shock in response to the false, negative publicity branding him as a bigot and a racist.

79.   On June 17, 2019, Corporal Young was interviewed by Sergeant Saba from Internal Affairs. He was shown several Facebook posts and asked whether they were his posts and if anyone else had access to his computer. Corporal Young complied with the interview and acknowledged that the posts were his and no one had access to his home computer.

80.   On July 17, 2019, Corporal Young was contacted by Lieutenant Young of Internal Affairs who instructed him to report at 9:00 a.m. to the Internal Affairs Bureau. There he was to be served with his disciplinary action consisting of a 30-day suspension with intent to dismiss.

81.   In 2019, Corporal Young had just under 30 years of service with the Police Department.

82.   Corporal Young was in the DROP program for 19 months, and so Corporal Young decided to retire.

83.   On July 19, 2019, Corporal Young went to Police Personnel and retired from the Philadelphia Police Department, rather than face involuntary termination and forfeiture of all his insurance benefits.

84.   Throughout his career in law enforcement, Corporal Young has taken great pride in being a police officer, and has always tried to conduct himself in a professional manner. He served the public well, at times even risking his own life to save others.

85.   Each of the comments posted by Corporal Young which formed the basis for his termination were statements made in his personal capacity as a private citizen, and addressed matters of political, social or other concern to the community.

86.   The content, form and context of each of the comments posted by Corporal Young which formed the basis of the City's adverse employment actions, involved matters of public concern.

87.   The Defendant's negative employment action against Corporal Young was motivated in substantial part by the Plaintiff's speech activity.

88.   The Plaintiff's private speech in the form of comments on social media did not cause any disruption within the Department; nor did it negatively impact the ability of the City to maintain discipline and relationships in the workplace.

**Plaintiff Thomas Gack**

89.   Thomas Gack was employed by the City as a commissioned police officer in 1993.

90.   Plaintiff Gack was initially assigned to 14th District in the Germantown section of the city, and then transferred to the 7th District in 2007.

-15-

91.  He is certified in in Major Incident Response Team capacity and holds several Federal certifications in Biohazard Response, Riot Training, and Radiological Detection.

92.  Officer Gack is a highly decorated officer, and over the course of his almost 25-year career he received many awards and honors for his service.

93.  During Officer Gack's off duty time he utilized a Facebook account.

94.  On June 1, 2019, Buzzfeed released a story entitled "Cops Across the U.S. Have Been Exposed Posting Racist and Violent Things on Facebook. Here's the Proof".

95.  On June 7, 2019, Officer Gack's Captain, came to his home to retrieve his service pistol and to inform him that he was being placed under investigation. Officer Gack's service weapon was in his locker at the 7th District, so he signed a document relinquishing the weapon to Captain Robert Ritchie. Officer Gack was placed on restrictive duty pending the investigation.

96.  On June 11, 2019, Officer Gack reported to Internal Affairs for an interview. During the interview, he was shown 37 Facebook posts dating between 2015-2016 that had been labeled as racist, homophobic, Islamophobic and/or violent by the Plain View Project. Officer Gack was required to initial all of the pages to confirm that they were his posts or comments. (True and correct copies of these posts are assembled in the Plaintiffs' Appendix to Complaint at pp 8 to 44 and are incorporated herein by reference.)

97.  During the interview, he was asked to disclose any screen names or social media accounts, and was told that if he did not surrender this private information, he would be cited with failure to cooperate in an internal investigation.

98.  Officer Gack was not allowed to explain the context surrounding his comments or posts.

99.  On June 25, 2019, Officer Gack left for a planned 3-week summer vacation with his family.  The following day his vacation was interrupted when he received a telephone call instructing him to report to Administrative Lieutenant Blackmon as soon as possible.

100. Lieutenant Blackmon ordered Officer Gack to cancel his vacation, immediately return home and attend a class on social media training and accountability on June 28, 2019.

101. On July 17, 2019, while Officer Gack was on duty, Captain Robert Ritchie, came to his home. When Mr. Gack's wife came to the door, Captain Ritchie proceeded to tell her that he had just come from a meeting with the Commissioner and it was not good news.  Officer Gack was able to hear and observe this communication remotely through a cell-phone application called "Ring App".  When he asked "Why are you at my house while I'm at work?", Captain Ritchie realized that he was being observed and heard through the Ring camera, he stopped talking and then requested that Officer Gack call him for a private conversation, not on City issued cellphones.

102. When Captain Ritchie arrived at the police station, he refused to allow Officer Gack to have a private conversation with the FOP and instead he began to speak over Officer Gack, "Friday 9:00 a.m. Internal Affairs Office. I'll see you then, when you go in to surrender yourself for firing."

103. On July 19, 2019, Officer Gack reported to Internal Affairs, where he was met by his FOP representatives and his Captain. He signed multiple copies of his paperwork and was read the conditions of his termination. He was given a set of documents to sign and informed that he was being placed on a 30 day suspension with intent to fire, commencing on August 15, 2019.

104. Over the thirty-day suspension period Officer Gack was served with an additional two sets of dismissal documents: the first on August 5, 2019; and the second time on August 16, 2019.

105. The basis cited for his termination was Conduct Unbecoming, Section 1-§021-10 and Neglect of Duty, Section 5-§011-10.

106. Each of the comments posted by Officer Gack which formed the basis for his termination were statements made in his personal capacity as a private citizen, and addressed matters of political, social or other concern to the community.

107. The content, form and context of each of the comments posted by Officer Gack which formed the basis of the City's adverse employment actions, involved matters of public concern.

108. The Defendant's negative employment action against Officer Gack was motivated in substantial part by the Plaintiff's speech activity.

109. The Plaintiff's private speech in the form of comments on social media did not cause any disruption within the Department; nor did it negatively impact the ability of the City to maintain discipline and relationships in the workplace.

### Plaintiff Edward McCammitt

110. Edward McCammitt was employed by City as a commissioned police officer in 1986.

111. He was initially assigned to the 22nd District from 1986 -1991. And then the 2nd District from 1991- 2001, he then was assigned to the Traffic Division of the PPD from 2001 to 2019.

112. Officer McCammitt is certified in Weapons, MPO, PA Municipal Police officer training, AIDS Training, Driver Training all phases, HazMat First Responder, Bio-chem HazMat, Suicide Prevention, Riot Tactics, MACE training, Close combat, Narcotic Enforcement/Intervention, NCIC/PCIC Training, Mental Health Intervention, MDT(computer), Baton Training, Advance EVOC Training, Home Land Security Training, Open Carry Training and First Aid, CPR, and 6/28/19 Professionalism/Social Media Training. He also has had training in crowd control, traffic control, riot control, protest control special security for RNC, DNC and Papal visit, dignitary security, parade control.

113. Officer McCammitt is a highly decorated officer, and over the course of his thirty-three (33) year career he has received several awards and honors for his service to the community.

114. In 1989 and 1992 he received the Medal of Merit for his service. He received a Commendatory Citation in 1994 for his service. In 1996 he received the Medal of Heroism for entering a burning apartment building and evacuating the residents to safety until the fire department arrived. Officer McCammitt received the Official Citation for his work in 2000 during the Republican National Convention. He was awarded the Special Event Medal in 2015 for Pope Francis' visit to Philadelphia and in 2016 for the Democratic National Convention in Philadelphia. He also received an award for Honorable Service in 2016.

115. During Officer McCammitt's off duty time he maintained a personal Facebook account.

116. Following the release of the Buzzfeed article on June 1, 2019, and following the Mayor and Commissioner's press conference, Officer McCammitt was ordered to report to the Internal Affairs Bureau (IAB) for an interview. During the interview he was questioned regarding his personal Facebook account.

117. On June 18, 2019, his regularly scheduled day off, Officer McCammitt was called into his Captain's office where he was informed that he was being placed on restricted duty.  He was instructed to turn in his service weapon and was stripped of all his police powers.

118. On June 26, 2019, he was then ordered by his Captain's office to attend a mandatory training on June 28, 2019, for Social Media and Professionalism at 8:00 a.m. at the police training center.

119. Officer McCammitt reminded his Captain that the next day, June 27, 2019, he was scheduled to have urgently needed surgery to remove a large infected cyst on his back.

120. Despite his need to undergo surgery, Officer McCammitt was advised that this training was mandatory and that if he did not attend he would remain on restricted duty indefinitely.

-19-

121. On June 28, 2019, Officer McCammitt did as ordered and attended the training.

122. Officer McCammitt's annually scheduled vacation was June 30, 2019 - July 20, 2019.

123. While in Washington D.C. vacationing with his family, Officer McCammitt received a phone call on the morning of July 17, 2019, from Lt. Lark instructing him to report to IAB on July 19, 2019. He was ordered to report with all of his equipment, and that he was being suspended for thirty days, with intent to be terminated, because of his Facebook posts. (True and correct copies of these posts are assembled in the Plaintiffs' Appendix to Complaint at pp. 45-64 and are incorporated herein by reference.)

124. Officer McCammitt immediately left Washington D.C., cutting his family vacation short, and headed home to Philadelphia.

125. On July 19, 2019, Officer McCammitt returned to IAB, turned in his badge, identification and his equipment.

126. On the "Statement of Charges Filed and Action Taken", on July 19, 2019 the two bases for the City's disciplinary action were violation of:

   a. **Article I- Conduct Unbecoming – Section 1-§021-10:** Any incident, conduct, or course of conduct which indicates that an employee has little or no regard for his/her responsibility as a member of the Police Department.

   b. **Article V- Neglect of Duty – Section 5-§011-10:** Failure to comply with any Police Commissioner's orders, directives, memorandums, or regulations; or any oral or written orders of superiors.

127. For the charge of Conduct Unbecoming the City gave the following specification:

ARTICLE I          : Conduct Unbecoming

SECTION 1-§021-10: Any incident, conduct, or course of conduct which indicates that an employee has little or no regard for his/her responsibility as a member of the Police Department.

SPECIFICATION   : Internal Affairs initiated an internal investigation, IAD#19-1077.327, after receiving information alleging that employees of the Philadelphia Police Department were posting offensive and inappropriate materials and/or comments to social media,

specifically on the Facebook social media site. An analysis was conducted of Facebook posts and/or comments collected in the Plainview Project database. The analysis displayed a course of conduct, where no fewer than ten (10) times, you posted, shared, and/or commented on video, photographs/pictures, and articles, using racial slurs, profanity, dehumanizing, defamatory, and/or discriminatory language, and/or language that condoned, glorified, or encouraged violence, and/or language that was insensitive and mocked individuals, due process, and the criminal justice system. As a member of the Philadelphia Police Department, you are expected to strive to maintain public trust and confidence, not only in your professional capacity but also in your personal and on-line activities. Your posts and comments in question are devoid of any professional expectations and standards.

128. As for the charge of Neglect of Duty, the City specified the following policy violation:

ARTICLE V          : Neglect of Duty

SECTION 5-§011-10: Failure to comply with any Police Commissioner's orders, directives, memorandums, or regulations; or any oral or written orders of superiors.

SPECIFICATION   : Internal Affairs investigation #19-1077.327 determined that you posted material, statements, or comments on Facebook that are in direct violation of Directive 6.10, Social Media and Networking. An analysis of Facebook posts and/or comments collected in the Plainview Project database was conducted. Results indicated that you posted, shared, and/or commented on video, photographs/pictures, and articles, using racial slurs, profanity; dehumanizing, defamatory, and/or discriminatory language; and/or language that condoned, glorified, or encouraged violence; and/or language that was insensitive and mocked individuals, due process, and the criminal justice system. In many instances, these posts and comments were directed at the same persons whom you have been sworn to serve. Directive 6.10 specifically states that while engaging in social media, "Employees are prohibited from using ethnic slurs, profanity, personal insults; material that is harassing, defamatory, fraudulent, or discriminatory, or other content or communications that would not be acceptable in a City workplace under City or agency policy or practice." The Directive further states that "each member must strive to maintain public trust and confidence, not only in his or her professional capacity, but also in his or her personal and on-line activities. Moreover, as police personnel are necessarily held to a higher standard than general members of the public, the on-line activities of employees of the police department shall reflect such professional expectations and standards."

(A copy of the Policy Directive 6.10 Social Media and Networking is attached hereto as Exhibit A).

129. The Philadelphia Police Department's Directive 6.10, Social Media and Networking, effective on May, 26, 2011, expressly provides that employees using their social media during off-hours for personal expression do not represent the Department, or any official position of the Department.

### Directive 6.10 Social Media and Networking

G. Employees who are off-duty, and using privately-owned property to engage in the personal use of social media, do not represent the City of Philadelphia, the Philadelphia Police Department, or any official position maintained by either entity. Under such conditions, employees represent only themselves and their personal interests.

130. As a result of the adverse actions taken against him by the City, and in consultation with the F.O.P., Officer McCammitt decided that his only option was to resign as a police officer and take an early retirement.

131. On July 23, 2019, Officer McCammitt requested early retirement, under duress and in order to prevent a lapse in medical coverage for he and his family.

132. Despite this request, the City listed Officer McCammitt as "resigned" in his personnel file as opposed to "retired". By doing this, the City has intentionally and deliberately impeded his ability to apply or obtain another position in law enforcement.

133. Each of the comments posted by Officer McCammitt which formed the basis for his termination were statements made in his personal capacity as a private citizen, and addressed matters of political, social or other concern to the community.

134. None of the comments posted by Officer McCammitt violated Policy Directive 6.10.

135. Each of the comments posted by Officer McCammitt which formed the basis of the City's adverse employment actions, involved matters of public concern.

136. The Defendant's negative employment action against Officer McCammitt was motivated in substantial part by the Plaintiff's speech activity.

137. The Plaintiff's private speech in the form of comments on social media did not cause any disruption within the Department; nor did it negatively impact the ability of the City to maintain discipline and relationships in the workplace.

**Plaintiff Tanya Grandizo**

138. Officer Tanya Grandizo was employed with the City as a commissioned police officer starting in 1995.

139. She served in the 18th District from 1995 until 2005.

140. In 2005, she transferred to the 15th District, and worked there until she was promoted to the rank of Corporal in 2009.

141. From 2009 until 2019, she was assigned to the 17th District.

142. In 2012, while in the 17th District, she was assigned to the Training Bureau in the Driver Training Unit – Accident Reduction Unit. She is a Certified Advanced Emergency Vehicle Operations Course Instructor, a Certified Firearms Instructor, as well as a General Course Instructor.

143. On October 18, 2019 Corporal Grandizo was transferred to the 14th District.

144. Sometime in June of 2019, Corporal Grandizo was notified that she was under investigation for some questionable posts on Facebook and that she would be placed on restricted duty until the investigation was cleared.

145. Once the investigation was concluded she was given her service weapon back and put on full duty.

146. She was told by one of her supervisors, that there was still a possibility that she could receive a 30 – day suspension, and/or a transfer.

-23-

147. Corporal Grandizo plead not guilty to the charges brought against her.

148. On June 28, 2019, she was notified by the D.A.O. that she was placed on the Police Misconduct list.

149. On July 18, 2019, she once again, had her service weapon returned and put back on full duty.

150. Then in March of 2020, she received a 30 – day suspension.

151. She was denied a hearing by the then Acting Commissioner Christine Coulter and given a Commissioners Direct Action.

152. All of these disciplinary actions were imposed solely in retaliation for her personal Facebook posts on issues of inherent public concern.  (True and correct copies of Corporal Grandizo's Facebook posts which formed the basis of the City's disciplinary actions are contained in Plaintiffs' Appendix of Exhibits to the Complaint at pp 65 to 73 and are incorporated herein by reference.)  As a consequence of the City's adverse actions against her, Corporal Grandizo has suffered emotional injury, including feelings of hopelessness, embarrassment and humiliation as well as anxiety and depression.

**Plaintiff Anthony Anzideo**

153. Detective Anthony Anzideo was employed by the City as a commissioned police officer on February 12, 2007.

154. He was initially assigned to the 3rd District of the South Division from September 2007-November 2007. From November 2007 - November 2018 he was assigned to the 17th District of the South Division.

155. From November 2018 until the present, Det. Anzideo has been a member of the South Detective Division.

156. Most recently he was also assigned to the 17th District's 5 Squad Tactical Team, and the South Division's Gang Task Force overseen by the District Attorney's Office.

157. He is certified and trained in the following skills: Long Gun/Shotgun certified; First Aid/CPR trained; NETS (Narcotics) trained; Crime Scene trained; Crisis Intervention Team trained; Vehicle Identification Number trained; and Detective Promotional trained.

158. Det. Anzideo is a highly decorated officer and detective, and during his thirteen year career he has received 13 awards and honors.

159. He has been awarded the following honors: Sharpshooter Marksman Award; Medal of Merit in January 2010, March 2012 and April 2013; Commendatory Citation in April 2011; Special Event Medal in 2015 and 2016; Perfect Attendance Award in 2008 and 2016; and Officer of the Month in April 2008, February 2010, April 2013 and March 2014.

160. During Det. Anzideo's off duty time he maintained a personal Facebook account which he started in 2004 while in college.

161. Following the release of the Buzzfeed article on June 1, 2019, he received a link to the Plain View Project from a friend on Facebook. On the site he observed multiple posts which included his name, and information regarding his rank, badge number, salary and how long he had been employed by the Defendant.

162. The Buzzfeed article mischaracterized Det. Anzideo's posts completely out of context.

163. On approximately June 7, 2019, between 7:00 a.m. and 8:00 a.m., Det. Anzideo received a phone call his superior, Lt. Biello. Lt. Biello informed Det. Anzideo that he was sorry for having to make the call, expressing his anger and dissatisfaction for calling him, but that he was required to do it. Lt. Biello said that he was instructed by Internal Affairs to place Det. Anzideo on restricted duty and take his service firearm.

164. On approximately June 12, 2019, Det. Anzideo was called into Sergeant Greer's office and was instructed to report for an appointment with the Employee Assistance Program (E.A.P.) where he would be allowed to speak confidentially about his situation.

165. Det. Anzideo had a spotless record as an officer and detective for thirteen years.

166. While on restricted duty Det. Anzideo was tasked with working the front desk, answering the phones, assigning investigations, and other police tasks to his fellow officers.

167. On June 13, 2019, he appeared for his Internal Affairs interview as part of the investigation accompanied by an attorney from F.O.P.  There he was interviewed by Lt. Mella with Internal Affairs, and shown for the first time his allegedly offensive Facebook posts dating back to 2010-2016. He was asked to initial each page, to acknowledge that he was shown the posts. Lt. Mella told Det. Anzideo that his "posts are not bad at all". There were 38 allegedly offensive Facebook posts made my Det. Anzideo on the Plainview Project. (True and correct copies of Detective Anzideo's Facebook posts which formed the basis of the City's disciplinary actions are contained in Plaintiffs' Appendix of Exhibits to the Complaint at pp. 74 to 77 and are incorporated herein by reference.)

168. On June 28, 2019, Det. Anzideo attended a required mandatory training for the 72 officers who had been placed on restricted duty or suspended. The two training classes were titled "Professionalism Training" and "Social Media Guidance". Both classes were mainly geared toward Facebook and issues which may arise from posting on social media sites.

169. On July 19, 2019, Det. Anzideo was notified that he was being placed back on full duty and he would be given his weapon back.

170. On July 22, 2019, Det. Anzideo received his first set of "75-18s", a term used to refer to disciplinary reports generated as a result of the investigation into his Facebook activity.

171. On the "Statement of Charges Filed and Action Taken", the bases for the City's disciplinary action against him were violation of:

> **Article V- Neglect of Duty – Section 5-§ 011-10:** Failure to comply with any Police Commissioner's orders, directives, memorandums, or regulations; or any oral or written orders of superiors.

172. Captain Robert Zaffino informed Det. Anzideo that he was facing up to a five day suspension. In addition, he would not be able to utilize his vacation pay in lieu of receiving no pay. Capt. Zaffino also told Det. Anzideo that if it were up to him, he would receive a simple reprimand; however, the upper echelon of the department would not allow a more lenient punishment.

173. Capt. Zaffino also explained that the department took each of his posts and graded them on a scale of one to four, with four being the "worst". The Captain explained that some of Det. Anzideo's posts were given "3's" and "4's". And there were a total of four or five posts with which the department took issue out of the thirty-eight posts reviewed.

174. At the conclusion of this meeting Det. Anzideo signed a not guilty form and requested a Police Board of Inquiry (PBI) hearing. He explained to Capt. Zaffino that he felt he had done nothing wrong, and the Captain agreed with him.

175. Several months later on January 31, 2020, Det. Anzideo was called into Captain Kearney's office, and was given a second set round of 75-18 forms to sign. The documents recommended a suspension up to five days, without the possibility of utilizing vacation days in lieu of receiving no pay.

176. Contained in the 2020 set of 75-18's, were the specific the Facebook posts the City found offensive.  (True and correct copies of these posts are assembled in the Plaintiffs' Appendix to Complaint at pp 74 to 77 and are incorporated herein by reference.)

177. Det. Anzideo signed a statement of "not guilty" and requested a PBI hearing.

178. As a result of the Plain View Project and the City's retaliatory actions, Det. Anzideo deactivated his Facebook page he had maintained since 2004.

179. In total, Det. Anzideo remained on restricted duty for approximately sixty (60) days. During this time he forfeited numerous hours of investigative overtime, and reimbursable overtime, and opportunities to work at public events such as the Philadelphia Phillies games.

180. Det. Anzideo was also not allowed to carry a firearm while off duty, leaving him unable to protect himself or his family.

181. Each of the comments posted by Det. Anzideo which formed the basis for his termination were statements made in his personal capacity as a private citizen, and addressed matters of political, social or other concern to the community.

182. Each of the comments posted by Det. Anzideo which formed the basis of the City's adverse employment actions, involved matters of public concern.

183. The Defendant's negative employment action against Det. Anzideo was motivated in substantial part by the Plaintiff's speech activity.

184. The Plaintiff's private speech in the form of comments on social media did not cause any disruption within the Department; nor did it negatively impact the ability of the City to maintain discipline and relationships in the workplace.

185. As a consequence of the City's adverse actions against him, Det. Anzideo has suffered emotional injury, including feelings of hopelessness, embarrassment and humiliation as well as anxiety and depression for which he has received, and continues to receive, medical and psychiatric treatment.  He also has suffered pecuniary and economic loss for which he is entitled to compensatory damages.

186. The adverse actions taken against Det. Anzideo were in retaliation for his exercise of free speech as a citizen on issues of inherent public concern.

**Plaintiff Anthony Acquaviva**

187. Anthony Acquaviva was employed by City as a commissioned police officer in 1990.

188. He was initially assigned to the 39th District of the Northwest Division from 1991-1995. In 1995, while in the 39th District of the Northwest Division, he was assigned to the graffiti squad. The graffiti squad was a specific group that worked to prevent and apprehend individuals who "tagged" or spray painted graffiti near Gratz High School. In 2003, Officer Acquaviva was assigned to the 2nd District of the Northeast Division 5 Squad, a special unit utilized by the Department.

189. Throughout his tenure on the police department he has consistently received positive feedback on  Performance Reports.  He also received numerous letters of gratitude from the public, including one from President Judge Frank Little, and one from the District Attorney's Office of Chester County.

190. Officer Acquaviva is a highly decorated officer, during his thirty-year (33) career he received many awards and honors.

191. Specifically, he received Commendatory Citations in 1992, 2000, three times in 2001, and in 2009 for his service. He received Officer of the Month in April of 2007 from the City Council, 2nd Police District and the 2nd Senatorial District, and again in November 2009 from the House of Representatives and the 2nd Police District. Officer Acquaviva received the Special Event Medal in 2000 for the Republican National Convention in Philadelphia, in 2015 for Pope Francis' visit to Philadelphia and in 2016 for the Democratic National Convention. Officer Acquaviva received a Certificate of Honorable Service in 2015. He received the honor of Police Officer of the Year in 2003 from the Steuben Lodge Knights of Pythias. He also received

certificates of recognition from the Commonwealth of Pennsylvania and the American Missionary Fellowship for his outstanding service.

192. During Officer Acquaviva's off duty time he maintained a personal a Facebook account.

193. The June 1, 2019, Buzzfeed article specifically listed (17) Facebook postings made by Officer Acquaviva, and taken from the Plain View Project database. (True and correct copies of these posts are assembled in the Plaintiffs' Appendix to Complaint at pp 78 to 93 and are incorporated herein by reference.)

194. On June 5, 2019, Officer Acquaviva was informed by his supervisor, Lieutenant Rutizer that the Department had decided to remove him from his normal duties and had to surrender his service weapon as well. Lt. Rutizer also told him to report the following morning, June 6, 2019, to the DIVIC (Delaware Valley Intelligence Center). Officer Acquaviva was never specifically told why these actions were being taken against him.

195. He was assigned to work at DVIC, as a security guard. DVIC is the agency of the police department that monitors the City's camera system and looks for criminal activity.

196. On June 6, 2019, Officer Acquaviva learned that the reason for his assignment to DVIC, was because of his Facebook posts listed by the Plain View Project and discussed by Buzzfeed.

197. On June 27, 2019, Officer Acquaviva's commanding officer, Captain Matthew Deacon told him that he had to sign what is known as a "Giglio Letter" from the District Attorney, which effectively barred Officer Acquaviva from ever testifying in court in the City of Philadelphia.

198. The following day on June 27, 2019, Officer Acquaviva was ordered to report to the Police Academy to attend a Professionalism Training Course, given by Officer Sequitta Adams. He was told that this class was a requirement in order to return to work and have his service weapon returned.

199. On or about July 17, 2019, Officer Acquaviva received a phone call from Capt. Deacon informing him that he was being terminated and to report to the Internal Affairs Unit, (I.A.U.) on July 19, 2019, at 9:00 a.m.

200. Officer Acquaviva was compelled to retire in order to preserve medical insurance for his family, and more specifically for his 31 year old daughter, Christina, who suffered a brain hemorrhage at the age of two weeks old, never recovered and is bed ridden.

201. On July 19, 2019, instead of reporting to I.A.U. Officer Acquaviva reported to the Police Administration Building (P.A.B.) to retire, or more accurately, accept his constructive discharge from the department.

202. Officer Acquaviva never received any termination papers or charging papers.

203. Following his constructive discharge, Officer Acquaviva obtained employment with Thomas Jefferson University Hospital as a security officer, taking a drastic cut in pay, and making approximately one-third to one-half of what he had been earning as a 30-year veteran of the police department. He was scheduled to commence his new employment on December 16, 2019; however, on December 18, 2019, after losing approximately eighty (80) pounds from the stress, he was admitted into the hospital for two weeks. During his hospitalization, he underwent five operations to deal with the diagnosis of Fournier's Gangrene, which is a rapidly progressing, tissue-destroying infection; and is a medical emergency that can be fatal without immediate treatment.

204. As a consequence of the City's adverse actions against him, Officer Acquaviva has suffered, and continues to suffer emotional injuries, including feelings of hopelessness, embarrassment and humiliation as well as anxiety and depression for which he has received, and continues to receive, medical and psychiatric treatment.  He also has suffered pecuniary and economic loss for which he is entitled to compensatory damages.

**Plaintiff Kristine Amato**

205. Officer Kristine Amato began employment with the City as a commissioned police officer in 1990.

206. She was initially assigned to the City Center District from 1990 - 1993. From 1993-2007, she was assigned to the 9th District. In 2001-2011, where she worked in the Evidence Custodial Unit.

207. In 2014, she was assigned back to the 9th District.

208. Officer Amato is a highly decorated officer, during her thirty-year (30) career she has received multiple merit Awards.

209. During Officer Amato's off duty time she maintained a personal Facebook account under the name of "Yo Stuff". Nowhere on her personal Facebook webpage or her biographical hyperlink did Officer Amato identify herself as an employee of the City of Philadelphia or as a police officer.

210. On or about June 5, 2019, following the Buzzfeed article published on June 1, 2019, Officer Amato received a voicemail at approximately 7:00 p.m. ordering her to immediately return to work and meet with her superior, Captain Vales, where she would be surrendering her service weapon, and be assigned to desk duty pending further notice.

211. When Officer Amato turned in her service weapon on June 5th, she had to sign a statement acknowledging that she was not allowed to carry any weapon while off duty.

212. Officer Amato was assigned to desk duty for approximately 53 days, resulting in a loss of overtime wages and other opportunities to earn compensation.

213. In mid-June of 2019, she was ordered to report to Internal Affairs to discuss her Facebook posts. During this interview, she was shown approximately twelve to fourteen posts that were found to be offensive by the Plainview Project. She was instructed to initial each post

-32-

acknowledging that they were hers.  (True and correct copies of these posts are assembled in the Plaintiffs' Appendix to Complaint at pp 94 to 106 and are incorporated herein by reference.)

214. On June 28, 2019, Officer Amato attended mandatory training regarding the department's Social Media Policy.

215. By the end of the summer in 2019, she was given her service weapon back and placed on active duty. At that point she assumed that the investigation had been concluded.

216. In early Fall of 2019, she was given a "75-18", or notice for Disciplinary Action. This time, the punishment for allegedly violating the Social Media Policy, was a thirty 30-day suspension to dismissal with the option to either plead guilty or request a PBI hearing.

217. Officer Amato pleaded not guilty and requested a PBI hearing.

218. While waiting for her PBI hearing, she was informed that she was going to be disciplined anyway, and given a thirty day suspension without pay. This summary action was taken by Commissioners Direct Action, and she was denied any right or opportunity for a hearing.

219. Officer Amato served her thirty day suspension from February 19, 2020 through March 18, 2020.

220. Prior to serving her thirty day suspension, Officer Amato was also informed that the she would not be allowed to her usual Monday through Friday assignment that she had held for two and half years.

221. Each of the comments posted by Officer Amato which formed the basis for her termination were statements made in his personal capacity as a private citizen, and addressed matters of political, social or other concern to the community.

222. The content, form and context of each of the comments posted by Officer Amato which formed the basis of the City's adverse employment actions, involved matters of public concern.

223. The Defendant's negative employment action against Officer Amato was motivated in substantial part by the Plaintiff's speech activity.

224. The Plaintiff's private speech in the form of comments on social media did not cause any disruption within the Department; nor did it negatively impact the ability of the City to maintain discipline and relationships in the workplace.

225. As a consequence of the City's adverse actions against him, Officer Amato has felt feelings of hopelessness, embarrassment and humiliation as well as anxiety and depression for which he has received, and continues to receive, medical and psychiatric treatment.  She also has suffered pecuniary and economic loss for which she is entitled compensatory damages.

226. The adverse actions taken against Officer Amato were in retaliation for her exercise of free speech as a citizen on issues of inherent public concern.

**Plaintiff Joseph Przepiorka**

227. Joseph Przepiorka was employed by City as a commissioned police officer in 1989.

228. Sgt. Przepiorka was initially assigned after the Police Academy to the 9th District of the Central Division in 1989. He then worked a patrol wagon for seven (7) years from 1990 to 1997. In 1998 he was assigned to the homeless unit, working with issues surrounding the city's homeless. In March of 2002, he was promoted to Sergeant and assigned to the 2nd District in the Northeast Division. Until his forced retirement, Sgt. Przepiorka supervised hundreds of officers for seventeen years.

229. Sgt. Przepiorka is a highly decorated officer, during his thirty (30) year career he received numerous awards and honors.

230. In 2002, Officer Przepiorka was promoted to Sergeant. He received Commendatory Citations in 2006 and twice in 2007 for his service. Sgt. Przepiorka received the Medal of Merit for his work in 1991. The Special Event Medal in 2015 for Pope Francis' visit to Philadelphia

and in 2000 for the Republican National Convention in Philadelphia. He received a Certificate of Appreciation in 1996. He was given a Commendatory Letter in 1998, and an Official Commendation in 2003.

231. Sgt. Przepiorka has received training from: FEMA at the National Fire Academy in September 2011; New Mexico Tech for Prevention and Response to Suicide Bombing Incidents in February 2009; LoJack for Stolen Vehicle Police Recovery System; the Authority completing training for Identifying stolen, re-plated and cloned vehicles in March 2008; and FTAC for Enhancing Officer and Community Safety: A Law Enforcement and Behavioral Health Partnership.

232. During Sgt. Przepiorka's off duty time he maintained a personal a Facebook account.

233. On June 4, 2019, Sgt. Przepiorka reported for duty at the Marine Unit for his 2:00 p.m. – 10:00 p.m. shift. At the beginning of his shift, he was advised that his Lieutenant wished to speak to him, and that he was being reassigned to the auto impound unit and his service weapon had to be surrendered. The Lieutenant only informed him that it had something to do with his Facebook posts, and that it came from the Commissioner's office.

234. He was then instructed to go to the Employee Assistance Program and to speak confidentially with a counselor.

235. Typically, when the department takes an officer's firearm and transfers them, it is for a serious infraction or criminal action. Sgt. Przepiorka could not believe this was happening over his Facebook posts.

236. On June 5, 2019, he reported to the auto impound lot.

237. Sgt. Przepiorka had planned an important family trip to Poland, from July 3, 2019 to July 22, 2019. The trip had been planned months in advance, and well before the City's reaction to the Plain View article.

238. In the middle of his trip, Sgt. Przepiorka received a phone call from his brother, Captain John Przepiorka informing him that he was going to be fired due to his Facebook postings.

239. Sgt. Przepiorka had a spotless record as an officer for more than thirty years. Every year his Performance Reports rated him as a valued asset to the police department.

240. At the time, Sgt. Przepiorka was unaware of any investigation into his Facebook posts.

241. Sgt. Przepiorka was never offered an opportunity to appeal the decision.

242. There were 94 controversial Facebook postings made by Sgt. Przepiorka. (True and correct copies of these posts are assembled in the Plaintiffs' Appendix to Complaint at pp 107 to 207 and are incorporated herein by reference.)

243. Immediately upon arriving home, Sgt. Przepiorka was instructed to report to Internal Affairs the following day and sign his thirty-day suspension with intent to dismiss.

244. On July 25, 2019, Sgt. Przepiorka met with John McGrody from the F.O.P. and a lawyer to sign his termination paperwork. After discussing his options, Sgt. Przepiorka decided he had no choice but to retire in order to keep his benefits.

245. On the "Statement of Charges Filed and Action Taken", signed by Sgt. Przepiorka on July 25, 2019 the two bases for the City's disciplinary action were violation of:

> **Article I- Conduct Unbecoming – Section 1-§021-10:** Any incident, conduct, or course of conduct which indicates that an employee has little or no regard for his/her responsibility as a member of the Police Department.
>
> **Article V- Neglect of Duty – Section 5-§011-10:** Failure to comply with any Police Commissioner's orders, directives, memorandums, or regulations; or any oral or written orders of superiors.

246. As for the charge of Conduct Unbecoming the City specified the following policy violation:

-36-

Internal Affairs initiated an internal investigation, IAD#19-1077.44, after receiving information alleging that employees of the Philadelphia Police Department were posting offensive and inappropriate materials and/or comments to social media, specifically on the Facebook social media site. An analysis was conducted of Facebook posts and/or comments collected in the Plainview Project database. The analysis displayed a course of conduct, where no fewer than forty-one (41) times, you posted, shared, and/or commented on video, photographs/pictures, and articles, using racial slurs, profanity, dehumanizing, defamatory, and/or discriminatory language, and/or language that condoned, glorified, or encouraged violence; and/or language that was insensitive and mocked individuals, due process, and the criminal justice system. As a member of the Philadelphia Police Department, you are expected to strive to maintain public trust and confidence, not only in your professional capacity but also in your personal and on-line activities. Your posts and comments in question are devoid of any professional expectations and standards.

247. For the charge of Neglect of Duty the Specification given by the City was:

Internal Affairs investigation #19-1077.44 determined that you posted material, statements, or comments on Facebook that are in direct violation of Directive 6.10, Social Media and Networking. An analysis of Facebook posts and/or comments collected in the Plainview Project database was conducted. Results indicated that you posted, shared, and/or commented on video, photographs/pictures, and articles, using racial slurs, profanity; dehumanizing, defamatory, and/or discriminatory language; and/or language that condoned, glorified, or encouraged violence; and/or language that was insensitive and mocked individuals, due process, and the criminal justice system. In many instances, these posts and comments were directed at the same persons whom you have been sworn to serve. Directive 6.10 specifically states that while engaging in social media, "Employees are prohibited from using ethnic slurs, profanity, personal insults; material that is harassing, defamatory, fraudulent, or discriminatory, or other content or communications that would not be acceptable in a City workplace under City or agency policy or practice." The Directive further states that "each member must strive to maintain public trust and confidence, not only in his or her professional capacity, but also in his or her personal and on-line activities. Moreover, as police personnel are necessarily held to a higher standard than general members of the public, the on-line activities of employees of the police department shall reflect such professional expectations and standards."

248. On August 6, 2019, Sgt. Przepiorka reported to the Police Administration building and retired.

249. Sgt. Przepiorka had planned on working an additional ten to fourteen years before retiring.

250. In addition, at the time he retired, Sgt. Przepiorka was owed approximately $30,000.00 from his deferred compensation for his vacation and sick pay balance. The City took nine months to pay his deferred compensation. When Sgt. Przepiorka finally received his check, he only received $3,758.07.

251. Each of the comments posted by Sgt. Przepiorka which formed the basis for his termination were statements made in his personal capacity as a private citizen, and addressed matters of political, social or other concern to the community.

252. The content, form and context of each of the comments posted by Sgt. Przepiorka which formed the basis of the City's adverse employment actions, involved matters of public concern.

253. The Defendant's negative employment action against Sgt. Przepiorka was motivated in substantial part by the Plaintiff's speech activity.

254. The Plaintiff's private speech in the form of comments on social media did not cause any disruption within the Department; nor did it negatively impact the ability of the City to maintain discipline and relationships in the workplace.

255. As a consequence of the City's adverse actions against him, Sgt. Przepiorka has suffered, and continues to suffer emotional injuries, including feelings of hopelessness, embarrassment and humiliation as well as anxiety and depression for which he has received, and continues to receive, medical and psychiatric treatment.  He also has suffered pecuniary and economic loss for which he is entitled to compensatory damages.

256. The adverse actions taken against Sgt. Przepiorka were in retaliation for his exercise of free speech as a citizen on issues of inherent public concern.

**Plaintiff William Bowdren**

257. William Bowdren was employed by the City as a commissioned police officer in July of 1996.

258. Between 2004 through 2012 he was assigned to the 9th District 5 Squad, working with plain clothes criminal investigations, which included burglary detail and NETS Operations.

259. In April of 2012, Bowdren was promoted to Detective. He was later assigned, in March of 2019, to the Gun Violence Task Force.  At the time, there were only two detectives from six Divisions assigned to that unit.

260. As a Detective for the Gun Violence Task Force, his schedule was Monday through Friday from 10:00 a.m. until 6:00 p.m., which allowed him to earn additional overtime whenever he was subpoenaed for court between 8:00 a.m. and 10:00 a.m.

261. Det. Bowdren is skilled in department accreditation procedures, tactical policing, counterintelligence, search and rescue, , surveillance and covert operations, drug enforcement, undercover operations, defense and arrest tactics (DAAT), and intelligence reports.

262. During his 23-year career, Det. Bowdren has been awarded ten Commendatory Citations, eleven Merit Commendations, and one Bravery Commendation. Det. Bowdren was named "Officer of the Month" five times and "Officer of the Year for the 9th District".  He has also received multiple outside commendations from the International German American Police Association, and was nationally recognized with a Police Team Award bestowed by the National Liberty Museum.

263. During Det. Bowdren's off duty time he utilized a Facebook account. Nowhere on his personal Facebook webpage or in his biographical hyperlink did he identify himself as an employee of the City of Philadelphia or as a police officer.

264. On June 7, 2019, Det. Bowdren's Commanding Officer notified him of a pending Facebook investigation. Later that day, he also came to Det. Bowdren's residence to collect his service weapon and to have him sign certain Internal Affairs documents.  On June 7, 2019, Det. Bowdren buried Mrs. Bowdren's sister, and the Bowdren family was hosting a large, post-funeral

family gathering by the time his Commanding Officer arrived and presented him the documents and confiscated his service weapon.

265.  On June 9, 2019, Det. Bowdren was assigned to strict desk duty and was also restricted in the types of investigations he was permitted to conduct. Furthermore, unbeknownst to Det. Bowdren, his Commanding Officer altered his hours to 8:00 a.m. to 4:00 p.m. Despite the change, Det. Bowdren continued to work his 10:00 a.m. to 6:00 p.m. shift and attending court at the Criminal Justice Center.  It was not until July 2, 2019, that he was verbally notified of his change in hours by a shift supervisor. This change in his schedule resulting in a loss of his ability to obtain overtime compensation for the dates he appeared in court at the Criminal Justice Center.

266.  Between July 16th – 31st of 2019, Det. Bowdren was traveling abroad on a previously scheduled vacation.

267.  Upon his return, on August 2, 2019, he was given notice that on July 18, 2019, he had been placed back on Active Duty status. He was then given a memorandum from his supervisor that stated he was immediately being taken off of the Gun Violence Task Force, and placed back into a regular rotation with line squad detectives. This change resulted in a rotating schedule, working 8:00 a.m. to 4:00 p.m. for two weeks, then 4:00 p.m. to 12:00 a.m. for two weeks. Det. Bowdren was instructed to sign the memorandum; next to his signature he wrote: "I was never told as to why I'm being reassigned to 2sqd."

268.  On August 22, 2020, in the presence of his Commanding Officer, Det. Bowdren was ordered to sign his first set of "75-18" disciplinary documents. The general allegations by the City against Det. Bowdren mirrored those against the other Plaintiffs. Det. Bowdren plead not guilty and requested a PBI Hearing. He was also informed that as of July 31, 2019, District Attorney Larry Krasner, had placed Det. Bowdren on the "Giglio List".

269. On February 13, 2020, Det. Bowdren was given a revised set of 75-18' disciplinary reports by his Commanding Officer and ordered to sign them. The revised 75-18's no longer contained the broad, generalized summary, and was more specific regarding the same alleged policy violations. Again, Det. Bowdren plead not guilty and requested a PBI hearing.

270. The vast majority of Facebook posts by Det. Bowdren consist of news articles.  The topics discussed in these articles include the following:

- Special-needs man tortured while attackers stream it on Facebook

- Suspect for Theft from 15th District

- Tennessee Passes Bill Allowing People To Hit Protesters Blocking Roads

- 89 Year Old WWII Veteran Beaten To Death

- 10-Year-Old Girl Beaten, Dragged by Car; 4 Charged

- Mother and Boyfriend Both Charged in Teen's Murder

(A copy of these Facebook Posts appear in the Amended Appendix under the heading William Bowdren Facebook Posts).

271. Det. Bowdren has lost overtime pay, a preference in his schedule, and his reputation. He has yet to have his PBI hearing, and feels he has no other choice but to retire from the Department.

272. As a consequence of the City's adverse actions against him, Officer Bowdren has suffered and continues to suffer emotional injuries, including but not limited to, feelings of hopelessness, embarrassment and humiliation as well as anxiety and depression.  In addition, he has incurred economic and pecuniary loss, forfeiture of benefits and lost earnings for which he is entitled to compensatory damages.

**Plaintiff Raphael McGough**

273. Raphael "Ray" McGough was employed by the City as a commissioned police officer on April 14, 2003.

274. He was initially assigned to the 4ᵗʰ District on November 21, 2003. On March 22, 2009 Plaintiff was assigned to the 3ʳᵈ District due to the merger of the 3ʳᵈ and 4ᵗʰ Districts.

275. On October 22, 2001, Plaintiff was assigned to the 24ᵗʰ District after a swap transfer with a fellow officer.   While in the 24ᵗʰ District, Officer McGough served as a Crime Scene Officer. His duties included fingerprinting and DNA retrieval from burglary scenes, burglary and theft prevention from automobiles, and community relation activities.

276. On November 30, 2018, Ray McGough was promoted to Detective.

277. Detective McGough is highly decorated, and over the course of his seventeen (17) year career he has received several awards and honors for his service to the community. On December 1, 2003, Det. McGough made his first arrest for a bank robbery and received a commendation for the arrest. He has received two Commendatory Citations, one Merit Citation, and a Heroism award for saving an African American male in a fire.

278. During Det. McGough's off duty time he maintained a personal Facebook account. And a Facebook account for his insurance adjustment business.

279. Following the release of the Buzzfeed article on June 1, 2019, and following the Mayor and Commissioner's press conference, Det. McGough learned that his Facebook posts were disclosed by news outlets locally and as far as Florida. However, these news outlets did not name Det. McGough specifically.

280. On July 20, 2019, an investigation was opened by the Philadelphia Police Internal Affairs Unit, case number 19-0602, involving Det. McGough.

-42-

281. Sometime in August of 2019, Det. McGough received disciplinary paperwork, notifying him that he was facing a two-to-five day suspension. The 75-18s (disciplinary reports) stated that he was facing discipline because of racist, sexist, and/ homophobic posts.

282. Det. McGough took his Captain's advice and plead not guilty to the charges.

283. On November 29, 2019, Det. McGough received a second set of 75-18s with new charges against him. The charge was for violation of Section 5-011-10, failure to comply with Police Commissioner's orders, directives, memorandums, regulations, or written orders of superiors. The penalty for this violation ranged from a reprimand to a five-day suspension.

284. On December 12, 2019, Det. McGough was issued a letter of reprimand.

285. Since the summer of 2019, Det. McGough had been placed on the "Giglio list", which affects his reputation in the Philadelphia Municipal Court, Pennsylvania Common Pleas Court and Federal Court.

286. The vast majority of Facebook posts by Det. McGough consist of news articles.  The topics discussed in these articles include the following:

- Antifa Violence Against Police Officers

- Defunding of Police and Corresponding Increase in Violent Crime

- Antifa Extremists Targeting Police At Their Personal Residences

- Whether the Death Penalty Is Appropriate In Rape of Three Year Old

- Blue Lives Matter Post Supporting Slain Officer

(A copy of these Facebook Posts appear in the Amended Appendix under the heading Raphael McGough Facebook Posts).

287. In addition to having his reputation in law enforcement irreparably tarnished, and being placed on a "Giglio" list barring future testimony, Officer McGough has suffered, and continues to suffer, mental anguish and emotional suffering and loss of benefits.

**Plaintiff Francis T. Sheridan**

288. Francis T. Sheridan was employed by the City as a recruit police officer in September of 1990. In February of 1991, Francis Sheridan became a uniformed officer.

289. He was initially assigned to the 18th District in February of 1991. During his time with the 18th District he was a member of the Tactical Response Team and the Philadelphia Highway Patrol Unit.

290. In January of 2001 until October of 2008, Plaintiff became an undercover police officer in the Major Crimes Auto Division.

291. In October of 2008, Mr. Sheridan was promoted to Detective. Until February of 2015, he was a member of the South West Detective Division. From February of 2015 until December of 2019, Det. Sheridan was a member of the Dignitary Protection Section. From December of 2019 to the present he has been assigned as a Task Force Officer on the FBI Joint Terrorism Task Force. As a member of the Task Force Det. Sheridan works with local, state and federal law enforcement and analysts that investigate international terrorism with ties to the Philadelphia Metropolitan region.

292. Detective Sheridan is highly decorated, and over the course of his thirty (30) year career he has received several awards and honors for his service to the community.

293. During Det. Sheridan's off duty time he maintained a personal Facebook account. Nowhere on his Facebook account did Det. Sheridan list that he was employed by the City of Philadelphia or a police officer.

294. Following the release of the Buzzfeed article on June 1, 2019, and following the Mayor and Commissioner's press conference, Det. Sheridan learned that his Facebook posts were a part of the Plain View Project from a former co-worker, Keven Hanna on June 2, 2019. Mr. Hanna

forwarded screen shots of Det. Sheridan's Facebook posts that were on the Plain View Project's website.

295.  On or about January 27, 2020, Det. Sheridan was issued Disciplinary action in the form of 75-18's. The documents once submitted to Det. Sheridan by his immediate supervisor already listed a "Guilty Plea". As a result of the "guilty plea" Det. Sheridan was to be given a reprimand only; it also stated that he would have to waive any and all suits against the City of Philadelphia for acceptance of that "guilty plea".

296.  Because Det. Sheridan did not want to plead guilty, he told his supervisor respectfully that he would not sign the documents and that he would be requesting a hearing on the matter.

297.  Det. Sheridan has yet have a hearing regarding the charges against him.

298.  The two Facebook comments by Det. Sheridan consist of news articles.  The topics discussed in these articles include the following:

- A Child Rapist Raped

- A Teenager Arrested for Raping a Baby Will Avoid Prison

 (A copy of these Facebook Posts appear in the Amended Appendix under the heading Francis Sheridan Facebook Posts).

**299.**  In addition to having his reputation in law enforcement irreparably tarnished, Det. Sheridan has suffered, and continues to suffer, mental anguish and emotional suffering and loss of benefits.

**VI.**
**Causes of Action**

**COUNT I**
**42 U.S.C. § 1983**
**Violation of First Amendment of United States Constitution**

300. Plaintiffs incorporate by reference herein as fully as though set forth verbatim the allegations set forth in the preceding numbered paragraphs and does further allege as follows.

301. The Defendant's decision to take the adversary actions described herein against the Plaintiffs was retaliatory in nature and based, in whole or in part, on their personal exercise of their protected free speech activity on matters of inherent public concern.

302. The Defendant's actions, as set forth herein, served to deprive the Plaintiffs of, and to infringe upon, their protected rights of freedom of expression as guaranteed by the First Amendment of the United States Constitution.

303. As a proximate result of the Defendant's actions, each of the Plaintiffs have suffered, and continue to suffer, economic and pecuniary damages in the form of loss of earnings and the destruction of their professional and personal reputation and career in law enforcement.  In addition, the Plaintiffs have suffered mental anguish, humiliation, embarrassment and emotional injury for which each of them is entitled to an award of compensatory damages.

**COUNT II**

**Violation of Pennsylvania Constitution**
**Article I, Section 7**

304. Plaintiffs incorporate by reference herein as fully as though set forth verbatim the allegations set forth in the preceding numbered paragraphs and does further allege as follows.

305. Article I § 7 of the Constitution of the State of Pennsylvania provides as follows:

**Freedom of press and speech**

c. The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government, and no law shall ever be made to restrain the right thereof. ***The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject***, being responsible for the abuse of that liberty. No conviction shall be had in any prosecution for the publication of papers relating to the official conduct of officers or men in public capacity, or to any other matter proper for public investigation or information, where the fact that such publication was not maliciously or negligently made shall be established to the satisfaction of the jury; and in all indictments for libels the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases.

Emphasis added.

306. The Defendant's decision to take the adversary and disciplinary actions described herein against each of the individual Plaintiffs was retaliatory in nature and based, in whole or in part, on their personal exercise of their protected free speech activity on a matter of inherent public concern.

307. The Defendant's actions, as set forth herein, served to deprive the Plaintiffs of, and to infringe upon, their protected rights of freedom of expression as guaranteed by the Constitution of the State of Pennsylvania.

308. As a proximate result of the Defendant's actions, the Plaintiffs have suffered, and continue to suffer economic and pecuniary damages in the form of loss of earnings.  In addition, the Plaintiffs have suffered mental anguish, humiliation, embarrassment and emotional injury for which they are entitled to an award of compensatory damages.

**COUNT III**
**Violation of Fourteenth Amendment Due Process**

309. Plaintiffs incorporate by reference herein as fully as though set forth verbatim the allegations set forth in the preceding numbered paragraphs and does further allege as follows.

310. Plaintiffs allege that the following two specific provisions in the City of Philadelphia Police Department Directive 6.01, are unconstitutionally vague and overbroad, as applied to the Plaintiffs' exercise of their free speech activity in this case.

I.      Employees are prohibited from using ethnic slurs, profanity, personal insults; material that is harassing, defamatory, fraudulent, or discriminatory, or other content or communications that would not be acceptable in a City workplace under City or agency policy or practice.

J.      Employees are prohibited from displaying sexually explicit images, cartoons, jokes, messages or other material that would be considered in violation of the City Policy Preventing Sexual Harassment in City Government.

(A copy of the full text of Policy Directive 6.01 is attached hereto as Exhibit A an incorporated herein by reference).

311. To the extent that any disciplinary measures were taken against the Plaintiffs based on an alleged violation of Policy Directive 6.01(I) or 6.01(J), such action impermissibly infringes on the Plaintiffs' freedom of speech and otherwise violates their constitutional right under the Fourteenth Amendment due process clause.

312. Policy Directive 6.01(I) and 6.01(J), as applied to the Plaintiffs' Facebook posts, are unconstitutionally vague and overbroad and do not reasonably inform the Plaintiffs of the type of speech activity that is proscribed.

313. In addition, the Defendant arbitrarily and capriciously applies a double standard in its enforcement of Policy Directive 6.01(I) and (J) based on the viewpoint being expressed, and oftentimes the race of the speaker.

314. Kathy Caswell is an officer in the 12th District. Unlike the Plaintiffs, Officer Caswell identifies herself on her personal Facebook Page as an employee of the City of Philadelphia Police Department. Officer Caswell posted a very controversial Facebook post utilizing extremely foul, racist and inflammatory language, yet Officer Caswell was never punished by

the Police Department for her publication of this post; nor was she singled out by the Plain View

Project for this or any other Facebook posting.



315. Michelle Dennard is a police officer with the City of Philadelphia Police Department. Unlike the Plaintiffs, Ms. Dennard identifies herself as a member of the City of Philadelphia Police Department on her Facebook page.

316. The following is a copy of a Facebook post by Officer Dennard in which she engages in blatantly racist commentary:



317. Officer Dennard was never punished by the Police Department for her publication of this post; nor was she singled out by the Plain View Project for this or any other Facebook posting.

318. Glenn Holmes is an officer in the 9th District of the City of Philadelphia. Officer Holmes has posted in excess of 100 Facebook postings including the examples below, of

controversial, racially charged and inappropriate Facebook Posts. However, Glenn Holmes was

not disciplined or reprimanded for his posts; nor was he ever flagged by Plain View project.



**319.** Lt. Jonathan Josey is an officer with the Philadelphia Police Department.  The following is an example of a Facebook post by Lt. Josey.  Plaintiffs allege that Lt. Josey has not been subjected to any form of discipline for his post or cited with any violation of Police Directive 6.01.



**Request for Relief**

*Declaratory Judgment*

1.    An actual controversy exists between the parties as to whether the Defendant's policies, practices and customs with regard to the restrictions placed its employee's free speech activity as expressed on the employee's personal social media are enforced in an arbitrary manner and therefore violate the Plaintiffs' constitutional rights.  Plaintiffs respectfully request a declaratory judgment that the actions of the City of Philadelphia, Pennsylvania violated the federal and state constitutional rights of the Plaintiffs to freely exercise their freedom of speech.

*Nominal Damages*

2.     Plaintiffs seek an order awarding nominal damages for the Defendant's violation of their federal and state constitutional rights.

*Compensatory Damages*

3.     Plaintiffs each individually seek an order awarding compensatory damages to them for the Defendant's violation of their federal and state constitutional rights in the amount of $2,000,000.

*Attorney's Fees and Costs*

4.     Plaintiffs seek an order awarding the costs of this cause, including attorney's fees, costs and expenses under 42 U.S.C. § 1988.

*Jury Demand*

5.     Plaintiffs demand a jury of six to hear and try this case.

*Other Relief*

6.     Plaintiffs additionally request such other relief as the Court deems just and proper.

Respectfully submitted,



*/s Larry L. Crain*
Larry L. Crain
5214 Maryland Way, Suite 402
Brentwood, TN  37027
Tel.  615-376-2600
Fax. 615-345-6009
Larry@crainlaw.legal

*/s Emily A. Castro*_____
Emily A. Castro
5214 Maryland Way, Suite 402
Brentwood, TN  37027
Tel.  615-376-2600
Fax. 615-345-6009
Emily@crainlaw.legal

*/s/ Jonathan J. Sobel*_____
Jonathan J. Sobel
Law Offices of Jonathan J. Sobel
1500 Walnut Street, Suite 2000
Philadelphia, PA  19102
Tel. (215) 735-7535
Fax: (215) 269-2540
Email: mate89@aol.com

*Counsel for the Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and correct copy of the foregoing Amended Complaint was served on the following individual(s) via the Court's ECF-filing system on this the 7th day of October, 2020.

Brian Matthew Rhodes  brian.rhodes@phila.gov
Frank Wehr  frank.wehr@phila.gov
Nicole Morris   nicole.morris@phila.gov
Philadelphia Department of Law
1515 Arch St #15
Philadelphia, PA 19102

*/s Larry L. Crain*
Larry L. Crain