## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CHRISTIAN FENICO,** | : | |
| **THOMAS YOUNG,** | : | |
| **THOMAS GACK,** | : | |
| **EDWARD McCAMMITT,** | : | |
| **TANYA GRANDIZO,** | : | |
| **ANTHONY ANZIDEO,** | : | |
| **ANTHONY ACQUAVIVA,** | : | |
| **KRISTINE AMATO,** | : | |
| **JOSEPH PRZEPIORKA,** | : | |
| **FRANCIS SHERIDAN,** | : | |
| **WILLIAM BOWDREN, and** | : | |
| **RAPAHEL MCGOUGH** | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 20-3336 (PBT) |
| | : | |
| **CITY OF PHILADELPHIA,** | : | |
| | : | |
| Defendant. | : | |

## <u>ORDER</u>

    **AND NOW**, this _____day of _____, 20_____, upon consideration of Defendant City of Philadelphia's Motion to Dismiss, and any response thereto, it is hereby **ORDERED** that the Motion is **GRANTED**. All claims against Defendant City of Philadelphia are **DISMISSED WITH PREJUDICE.**

                        **BY THE COURT:**

                        _____

                        **PETRESE B. TUCKER, J.**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHRISTIAN FENICO,** | : | |
| **THOMAS YOUNG,** | : | |
| **THOMAS GACK,** | : | |
| **EDWARD McCAMMITT,** | : | |
| **TANYA GRANDIZO,** | : | |
| **ANTHONY ANZIDEO,** | : | |
| **ANTHONY ACQUAVIVA,** | : | |
| **KRISTINE AMATO,** | : | |
| **JOSEPH PRZEPIORKA,** | : | |
| **FRANCIS SHERIDAN,** | : | |
| **WILLIAM BOWDREN, and** | : | |
| **RAPAHEL MCGOUGH** | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 20-3336 (PBT) |
| | : | |
| **CITY OF PHILADELPHIA,** | : | |
| | : | |
| Defendant. | : | |

**DEFENDANT CITY OF PHILADELPHIA'S
<u>MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM</u>**

Defendant City of Philadelphia files this motion to dismiss for failure to state a claim

under Fed. R. Civ. P. 12(b)(6), seeking that all counts of Plaintiffs' Amended Complaint be

dismissed with prejudice on the grounds more fully described in the supporting memorandum of

law.

1

Respectfully Submitted,

CITY OF PHILADELPHIA
LAW DEPARTMENT

Date: <u>November 2, 2020</u>                    BY:   <u>s/*Brian Matthew Rhodes*</u>
Brian Matthew Rhodes
Senior Attorney
Pa. Attorney ID No. 69716
City of Philadelphia Law Dept.
1515 Arch St., 16th Fl.
Philadelphia, PA 19102
215.528.9960
Brian.Rhodes@phila.gov


Meghan A. Byrnes
Deputy City Solicitor
Pa. Attorney ID No. 321316
City of Philadelphia Law Dept.
1515 Arch St., 17th Fl.
Philadelphia, PA 19102
215.683.5011
Meghan.Byrnes@phila.gov

Frank Wehr
Assistant City Solicitor
Pa. Attorney ID No. 318464
City of Philadelphia Law Dept.
1515 Arch St., 16th Fl.
Phone Number
Frank.Wehr@phila.gov

## <u>TABLE OF CONTENTS</u>

I.     **INTRODUCTION** ................................................................................................. **10**

II.    **FACTUAL SUMMARY** .................................................................................... **11**

  A.  Christian Fenico: "Hates Every Last [Muslim Refugee]" ................................ 14

  B.  Thomas Young: Called for "Ban [of] Islam from all Western Nations." ........... 14

  C.  Thomas Gack: Compared "Obama Voters" to Chimpanzees. ........................... 16

  D.  Edward McCammitt: Promoted extreme violence against Protesters. .............. 18

  E.  Tanya Grandizio: Asked "Can a Muslim be a Good American?" ..................... 19

  F.  Anthony Anzideo: Promoted Vigilante Justice ................................................ 20

  G.  Anthony Acquaviva: Compared Muslim Women and Children to trash bags. ........ 21

  H.  Kristine Amato: Promoted excessive use of force. .......................................... 23

  I.  Joseph Przepiorka: Called for "Death to Islam." ............................................ 25

  J.  Francis Sheridan: Celebrated prison rape. ...................................................... 26

  K.  William Bowdren: Promoted violence against protesters. ............................... 27

  L.  Raphael McGough: Called for the "extermination" of "alt left extremists." ..... 28

III.  **STANDARD OF REVIEW** ........................................................................... **29**

IV.  **THE OFFICERS' FIRST AMENDMENT CLAIM SHOULD BE DISMISSED BECAUSE THEIR SOCIAL MEDIA POSTINGS WERE *PER SE* DISRUPTIVE.** **30**

  A.  **The City has a compelling interest in ensuring public trust in, and promoting efficiency the PPD and Plaintiffs' posts are disruptive to that mission.** .................... **32**

    1.  Speech displaying animus against individuals on the basis of Race, Ethnicity, Religion, Sexual Orientation and/or Gender Identity, is disruptive ............................... 36

    2.  Violence and Vigilantism, Lack of Respect of Due Process; Police Brutality, Misuse of Power ..................................................................................................... 40

  B.  The City's interest in maintaining effectiveness and preserving the public trust far outweighs the Plaintiffs' free speech rights. ...................................................... 42

V.   **PLAINTIFFS' CLAIMS UNDER THE PENNSYLVANIA CONSTITUTION FAIL AS A MATTER OF LAW.** ................................................................................ **43**

VI.  **THE OFFICERS HAVE NOT ALLEGED A VIOLATION OF FOURTEENTH AMENDMENT DUE PROCESS.** ..................................................................... **44**

A. The Plaintiffs Have no Standing to Assert Vagueness. ...................................................... 44

B. The Plaintiffs cannot show that the PPD arbitrarily enforced the Social Media Policy. ... 47

**VII. CONCLUSION** ............................................................................................................. **48**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aiello v. City of Wilmington, Del.*,
    623 F.2d 845 (3d Cir. 1980).................................................................................45

*Albright v. Oliver*,
    510 U.S. 266 (1994)..........................................................................................45

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..........................................................................................30

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..........................................................................................30

*Borden v. Sch. Dist. of Twp. of E. Brunswick*,
    523 F. 3d 153 (3d Cir. 2008)............................................................................46

*Brennan v. Norton*,
    350 F.3d 399 (3d Cir. 2003)........................................................................32, 33

*Broadrick v. Oklahoma*,
    413 U.S. 601 (1973)..........................................................................................46

*Citizens Fin. Grp. v. Citizens Nat'l Bank of Evans City*,
    383 F.3d 110 (3d Cir. 2004).............................................................................31

*Com v. Pownall*,
    CP-51-CR-0007307-2018 (Pa. Com. Pl.) ........................................................24

*Connick v. Meyers*,
    461 U.S. 138 and 150...................................................................................32, 34

*Dible v. City of Chandler*,
    515 F.3d 918 (9th Cir. 2008) ...........................................................................35

*Dooley v. City of Phila.*,
    153 F. Supp. 2d 628 (E.D. Pa. 2001) ...............................................................44

*Fisher v. Mermaid Manor Home for Adults, LLC*,
    192 F. Supp. 3d 323 (E.D.N.Y. 2016) .............................................................40

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006)..........................................................................................33

*Grutzmacher v. Howard Cty.*,
    851 F.3d 332 (4th Cir. 2017) ........................................................................41, 43

*Heil v. Santoro*,
    147 F.3d 103 (2d Cir. 1998)................................................................................35

*Hernandez v. City of Phoenix*,
    No. CV-19-05365, 2020 WL 5057634 (D. Ariz. Aug. 27, 2020)..........................34

*Hill v. Borough of Kutztown*,
    455 F.3d 225 (3d Cir. 2006)................................................................................32

*Jones v. City of Phila.*,
    890 A.2d 1188 (Pa. Commw. Ct. 2006), *appeal denied*, 909 A.2d 1291 (Pa.
    2006) ....................................................................................................................44

*Kelley v. Johnson*,
    425 U.S. 238 (1976)............................................................................................34

*Lloyd v. Holder*,
    No. 11 Civ. 3154, 2013 WL 6667531 (S.D.N.Y. Dec. 17, 2013)..........................38

*Locurto v. Giuliani*,
    447 F.3d 159 (2d Cir. 2006).................................................................... *passim*

*Loscombe v. City of Scranton*,
    902 F. Supp. 2d 532 (M.D. Pa. 2012), *aff'd*, 600 F. App'x 847 (3d Cir. 2015) .....................46

*Lytle v. City of Haysville, Kan.*,
    138 F.3d 857 (10th Cir. 1998) ............................................................................39

*Meenan v. Harrison*,
    264 F. App'x 146 (3d Cir. 2008) ........................................................................34

*Morse v. Lower Merion Sch. Dist.*,
    132 F.3d 902 (3d Cir. 1997)................................................................................30

*Munroe v. Cent. Bucks Sch. Dist.*,
    805 F.3d 454 (3d Cir. 2015)................................................................................33

*Muti v. Schmidt*,
    96 F. App'x 69 (3d Cir.), *vacated on other grounds* (Aug. 12, 2004),
    *superseded on other grounds*, 118 F. App'x 646 (3d Cir. 2004) ............................30

*O'Connor v. Ortega*,
    480 U.S. 709 (1987)............................................................................................31

*Oladeinde v. City of Birmingham*,
    230 F. 3d 1275 (11th Cir. 2000) ......................................................34

*Pace v. Baker-White*,
    432 F. Supp. 3d 495 (E.D. Pa. 2020) ..............................................11

*Palardy v. Twp. of Mullburn*,
    906 F.3d 76 (3d Cir. 2018).............................................................31

*Pappas v. Giuliani*,
    290 F.3d 143 (2d Cir. 2002)................................................... *passim*

*Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*,
    998 F.2d 1192 (3d Cir. 1993).........................................................12

*Phillips v. Cty. of Allegheny*,
    515 F.3d 224 (3d Cir. 2008)...........................................................30

in the matter of *Pickering v. Board of Education of Township High School,
District 205, Will County, Illinois*,
    391 U.S. 563 (1968)..........................................................30, 32, 33

*Pinker v. Roche Holdings, Ltd.*,
    292 F.3d 361 (3d Cir. 2002)...........................................................30

*Pryor v. Nat'l Collegiate Athletic Ass'n*,
    288 F.3d 548 (3d Cir. 2002)...........................................................31

*Rankin v. McPherson*,
    483 U.S. 378 (1987)......................................................................33

*Rode v. Dellarciprete*,
    845 F.2d 1195, 1200 (3d Cir. 1988)...............................................45

*Sabatini v. Las Vegas Metro. Police Dep't*,
    369 F. Supp. 3d 1066 (D. Nev. 2019)................................38, 41, 42, 43

*Spence v. Bukofzer*,
    No. 15 Civ. 6167, 2017 WL 1194478 (S.D.N.Y. March 30, 2017)........40

*Stoltzfoos v. Sec'y of Pa. Dep't of Corrs.*,
    733 F. App'x 34 (3d Cir. 2018) .....................................................45

*Venable v. Metro. Gov. of Nashville*,
    430 F. Supp. 3d 350 (2019) ..........................................................42

*Waters v. Churchill*,
    511 U.S. 661 (1994)......................................................................34

*Webb v. City of Philadelphia*,
 562 F.3d 256 (3d Cir. 2009).........................................................................................48

**Other Authorities**

U.S. Const. amend. I ............................................................................................ *passim*

U.S. Const. amend. XIV ........................................................................10, 11, 44, 45

Fed. R. Civ. P. 12(b)(6)................................................................................9, 10, 29

Pa. Const. Art. I, § 7............................................................................................43, 44

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | |
|---|---|
| **CHRISTIAN FENICO,** | : |
| **THOMAS YOUNG,** | : |
| **THOMAS GACK,** | : |
| **EDWARD McCAMMITT,** | : |
| **TANYA GRANDIZO,** | : |
| **ANTHONY ANZIDEO,** | : |
| **ANTHONY ACQUAVIVA,** | : |
| **KRISTINE AMATO,** | : |
| **JOSEPH PRZEPIORKA,** | : |
| **FRANCIS SHERIDAN,** | : |
| **WILLIAM BOWDREN, and** | : |
| **RAPAHEL MCGOUGH** | : |
| | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :    Civil Action No. 20-3336 (PBT) |
| | : |
| **CITY OF PHILADELPHIA,** | : |
| | : |
| Defendant. | : |

---

### DEFENDANT CITY OF PHILADELPHIA'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS

Defendant City of Philadelphia ("City") submits this memorandum of law in support of

its motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) and seeks

dismissal on all counts of the Amended Complaint.  Plaintiffs, who comprise twelve (12) former

and current Philadelphia police officers, bring this suit against the City alleging that they were

wronged as a result of discipline issued to them because of inappropriate social media postings

they made on the social networking website Facebook. They contend that their free speech rights

under both the United States Constitution and the Pennsylvania Constitution have been violated

and that any adverse employment action taken against them was in retaliation for exercising their

freedom of speech.  Further, the Plaintiffs claim Fourteenth Amendment Due Process violations

based on their belief that the Philadelphia Police Department's social media policy is

unconstitutionally vague, and on the theory that the City engaged in viewpoint discrimination

against them.  On all counts, the Plaintiffs are woefully mistaken.

## I.  <u>INTRODUCTION</u>

The honor of being a member of the Philadelphia Police Department (hereinafter

"PPD")—the nation's fourth largest police department, with more than 6,300 sworn officers and

800 civilian employees,[1] and serving Philadelphia's approximately 1.5 million residents—comes

with great privilege and responsibility.  Every sworn officer, including the Plaintiffs, took an

Oath to become a police officer.  This Oath is a solemn pledge to each citizen of Philadelphia,

and its visitors, that, among other things, every officer will abide by three core values—Honor,

Integrity and Service.  The Plaintiffs' publicly advertised beliefs, via their Facebook posts, are

contrary to the PPD's core values and negatively impact their ability, or the public's perception

of their ability, to police equitably and carry out the PPD oath to serve with honor and integrity.

Aside from the many obvious harms done by the posts, when the public loses trust in the police,

it only makes a police officer's job more difficult and less safe.

Therefore, the City moves to dismiss under Fed. R. Civ. P. 12(b)(6) all of the Plaintiffs'

claims.  Specifically, Plaintiffs' First Amendment claims must be dismissed because their

Facebook posts were *per se* disruptive and the City's interest in maintaining effectiveness and

preserving the public trust far outweighs their free speech rights. In addition, because there is no

---

[1]     City    of    Philadelphia    web    page,    Philadelphia    Police    Department.
https://www.phillypolice.com/about/index.html

recognized private cause of action for violations of the Pennsylvania Constitution, that claim must fail.  Lastly, the Plaintiffs' Due Process claims also fail because they failed to plausibly allege viewpoint discrimination and they lack standing to attack the social media policy as vague.  For these and the proceeding reasons, this Court should dismiss the Amended Complaint in its entirety.

## II.  <u>FACTUAL SUMMARY</u>[2]

The Plaintiffs are a group of current and former members of the PPD, all of whom were disciplined, up to and including termination for some, because of posted content on Facebook.  Am. Compl. at ¶ 3.  Despite the violent content, blatantly racist and anti-Muslim animus displayed by the Plaintiffs' posts, they allege that the City improperly singled them out for discipline based on their political views, violating their First and Fourteenth Amendment rights and rights under the Pennsylvania Constitution.  They request $2 million each in damages. *Id*. at ¶ 7.

The Facebook posts at issue gained notoriety when several media outlets reported on the information disclosed through the Plain View Project[3] (also referred to herein as "PVP"), an online database "that has identified thousands of Facebook posts and comments by current and former police officers." *Pace v. Baker-White*, 432 F. Supp. 3d 495, 499 (E.D. Pa. 2020).[4] The most comprehensive exposé was a Buzzfeed News article titled "Cops Across The US Have Been Exposed Posting Racist And Violent Things On Facebook. Here's The Proof." Emily

---

[2]  For the purposes of this Motion to Dismiss, Defendant accepts the facts as pled by Plaintiff as true.

[3] The PVP is a live database available at <u>https://www.plainviewproject.org/</u>.

[4] The *Pace* case involved a defamation lawsuit brought by a PPD Inspector against the creators of the PVP Database.  The suit was dismissed.

Hoerner & Rick Tulsky, *Cops Across the US Have Been Exposed Posting Racist and Violent Things on Facebook.  Here's the Proof.*  BUZZFEED NEWS, June 1, 2019, https://www.buzzfeednews.com/article/emilyhoerner/police-facebook-racist-violent-posts-comments-philadelphia ("Buzzfeed Article"), attached hereto as Exhibit A.[5]  In the article, Buzzfeed News, in conjunction with Injustice Watch,[6] a non-profit organization, reviewed posts by police officers found in the PVP database and highlighted concerns raised by scholars and community leaders.[7]  Buzzfeed cited to Facebook posts solely from the PVP.  Upon discovering the Buzzfeed Article and the PVP database, the PPD conducted a thorough investigation of each of the Officers' Facebook posts published by the PVP, coming to the conclusion that the Officers violated either or both of the following PPD Disciplinary Code(s):

- Article I - Conduct Unbecoming - Section 1-§ 021-10, which allows for discipline based on "Any incident, conduct, or course of conduct which indicates that an employee has little or no regard for his/her responsibility as a member of the Police Department."

---

[5] Because the Plaintiffs attached their Facebook posts in separate appendices to the Amended Complaint and reference the Buzzfeed Article on numerous occasions in the Amended Complaint the City has attached these materials to this motion.  *See, e.g.*, Am. Compl. at ¶¶ 1, 40-42, 44, 94, 116, 161-62, 193, 196, 210, 279, 294; *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.").

[6] *See Mission*, INJUSTICE WATCH, https://www.injusticewatch.org/about/mission/ (last visited Oct. 23, 2020) ("Injustice Watch is a non-partisan, not-for-profit journalism organization that conducts in-depth research exposing institutional failures that obstruct justice and equality.")

[7] The Buzzfeed Article reports: "Of the pages of officers whom the Plain View researchers could positively identify, about 1 in 5 of the current officers, and 2 in 5 of the retired officers, made public posts or comments that met that threshold—typically by displaying bias, applauding violence, scoffing at due process, or using dehumanizing language. The officers mocked Mexicans, women, and black people, celebrated the Confederate flag, and showed a man wearing a kaffiyeh scarf in the crosshairs of a gun." Ex. A.  Specifically, with respect to the City, the Buzzfeed Article states, "[i]n Philadelphia, which has roughly 6,600 officers, the Plain View Project identified 1,073 on Facebook, about a third of whom had made troubling posts or comments." *Id.*

- Article V – Neglect of Duty – Section 5-§ 011-10, which allows for discipline based on "Failure to comply with any Police Commissioner's orders, directives, memorandums, or regulations; or any oral or written orders of superiors."

*See* Am. Compl. at ¶¶ 56-57.  These Facebook posts also violated the PPD's Social Media Policy (hereinafter the "Social Media Policy" or "Policy"), PPD Directive 6.10, which prohibits the use of ethnic slurs, profanity, personal insults, material that is harassing, defamatory, fraudulent, or discriminatory, or content and communications that would not be acceptable in a City workplace or under City agency, policy, or practice on social media. *See* Am. Compl. Ex. A.  The Policy specifically states:

> [A]s members of the Philadelphia Police Department, employees are embodiments of its mission. It is, thus, essential that each member accept his or her role as an ambassador of the department. In doing so, ***each member must strive to maintain public trust and confidence***, not only in his or her professional capacity, ***but also in his or her personal and on-line activities***. Moreover, as police personnel are necessarily held to a higher standard than general members of the public, the on-line activities of employees of the police department shall reflect such professional expectations and standards.

*Id.* (emphasis added).

Each Plaintiff pledged to abide by the following Philadelphia Police Department Code of Ethics, found in Philadelphia Police Department Directives 1.0: Mission, Values, Ethics and Code of Conduct, and also includes the PPD's Oath, which is attached hereto as Exhibit B.  In it, it specifically provides:

> As a Police Officer, my fundamental duty ***is to serve the community; to safeguard lives and property***; to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder***; and to respect the Constitutional rights of all persons to liberty, equality, and justice***. I will keep my private life unsullied as an example to all.

*See* Ex. B (emphasis added). It further states that:

> I will never act officiously ***or permit personal feelings, prejudices, animosities, or friendships to influence my decisions*** . . . . ***I recognize the badge of my office as***

13

> **_a symbol of public faith, and I accept it as a public trust to be held_** so long as I am
> true to the ethics of the police service.

*Id.*

Below is a separated list of facts pertaining to each individual Plaintiff, including

examples of posts published by each Plaintiff.

### A.  Christian Fenico: "Hates Every Last [Muslim Refugee]"

Christian Fenico was employed as a police officer with PPD from 2003 until his

termination on or about July 17, 2019. Am. Compl. at ¶¶ 26, 49.  PPD's analysis of Mr. Fenico's

Facebook posts and comments (under the name "Chris Joseph") from 2012 to 2015 led to the

determination that he violated both Article I, Conduct Unbecoming of an Officer, and Article V,

Neglect of Duty.  *Id.* at ¶¶ 54-58.  Mr. Fenico's posts are a mix of racial bias, anti-Muslim

sentiment, and promotion of extrajudicial violence and punishment.  For example, he commented

the following on a post about Muslim refugees refusing food donations, with the caption "STOP

ISLAM,": "Good, let them starve to death.  I hate every last one of them." Fenico App'x[8] at p.

8.[9]  In addition, Mr. Fenico demonstrated racial bias in a comment about a teen who was shot: "I

like the 'why is there no epidemic of white cops shooting white kids.' Ummm." *Id.* at p. 7.[10]

### B.  Thomas Young: Called for "Ban [of] Islam from all Western Nations."

---

[8] The Amended Complaint attaches separate appendices containing Facebook posts for each
individual Plaintiff, with the exception of Plaintiff Anthony Aquaviva. This memorandum cites
each appendix individually by including the author's last name in the citation, *e.g.*, "Fenico
App'x at [page number]."

[9] As discussed below, Plaintiff Kristine Amato, who goes under the name "Yo Stuff" also
commented on this post, stating "send these ungrateful fucks back – fuck them." Amato App'x
at 2.

[10] *See also* Fenico App'x at 4 (advocating violence in a post about allegedly racist speech by actor
Jamie Foxx, saying that "white people" should have "kicked his ass"); *id.* at 6 (demonstrating
flippant attitude towards use of force, Mr. Fenico shared an article about a teenager subjected to
police brutality, commenting "Who cares, kid and mom are scumbags. Good job police.")

Thomas Young was employed with PPD from around 1989 or 1990, reaching the rank of Corporal, until his resignation on or around July 19, 2019. Am. Compl. at ¶¶ 71, 83.  Mr. Young resigned instead of facing disciplinary charges. *Id*. at ¶ 83.  PPD's analysis of Mr. Young's Facebook posts and comments led to the determination that he violated both Article I, Conduct Unbecoming, and Article V, Neglect of Duty.  Although he made other types of problematic posts,[11] the majority of Mr. Young's posts demonstrate bias against Muslims and specifically call for "ban[ning] Islam from all Western nations":



_____

[11] In addition to anti-Muslim animus, Mr. Young's other posts demonstrate anti-LGBTQ animus and a cavalier attitude towards police use of force.  *See, e.g.*, Young App'x at p. 9 (identifying himself as a police officer, he posted the following comments on an article entitled "Homosexuals Throw Human Excrement At Christians, and Wipe Their Anuses With Pages of the Bible": "Liberalism is truly a mental disorder"; "…as a cop I've had the misfortune to detailed [sic] to events like this."); *id.* at p. 2 (commented "Don't resist arrest" on post of a news video about police officers breaking a man's leg after a traffic stop).

Young App'x at p. 14.  He also commented again to "Ban Islam from our country" to a post

regarding "Somali Terrorists" entering the United States. Young App'x at p. 10.[12]

### C.  Thomas Gack: Compared "Obama Voters" to Chimpanzees.

Thomas Gack was employed with PPD as a police officer from around 1993 until his

termination in or around August 2019.  Am. Compl. at ¶¶ 88, 103-04.  Mr. Gack was terminated

in August 2019 for violating both Article I, Conduct Unbecoming, and Article V, Neglect of

Duty of the disciplinary code.  *Id.* at ¶¶ 102-04.   As an example of one of his posts deemed in

violation of PPD policy, he posted the following meme[13] depicting four chimpanzees with their

hands outstretched, labelling them "Obama Voters":



---

[12] *See also, e.g.*, Young App'x at p. 3 ("I hope the people of the West wake up to this Islamic
Invasion before its [sic] too late!"); *id.* at p. 6 (in response to post about mass shooting in San
Bernardino, California, Mr. Young sarcastically commented "That pesky Religion of Peace
always up to something.*"*); *id*. at p. 12 ("Ah, where ever [sic] Islam goes it brings peace and
happiness. NOT!!").

[13] A meme is "an amusing or interesting item (such as a captioned picture or video) or genre of
items that is spread widely online especially though use of social media." *Meme*, Merriam-
Webster Online Dictionary, http://www.merriam-webster.com/dictionary/meme.

Gack App'x at p. 27.[14]  And, in the following post, Mr. Gack promoted police violence against

protestors, who are members of the community he is sworn to protect and serve:



Gack App'x at p. 15.

A number of Mr. Gack's posts advocate violence and excessive use of police force. For

instance, Mr. Gack posted a meme indicating that if someone "belongs" in a men's bathroom and

follow his wife or daughter into a women's bathroom, that person will need to use the

"handicapped" restroom.  Gack App'x at p. 21.  This post not only demonstrates bias against

transgender people, but actually threatens violence against them.[15]

---

[14] Mr. Gack published other posts clearly demonstrating racial and ethnic animus, as well as anti-Muslim sentiment.  *See, e.g.*, Gack App'x at p. 14 (referring to African-American politicians as "thugs" and "race baiters"); *id.* at p. 22 (meme stereotyping Mexican in a sombrero with the comment "Hillary Clinton sucks"); *id.* at 9 (commenting on an article about the Pope washing Muslim prisoners' feet: "This is what socialists do……pander to the evil that wants to kill you!!!"); *id.* at p. 1 (posted a video on 12/14/13 titled "Muslims Say They Will Make Rape Legal On White Women When They Take Over Europe!!"); *id.* at pp. 23-25 (commented on news that "Islamic refugees" would be allowed into Pennsylvania, calling them "terrorists").

[15] Mr. Gack posted other comments promoting vigilante justice and demonstrating lack of respect for due process. *See* Gack App'x at p. 36 (accused of child sex offender should be "beaten to

### D.  Edward McCammitt: Promoted extreme violence against Protesters.

Edward McCammitt was employed as a police officer with PPD from around 1986 until his retirement on or around July 23, 2019. Am. Compl. at ¶¶ 110, 131.  Mr. McCammitt resigned, rather than face termination, in July 2019 after he was cited for violating both Article I, Conduct Unbecoming, and Article V, Neglect of Duty of the disciplinary code.  *Id.* at ¶¶ 125-30.  Most astounding are his posts that make light of violence, excessive use of police force, and police misconduct.  In particular, Mr. McCammitt posted a meme of a shooting target of a human silhouette, with the caption "Why don't they shoot them in the leg?  Because you're an idiot…and its only 2 points."



---

death by the families of his victims"); *id.* at p. 10 (meme of pointed handgun captioned "[y]ou might break in, but you ain't walkin' out!," advocating violence and taking the law into your own hands); *id.* at p. 11 (shared a meme referring to "Child Molester Hunting Permit" and promoting shooting child molesters "on sight").

McCammitt App'x at p. 9.  In this post, he promoted police violence against protestors:



*Id.* at p. 2. Similarly, he posted a meme of a vehicle's front bumper with the caption "This bumper will take an animal hit at 65 mph or a protestor, whatever." *Id.* at p. 3.[16]

### E.  Tanya Grandizio: Asked "Can a Muslim be a Good American?"

Tanya Grandizio[17] has been employed with PPD since approximately 1995, reaching the status of Corporal.  Am. Compl. at ¶¶ 138, 140.  In June of 2019, PPD officials notified Corporal Grandizio that she was under investigation for problematic posts on Facebook and placed her on restricted duty during the investigation.  *Id.* at ¶ 144.  Following that investigation, Corporal Grandizio received a 30-day suspension based on her violation of both Article I, Conduct

---

[16] Mr. McCammitt's posts display brazen bias against Muslims and LGBTQ individuals. *See* McCammitt App'x at p. 4 ("Muslims: Death to America![;] American Liberals: Let them in!"); *id.* at p. 17 ("Knock Knock, We're Your New NEIGHBORS"); *id.* at p. 16 (posting meme implying Muslims are pedophiles); *id.* at p. 10 ("When you get shot in the groin by a rubber bullet and your made-up gender doesn't protect your willie.")

[17] The Complaint appears to misspell Officer Grandizio's name as "Grandizo."  Her Facebook posts in the Appendix indicate that the correct spelling is "Grandizio."

Unbecoming, and Article V, Neglect of Duty, of the disciplinary code. *Id*. at ¶ 150. Corporal Grandizio's posts demonstrated extreme anti-Muslim sentiment. For example, she posted a long meme which lists ten "reasons" why Muslims cannot be a "good American[s]" based on their religion. Grandizio App'x at p. 5. Further, she commented that she copied the reasons from someone else and that "every word is true" and "…perhaps we should be very suspicious of ALL MUSLIMS in this country…They obviously cannot be both 'good' Muslims and good Americans…The religious war is bigger than we know….Muslims everywhere have said they will destroy us from within." *Id*. (emphasis original). Similarly, in another meme she shared, it stated "Muslims hate pork, beer, dogs, bikinis, Jesus, and freedom of speech." *Id*. at p. 7.[18]

### F. Anthony Anzideo: Promoted Vigilante Justice

Anthony Anzideo began his employment at PPD in February 2007, and was eventually promoted to Detective. Am. Compl. at ¶¶ 153, 155. In June 2019, PPD notified Detective Anzideo that he was under investigation for problematic posts on Facebook and would be placed on restricted duty for sixty days during the investigation. *Id*. at ¶¶ 163, 169, 179. Detective Anzideo was found to have violated Article V, Neglect of Duty, and is earmarked to serve a five (5) day suspension. *Id*. at ¶¶ 170-174. Detective Anzideo's posts promoted violence, and in particular, vigilante justice against those accused of crimes in an affront to due process. For example, he stated "good point" in this post when someone commented 'throw him in general population and hopefully gets killed by an inmate" in reference to one of the Boston Marathon bombers:

---

[18] *See also* Grandizio App'x at p. 1 (meme with images of three different types religious leaders (representing Judaism, Christianity, and Hinduism) saying "Leave us Alone, We Leave You Alone" without a fourth image of a leader representing Islam saying "Leave us Alone, We'll Kill You Anyway."); *id*. at p. 3 (commented on meme titled "Can You Connect the Dots" that "Islam has been perverted and not many followers of Islam are trying to fix it").



Anzideo App'x at p. 4.[19]

### G. Anthony Acquaviva: Compared Muslim Women and Children to trash bags.

Anthony Acquaviva was employed with PPD as a police officer from approximately 1990 until his retirement on or around July 19, 2019.  Am. Compl. at ¶¶ 187, 201.  He chose to retire in lieu of facing disciplinary charges for violating both Article I, Conduct Unbecoming, and Article V, Neglect of Duty, of the disciplinary code.  *Id.* at ¶¶ 198-99.  Mr. Acquaviva disparaged African-Americans and Muslims in a number of Facebook posts.  For example, Mr. Acquaviva shared the following meme of a Muslim woman and child dressed in black burqas, comparing them to trash bags:

---

[19] *See also, e.g.*, Anzideo App'x at 1 (posted an article about the "knockout game" and commented "Haha!" in reply to another commenter saying he hoped "one of these kids get shot in the face."); *id.* at 3 (commented "POS [piece of shit] take him out" on a news article about the perpetrator of two shootings).



Original App'x at p. 83.[20]  Mr. Acquaviva also posted a meme of what appears to be a

Muslim man saying "All I want to do is move to your country, rape your women, bomb your

buses, riot in your streets, and demand that you accept my religion.  Why can't you be more

tolerant?"  *Id.* at p. 82.  Mr. Acquaviva also ridiculed and demeaned Black people by sharing a

meme of a Black man wearing what appears to be a diaper under his jeans.  The picture is

captioned with the word "Thuggies™," indicating a play on words between the derogatory term

"Thug" and the "Huggies" diaper brand: [21]

---

[20]  Because Plaintiffs failed to attach a separate appendix for Mr. Acquaviva to the Amended
Complaint, all references to Mr. Acquaviva's posts are to the appendix filed with the original
Complaint (and referred to herein as "Original App'x.").

[21]  Mr. Gack also posted this meme. Gack App'x at p. 19.



*Id.* at 91.[22]

### H.  Kristine Amato: Promoted excessive use of force.

Kristine Amato has been employed with PPD since approximately 1990.  Am. Compl. at

¶ 205.  In September 2019, following an IAU investigation of her Facebook posts, it was

determined that Officer Amato violated both Article I, Conduct Unbecoming, and Article V,

Neglect of Duty, of the disciplinary code and was issued a 30-day suspension without pay. *Id*. at

¶¶ 215-18. Officer Amato admits that each of the posts in the Appendix are hers (using "Yo

Stuff" as her pen name).  *Id.* at ¶ 209.  Officer Amato's posts primarily promote extrajudicial

---

[22] Mr. Acquaviva was the prolific author of a host of other anti-Black and anti-Muslim posts. *See, e.g.*, Original App'x at p. 78 (meme juxtaposing the Confederate flag being pulled down from a pole against a photo of Black males wearing low pants with their boxers exposed, caption below the meme states "profiling makes sense."); *id.* at p. 84 (meme of two women in burqas with the caption "This has no place on American soil.").

violence. For example, she commented on a news story where a police officer ran over an armed

suspect, "Awesome. I hope the wheel went over her scumbag ass":



Amato App'x at p. 11.  Similarly, Officer Amato commented on a video depicting people

demonstrating outside of the house of a Philadelphia police officer charged with murder.[23] *Id.* at

p. 5. Apparently outraged at the demonstration, Officer Amato said "the neighborhood should've

come out to face those savages" followed in a later post with "WE NEED TO START

FIGHTING BACK SOON!!!!!!!"  *Id.*  This post clearly calls for violence against lawful

---

[23] The video's caption states, "At the murderer of David Jones house officer Ryan Pownall of the
15TH district #Justice4DavidJones #NO #JUSTICE #NO #PEACE."  Amato App'x at p. 5.  *See
also Com v. Pownall*, CP-51-CR-0007307-2018 (Pa. Com. Pl.).

assembly, for police and neighbors to "fight back" and is disruptive to the police department's safety mission.[24]

### I.   Joseph Przepiorka: Called for "Death to Islam."

Joseph Przepiorka was employed with PPD from approximately 1989 until his retirement on or around August 6, 2019. Am. Compl. at ¶¶ 241, 248.  Mr. Przepiorka sought retirement in lieu of facing termination charges for violating both Article I, Conduct Unbecoming, and Article V, Neglect of Duty, of the disciplinary code. Mr. Przepiorka received his termination paperwork on or about July 25, 2019, and decided to retire on August 6, 2019. *Id.* at ¶¶ 244-48.

Out of the nearly 100 posts attributed to him and flagged by the Plain View Project, at least 41 of them are undoubtedly disruptive because of their discriminatory and violent content. For example, Mr. Przepiorka posted the following that was deemed both Anti-Muslim and violent:



---

[24] Ms. Amato also demonstrated anti-Muslim bias: in response to the same video posted about Muslim refugees refusing food donations as Mr. Fenico, she angrily commented to "send those ungrateful fucks back." Amato App'x at p. 2.

Przepiorka 1 App'x at p. 2.  Equally troublesome is his post of a meme of General "Mad Dog Mattis" captioned with "Fired by Obama to please the Muslims, Hired by Trump to exterminate them." Przepiorka 2 App'x at p. 10.[25]

Mr. Przepiorka's ire is not directed solely at Muslims.  Numerous posts ridicule or otherwise demonstrate prejudice towards African-Americans, Mexicans, and transgender individuals; and others promotes violence against protestors and vigilante justice.  For example, Mr. Przepiorka also posted a meme of someone intended to be transgender in a bikini saying "if you pee with my daughter I'll call you an ambulance," ridiculing and threatening violence against transgender people. Przepiorka 1 App'x at p. 14.[26]

### J.    Francis Sheridan: Celebrated prison rape.

Francis Sheridan has been employed with PPD since approximately September of 1990. Am. Compl. at ¶ 288.  Officer Sheridan received disciplinary charges for violating Article V, Neglect of Duty, on or around January 27, 2020, to which he pled guilty.  He has not yet received discipline related to these charges. *Id*. at ¶¶ 295-97.  Officer Sheridan had two posts in the PVP database; one of them explicitly promoting violence and vigilante justice (*i.e.* prison rape) against people who are accused and charged with, but not convicted of, crimes. Sheridan

---

[25] Mr. Przepiorka's other anti-Muslim posts include (but are not limited to): Przepiorka 2 App'x at p. 3. ("The Path of Islam is always the same: 1. Establish a Mosque 2. Create an enclave 3. Grow the population 4. Claim Victimhood 5. Resist Host Authorities & Customs 6. Exploit Lawfare 7. Institute Shariah 8. Secede 9. Take Control."); *id.* at 23 ("I learned everything I needed to Know About Islam on 9/11."); *id.* at 39 ("All of Europe and America need to unite and send these people back to their country or hell.")*; id.* (sharing a post about DHS granting amnesty to Syrian refugees saying they can fit at the bottom of his pool).

[26] *See also, e.g.*, Przepiorka 1 App'x at p. 33 ("How will Trump deport all the illegal aliens? Juan by Juan."); Przepiorka 2 App'x at p. 41 (referencing Black Lives Matter supporter as a "thug."); Przepiorka 1 App'x at p. 18. ("Don't Be Late for Work. Get the Protestor Plow").

App'x at 3.  In that post he commented "thank God for prison justice" in reference to a picture of what appears to be an inmate accused of a sex crime facing a wall with soiled pants and a wounded back:



*Id.*

### K.  William Bowdren: Promoted violence against protesters.

William Bowdren has been employed with PPD since approximately July of 1996. Am. Compl. at ¶ 257. On or around June 7, 2019 Officer Bowdren was informed of the pending Facebook investigation, and on June 9, 2019, he was assigned to restricted desk duty. *Id.* at ¶¶ 264-65.  Officer Bowdren subsequently returned to full active duty and was placed into a regular rotation with line squad detectives. *Id.* at ¶¶ 267.  PPD later served him with disciplinary charges for violating Article V, Neglect of Duty, on or around August 22, 2020, but he has not been formally suspended or terminated related to his Facebook posts. *Id.* at ¶¶ 268-72.  Officer Bowdren posted the following, supporting running over protestors:



Bowdren App'x at p. 7.  In addition, Mr. Bowdren referred to Black protesters as "savages," *Id.*

at p. 8, and also shared a post of a story where a WWII Veteran was murdered by "Black Thugs"

and questioning why President Obama didn't say anything about this and "You don't see any

riots going after this." *Id*. at p. 9.

### L.  Raphael McGough: Called for the "extermination" of "alt left extremists."

Raphael McGough has been employed with PPD since approximately April 14, 2003.

Am. Compl. at ¶ 273. On or around July 20, 2019, PPD internal affairs opened an investigation

involving Mr. McGough. *Id*. at ¶ 280. On or around August of 2019, Mr. McGough received

disciplinary charges for violating Article V, Neglect of Duty, facing a two-to-five-day

suspension. *Id*. at ¶ 281. On December 12, 2019, PPD issued him a letter of reprimand. *Id*. at ¶¶

284.  In one of Officer McGough's posts (he went by "Ray" on Facebook,) he called for the

"extermination" of "alt-left extremists":



McGough App'x at p. 3.  Further, in a post intermingling promotion of violence and abuse of due

process between two Plaintiffs, Mr. McGough responded to a meme shared by Mr. Acquaviva—

where Acquaviva stated "it should be legal to punch a civilian who spits on a man in uniform" —

that it is "legal" to punch said civilian "depending on who's writing the complaint." *Id.* at 2.

## III.   <u>STANDARD OF REVIEW</u>

The applicable standard for a Rule 12(b)(6) motion is well settled.  Under this Rule, the

Court must dismiss an action on motion made before a responsive pleading is filed, when a

complaint "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

To plead a viable cause of action, the allegations must transcend the "speculative" and "conceivable," and must include "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, 570 (2007).  The court must disregard "legal conclusions" and "conclusory statements," and must scrutinize the well-pleaded factual allegations to ensure that they are more than "merely consistent with a defendant's liability." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted); *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (disregarding "bald assertions" and "legal conclusions" in motion to dismiss).  When evaluating a motion to dismiss, the court must accept as true all well-pleaded allegations of fact in the plaintiff's complaint and must view any reasonable inferences that may be drawn therefrom in the light most favorable to the plaintiff.  *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231-33 (3d Cir. 2008).  Finally, the court must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002).

## IV.   THE OFFICERS' FIRST AMENDMENT CLAIM SHOULD BE DISMISSED BECAUSE THEIR SOCIAL MEDIA POSTINGS WERE *PER SE* DISRUPTIVE.

Despite their varied subject matter, the Officers' posts consistently revealed an unacceptable level of animus against members of the community they serve.  They are rife with statements that promote extrajudicial violence, vigilante justice, police brutality, and demonstrate a clear bias against African-Americans, Muslims, and members of the LGBTQ community— content that courts routinely find disruptive on its face.  While analysis of a First Amendment claim is ordinarily "fact intensive,"[27]  dismissal is appropriate in this case because the posts

---

[27] *See Muti v. Schmidt*, 96 F. App'x 69, 73-75 (3d Cir.), *vacated on other grounds*, (Aug. 12, 2004), *superseded on other grounds*, 118 F. App'x 646 (3d Cir. 2004) (holding that although First Amendment *Pickering* analysis is "fact intensive," complaint and documents referenced therein "compelled" conclusion that 12(b)(6)dismissal was warranted).

attached to the Complaint establish as a matter of law that each Plaintiff posted content that is *per se* disruptive, rendering their ability to perform their crucial, public-facing role and interact with the City's diverse community of citizens either was diminished—with respect to the Plaintiffs who were suspended—or impossible in the case of Plaintiffs who were terminated or retired in lieu of termination. There are no close calls here.  Ultimately, the Plaintiffs cannot demonstrate any reasonable right to relief because the City's interest in regulating unprofessional, biased, and often hateful speech by police officers far outweighs any alleged First Amendment protection they had in their Facebook posts.

Contrary to what the Plaintiffs think, as public employees, they do not enjoy constitutional *carte blanche* in all manners of speech.  Public servants "by necessity must accept certain limitations on his or her freedom." *Palardy v. Twp. of Mullburn*, 906 F.3d 76, 81 (3d Cir. 2018) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (internal quotation marks omitted)).  A public employer's ability to regulate its employees' speech stems from the "common-sense realization that government offices could not function if every employment decision became a constitutional matter." *O'Connor v. Ortega*, 480 U.S. 709, 722 (1987) (quotation omitted).

With those limitations in mind, a public employee's speech is constitutionally protected only if (1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) their interest in speaking outweighs the government's interest in promoting workplace efficiency and avoiding disruption.  *Hill v. Borough of Kutztown*, 455 F.3d 225, 241-42 (3d Cir. 2006) (quoting *Garcetti*, 547 U.S. at 418).  Importantly, "the inquiry into the protected speech is one of law, not fact," which requires the court's "independent constitutional judgment on the facts of the case." *Connick v. Meyers*, 461 U.S. 138, 148 n. 7 and

150 n. 10 (1983) (quotations omitted).  For purposes of this Motion only, the City will assume

that Plaintiffs spoke as citizens and on matters of public concern and focus only on the third

prong.

### A. The City has a compelling interest in ensuring public trust in, and promoting efficiency the PPD and Plaintiffs' posts are disruptive to that mission.

The City's interest in promoting efficiency and avoiding disruption in its police force far

outweighs any interest Plaintiffs had in the vast majority of their Facebook posts.  The final

prong of the analysis—authored by Justice Thurgood Marshall in the matter of *Pickering v.*

*Board  of Education of Township High School, District 205, Will County, Illinois*, 391 U.S. 563

(1968) and often referred to as the "*Pickering*" balancing test—weighs the plaintiff's interest in

speaking on a matter of public concern against the government's interest in the performance of

its functions. As mentioned above, the right to speak in the public employment context is "not

absolute" and "[a]t times, the right of free speech conflicts with other important governmental

values, posing the problem of which interest should prevail."  *Pappas v. Giuliani*, 290 F.3d 143,

146 (2d Cir. 2002).  In weighing interests, the Plaintiffs must demonstrate that their "interest in

the speech outweighs the state's countervailing interest as an employer in promoting the

efficiency of the public services it provides through its employees." *Brennan v. Norton*, 350 F.3d

399, 413 (3d Cir. 2003) (quoting *Baldassare v. N.J.*, 250 F.3d 188, 195 (3d Cir. 2001)).   Like

the first two inquiries of citizen speech and public concern, the *Pickering* balancing test is

"purely legal and is therefore decided by the court as a question of law." *Id.*

Accordingly, even if the employee spoke as a private citizen on a matter of public

concern, the government employer can still limit the speech with an adequate justification.  The

justification must balance the employee's interest in free speech rights with the employer's

operational interests to prevent workplace interference or disruption.  *See Munroe v. Cent. Bucks*

*Sch. Dist.*, 805 F.3d 454, 472 (3d Cir. 2015).  Examples of "legitimate operational interests" that

may justify restraint on an employee's speech include but are not limited to:

- promoting integrity;
- maintaining proper discipline;
- promoting efficiency;
- upholding public trust;
- executing government functions; and
- advancing government policy.

*Garcetti*, 547 U.S. at 418-19; *Pickering*, 391 U.S. at 568.

Further, relevant considerations as to whether the speech disrupts or interferes with the

workplace and the employer's legitimate operational interests include whether the speech has or

is reasonably predicted to:

- impair discipline by superiors or harmony among co-workers;
- have a detrimental impact on close working relationships for which personal loyalty and confidence are necessary; or
- impede the performance of the speaker's duties or interferes with the regular operation of the enterprise.

*Rankin v. McPherson,* 483 U.S. 378, 388 (1987).

Moreover, the City, acting as a law enforcement agency, has substantially more power to

control the speech of law enforcement officers than it does employees of other City agencies.

Courts universally recognize that law enforcement agencies have wide latitude to regulate an

employee's speech when that speech impacts areas such as discipline, morale, and uniformity

with the police force.  *Kelley v. Johnson*, 425 U.S. 238, 246 (1976) (police departments should

be granted deference to make choices related to "discipline, spirit de corps, and uniformity");

*Oladeinde v. City of Birmingham*, 230 F. 3d 1275, 1293 (11th Cir. 2000) ("In a law enforcement

agency, there is a heightened need for order, loyalty, morale and harmony, which affords a police

department more latitude in responding to the speech of its officers other than government

employers."); *see also Meenan v. Harrison*, 264 F. App'x 146, 151 (3d Cir. 2008) ("The public's

interest in potential impropriety and breaches of trust by public employees—especially police,
given their role in ensuring public safety—is strong.").

Here, based on the record presented by the Plaintiffs, the City had ample justification for
their disciplinary decisions based on a reasonable (and actual) concern that the Facebook posts
were both externally and internally disruptive to police operations.  The widespread publication
of the Facebook posts, starting with the Plain View Project database and Buzzfeed's subsequent
exposé,[29] caused actual disruption.[30]  Laid bare, these posts perpetuate the public's and City's
fear/concern that its police force cannot serve the community in a respectful and unbiased
manner.  The resulting mistrust in police erodes the ability for the PPD and individual officers to

---

[29]  *See Hernandez v. City of Phoenix*, No. CV-19-05365, 2020 WL 5057634, at *2 (D. Ariz. Aug.
27, 2020) (acknowledging police commander's report that the "overwhelming media coverage"
following the Plain View Project's release of the posts resulted in "major reputation damage" to
the Phoenix police department); *see also Locurto v. Giuliani*, 447 F.3d 159, 165, 180-81 (2d Cir.
2006) (noting "extensive press coverage" of police officers' participation in racist parade float,
finding "[t]he capacity for a particular incident to generate public attention is obviously highly
relevant to the City's assessment of the incident's disruptive effects.  That is to say, the evidence
is overwhelming that the *content* of racist speech did not bring about dismissal, in the absence
of notoriety which would reasonably be seen to affect the perception of the speaker and the
Government in the public eye.").

[30]  However, even if the Facebook posts came to light only internally—and were never made
public—the PPD did not (and should not) need to wait to take corrective action.  Plaintiffs'
discipline would be justified because of the Police Department's reasonable belief that the
racist, anti-Muslim and violent speech would be disruptive to its mission. *Waters v. Churchill*,
511 U.S. 661, 673-74 (1994); *Connick v. Meyers*, 461 U.S. 138, 152 (1983) ("[W]e do not see
the necessity for an employer to allow events to unfold to the extent that the disruption of the
office and the destruction of working relationships is manifest before taking action."); *see also
Dible v. City of Chandler*, 515 F.3d 918, 928 (9th Cir. 2008) ("It would not seem to require an
astute moral philosopher or a brilliant social scientist to discern the fact that [police officer's]
activities, when known to the public, would be detrimental to the mission and functions of the
employer." (quoting *City of San Diego v. Roe*, 543 U.S. 77, 84 (2004)); *Heil v. Santoro*, 147
F.3d 103, 109 (2d Cir. 1998) ("[T]he government can prevail if it can show that it is reasonably
believed that the speech would potentially interfere with or disrupt the government's
activities.").  Here, like in *Dible*, it does not take "a brilliant social scientist" to conclude that
Plaintiffs' racist, anti-Muslim, and violent rhetoric harms the PPD's mission.

ensure public safety.

Beyond just community mistrust, Plaintiffs' posts are disruptive of internal police operations. Posts indicating racial, ethnic, and religious bias can impair, if not destroy, personal and working relationships between police officers who need to rely on each other in life threatening situations. Further, Plaintiffs themselves admit harm to the PPD's criminal justice function. Specifically, they claim that they were "black-listed and placed on a Giglio List or Brady List . . . containing the names and details of law enforcement officers who have sustained incidents placing their credibility into question, thereby impairing their ability to be called as a witness in the prosecution of any arrests or criminal investigations conducted by them." Am. Compl. at ¶ 5. Testifying under oath in criminal hearings and trials is a crucial duty for all police officers. The Plaintiffs' posts would be fair game on cross-examination to impugn their credibility and demonstrate bias, especially in cases where criminal defendants claim excessive force, due process, or racial/ethnic profiling. Simply put, exhuming the Plaintiffs' posts in a trial would jeopardize criminal prosecutions. This disruptiveness outweighs any of Plaintiffs' individual expressive interests.

The over 250 Facebook posts in the appendices can be separated generally into two categories that courts regularly find, as a matter of law, to be *per se* disruptive: (1) speech indicating bias or animus regarding race, ethnicity, religion, sexual orientation or gender identity; and (2) speech promoting violence, extrajudicial punishment, vigilantism, police brutality, misuse of power, or lack of respect for due process. Each Plaintiff has posts that fall into at least one if not both of these categories. This speech unequivocally perpetuates public fear that the Plaintiffs cannot perform their duties in an unbiased and professional manner.

1. **Speech displaying animus against individuals on the basis of Race, Ethnicity, Religion, Sexual Orientation and/or Gender Identity, is disruptive.**

As catalogued above, nine of the twelve Plaintiffs boldly and brazenly displayed *per se* disruptive posts that showed their animus towards individuals based on race, ethnicity, and sexual orientation/gender identity. Although these topics can be newsworthy, courts often find that, on balance, an individual's interest in disruptive speech covering these topics yields to the employer's operational needs and overall mission.

A police department's interest in maintaining the public trust and promoting harmony in a diverse workforce outweighs an officer's interest in blatantly racist and otherwise biased speech, like the Plaintiffs' here, and as illustrated by the Second Circuit in *Pappas v. Giuliani*, 290 F.3d 143 (2d Cir. 2002) and its progeny, *Locurto v. Giuliani*, 447 F.3d 159 (2d Cir. 2006). In both *Pappas* and *Locurto*, the Second Circuit found that New York City Police Department's interests in efficiency and maintaining the public trust outweighed officers' racist and anti-Semitic speech.

First, in *Pappas* (and before Facebook existed), the Second Circuit determined that the NYPD was justified in terminating an officer who, in response to the receipt of charitable solicitations from an auxiliary police department, stuffed the reply envelopes with overtly anti-Black and anti-Semitic materials. *Pappas*, 290 F.3d at 144. The materials expressed "hostility to Jews," "ridicul[ed] African Americans and attribut[ed] to them a criminal disposition of rape, robbery, and murder." *Id.* at 145 (specifying that the materials warned against the 'Negro wolf … destroying American civilization with rape, robbery, and murder,' and declaimed against 'how the Jews control the TV networks and why they should be in the hands of the American public and not the Jews.'"). Four years later, the Second Circuit in *Locurto v. Giuliani* similarly

found that the NYPD was justified in disciplining an officer for his off-duty participation in a racist parade float in which participants donned blackface and Afro wigs, displayed stereotypical African-American food, and parodied a recent hate crime death of an African-American man. *Locurto*, 447 F.3d at 164-65.

In finding that the NYPD's interests far outweighed the speech, both *Pappas* and *Locurto* highlighted the crucial importance of the NYPD maintaining public trust.  *See Locurto*, 447 F.3d at 183 (noting "few" interests greater than maintaining a relationship of trust between NYPD and the communities they serve).  *Locurto* added that, "[t]he First Amendment does not require a Government employer to sit idly by while its employees insult those they are hired to serve and protect." *Id.* Both cases had no trouble concluding that the officers' interests in expressing their racist personal opinions must "yield to the public good."  *Pappas*, 290 F.3d at 147; *Locurto*, 447 F.3d at 183.

Importantly here, speech need not be explicitly racist or biased against a targeted community in order to be actionable.  Although this distinction is not analyzed in the opinions, *Pappas* and *Locurto* instruct that both "overt" racism (*i.e.* using the term "Negro" and donning blackface) and more subtle forms of racism—*i.e.* the invocation of well-known racial stereotypes—is actionable.  This distinction between overt and covert bias is also illustrated in *Sabatini v. Las Vegas Metro. Police Dep't*, 369 F. Supp. 3d 1066 (D. Nev. 2019), where the court found that a corrections officer was justifiably terminated for social media posts that explicitly mentioned race,[31] but also speech based on racial stereotypes and rife with racial

---

[31] The overtly racist Facebook posts in *Sabatini* included one entitled "Memorial to Why Blacks are Ghetto Dwellers" [*id.* at 1076] and another explicitly deriding the appearance of Black women, stating in part "The modern black wmn [sic] has literally become a clown." *Id.* at 1077.

undertones.  For example, in one post, plaintiff called Black Lives Matter protestors "ghetto[32] trash race baiting scumbags" who "blame their laziness and misfortunes on others," and who should "[b]urn in hell…." *Id*. at 1076.  In addition, he posted on Facebook regarding a Michael Brown exhibit at a museum, asking jokingly if there were a snack bar selling "chicharrones, steel reserve, [and] grape soda" which plaintiff later admitted was a stereotype of popular food amongst African-Americans. *Id*.  He also shared a post from featuring a picture of several Black men and women seemingly looting a store, with the superimposed text: "Looting, When Free Food, Housing, Phones[,] and Education Aren't Enough" *Id.* at 1066.  The internal affairs investigator found that, despite the lack of overtly racist language, the posts were "disparaging towards the African-American community," "promoted racial biases and stereotypes," and "clearly promoted racial ridicule."  *Id*. The court agreed that these posts "unquestionably exhibited racial animus." *Id*. at 1076-77, 1090.

     As instructed in *Pappas*, *Locurto*, and *Sabatini*, a police department's interest in maintaining the public trust and promoting harmony in a diverse workforce is paramount.  This interest cannot be understated: "[t]he effectiveness of a city's police department depends importantly on the respect and trust of the community and on the perception in the community that it enforces the law fairly, even-handedly, and without bias."  *Pappas*, 290 F.3d at 146." Accordingly, "[i]f the police department treats a segment of the population of any race, religion, gender, national origin, or sexual preference, etc., with contempt," respect for law enforcement from that segment of the population "is eroded and the ability of the police to do its work in that community is impaired."  *Id.* at 146-47.  This contempt causes members of the targeted

---

[32] Mere words like "thug," "ghetto" and "savage" are examples "facially non-discriminatory terms [that] can invoke racist concepts ... already planted in the public consciousness."  *Lloyd v. Holder*, No. 11 Civ. 3154, 2013 WL 6667531, at *9 (S.D.N.Y. Dec. 17, 2013).

community to "regard the police as oppressor rather than protector," and are thus "less likely to report crimes, to offer testimony as witnesses, and to rely on the police for their protection." *Id.* at 147.

Lastly, beyond preservation of public trust, the police also have equally compelling interests in efficient prosecution of crime and maintaining orderly internal operations. As mentioned above, Plaintiffs' social media posts could be fair game and destructive to an officer's credibility when on the stand. Moreover, a police officer's biased speech demonstrating animus or disrespect towards a segment of the population can damage trust and close working relationships between police officers who are members of the targeted community, especially where police officers often rely on each other in life-threatening situations. *Id.*; *see also, e.g.*, *Lytle v. City of Haysville, Kan.*, 138 F.3d 857, 864 (10th Cir. 1998) ("[P]ersonal loyalty and confidence are especially important among police officers, who are charged with ensuring public safety and who often must work together in life-and-death situations.") Further still, if these biased attitudes are allowed to flourish within the ranks, the department's ability to recruit and train personnel from the targeted community will suffer. *Id.*

Here, Plaintiffs had posts that are functionally identical to the content discussed in the cases above. Numerous posts not only ridicule Muslim dress by comparing them to trash bags [Original App'x at 83], but also indicate that Muslims cannot be "good" Americans [Grandizio App'x at p. 7] and even goes so far as to call for "Death to Islam." [Prezpiorka 1 App'x at p. 2]. Equally troubling, are the many other posts that demonstrated overt racism, like Mr. Gack's chimpanzee meme[33] [Gack App'x at 27] and Mr. Fenico sarcastically wondering why "there's no

---

[33] With regard to the "Obama Voters" meme: depicting primates to lampoon Black people is a hackneyed racist trope, and portrayal of outstretched hands calls upon the "welfare queen" stereotype that is often ascribed to Black and/or poor communities. *See, e.g.*, *Spence v. Bukofzer*,

epidemic of white cops shooting white kids" [Fenico App'x at 7]; and also those that utilized more covert forms of racism, like use of trigger words, stereotypes, and tropes (*i.e.* Mr. Acquaviva referring to African-American politicians as "thugs" and the "Thuggies" meme) [Original App'x at 14, 91]. Like those municipalities and police departments in the cases cited above, the City and the PPD were rightfully compelled to terminate or discipline the Plaintiffs who engaged in this type of disruptive speech.

### 2. Violence and Vigilantism, Lack of Respect of Due Process; Police Brutality, Misuse of Power

The potential disruptiveness within the PPD is not limited to speech that is racist or anti-Muslim. The Plaintiffs' posts are rife with statements that advocate extrajudicial violence and punishment, vigilantism, and, more specifically, police abuse of force and power. These types of posts are categorically found to be *per se* disruptive because, they too erode trust in the police forcing by celebrating, among other things, harm to people at the hands of the police and a flippant attitude of the power placed in their hands as officers sworn to uphold the law.

For example, the Fourth Circuit in *Grutzmacher v. Howard Cty.*, 851 F.3d 332 (4th Cir. 2017), found that county officials justifiably terminated a Fire Department paramedic who advocated violence against "liberals" on Facebook. There, a plaintiff posted on Facebook regarding news coverage of a gun control debate. Plaintiff, appearing in jest to replace the word "liberal" with "gun," posted "[m]y aide had an outstanding idea… lets all kill someone with a liberal…then maybe we can get them outlawed too! Think of the satisfaction of beating a liberal

---

No. 15 Civ. 6167, 2017 WL 1194478, at *8 (S.D.N.Y. March 30, 2017) (recognizing that referring to Black employees as "monkeys" is derogatory); *Fisher v. Mermaid Manor Home for Adults, LLC*, 192 F. Supp. 3d 323, 329 (E.D.N.Y. 2016) (denying defendant's summary judgment in hostile work environment claim where co-worker compared African-American plaintiff to a fictional chimpanzee).

to death with another liberal…its almost poetic…"  *Id.* at 338.  The Fourth Circuit found that his post "frustrated the Department's public safety mission and threatened community trust in the Department, which is vitally important to its function, [*id.* at 343 (internal quotation marks omitted)], reasoning that the post "advocat[ed] violence to certain classes of people and advocated using violence to effect a political agenda." *Id.*  Ultimately, the court concluded that "the potential for Plaintiff's statements to diminish the Department's standing with the public further weighs in favor of the Department."  *Id.* at 347.

Similarly, posts that celebrate or advocate police misuse of force and brutality are a more pernicious subset of violent posts considered disruptive.  In *Sabatini*, the court upheld the police department's decision to transfer a SWAT team sniper to patrol district after he posted on Facebook that it was a "shame" that the suspect in an officer-involved shooting "didn't have a few holes in him."  *Sabatini*, 369 F. Supp. 3d at 1071.  There, the court found that the department had a strong interest in prohibiting this sort of statement because of its officers' power to use deadly force in the course and scope of employment. "The public [] trusts that officers will rely on deadly force only when necessary, and this concern is heightened for officers whose roles more readily call upon them to draw their weapons." *Id.* at 1092.  Even if the comment was not sincere, "this cavalier and callous comment conveyed a lack of awareness for the degree of trust placed in SWAT officers." *Id.* at 1092-93.

Likewise, in *Venable v. Metro. Gov. of Nashville*, 430 F. Supp. 3d 350 (2019), the day after the police shooting of Philando Castile made national news, an officer posted in a Facebook thread in response to a comment that Castile was shot four times: "Yeah, I would have done 5." *Id.* at 353.  The officer's post went viral and he was terminated.  In affirming the termination, the court had "no hesitation in concluding that the MNPD could reasonably predict that Venable's

41

comments would be disruptive to its mission and affect officer morale." *Id*. at 361. The comments were made directly in response to a police shooting at a time when police shootings were hot topic of debate among members of the public and the subject of nationwide protests...." *Id.* at 360.

Here, eleven out of the twelve Plaintiffs, and *at least* 30 out of the over 250 posts in Plaintiffs' appendices, promote extrajudicial violence, vigilantism, misuse of power, and demonstrate an overall lack of respect of due process.  Prime examples of this problematic content are: Mr. Gack and Mr. McCammitt's memes depicting protestors being dragged and sprayed in the face with tear gas by officers [*see* Gack App'x at p. 5, McCammitt App'x at p.m2];  Ms. Amato's post celebrating police use of force by commenting that she hoped the police would run over a suspect [Amato App'x at p. 11]; and Mr. McGough's calls to "eliminate" "alt-Left extremists." [McGough App'x at p. 3].  As with their posts displaying animus based on religion, race, and national origin, these posts are disruptive to PPD's overriding interest in maintaining the public trust.

### B. The City's interest in maintaining effectiveness and preserving the public trust far outweighs the Plaintiffs' free speech rights.

The *Pickering* balancing test states that a court must balance the employee's right to free speech against the employer's interests in an efficient, disruptive-free workplace.  Here, it is abundantly clear that the Plaintiffs cannot show that their interest in disseminating derogatory and violent speech is more important than the City's interest in maintaining harmony within its ranks, efficient criminal prosecution, and keeping the public's trust in law enforcement.  It is extremely difficult to juxtapose the derogatory speech of the Plaintiffs with the City's desire to maintain the public's trust.  As the courts in *Locurto*, *Pappas*, *Sabatini*, and *Grutzmacher* have already found, a police department's interest in maintaining public trust and ensuring its criminal

justice and public safety mission easily surmounts an officer's right to engage in racist, biased, and violent off-duty speech.

Lastly, the City and the PPD face an existential challenge.  With increased national and local public scrutiny and the outcry against excessive force, police killings of unarmed Black men, and, more recently, calls to "defund" the police, police departments and cities nationwide face significant challenges with respect to the fundamental structure, purpose, and practices of law enforcement.  Given this volatility and national spotlight on police departments, the City—now more than ever—needs to be able to exercise their broad discretion as employers without fearing that every decision to cleanse its ranks is necessarily followed by sprawling allegations of First Amendment violations.  The Plaintiffs' speech here is simply beyond the pale.  This is not a case of constitutional dimensions, it's one of common sense.

## V.   PLAINTIFFS' CLAIMS UNDER THE PENNSYLVANIA CONSTITUTION FAIL AS A MATTER OF LAW.

Plaintiffs' claims that the City violated their free speech rights under the Pennsylvania Constitution can be easily dismissed because there is no right to bring such a claim.  Plaintiffs allege that the City violated Article I, section 7 of the Pennsylvania Constitution, which provides in pertinent part: "The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty." PA. CONST. Art. I § 7. However, the Pennsylvania Constitution does not establish a private cause of action for damages.  *Dooley v. City of Phila.*, 153 F. Supp. 2d 628, 663 (E.D. Pa. 2001); *see also Jones v. City of Phila.*, 890 A.2d 1188, 1208 (Pa. Commw. Ct. 2006), *appeal denied*, 909 A.2d 1291 (Pa. 2006) ("To date, neither Pennsylvania statutory authority nor appellate case law has authorized the award of monetary

damages for a violation of the Pennsylvania Constitution[.]").  Thus, Plaintiffs' Pennsylvania constitutional claim must fail.

## VI.   THE OFFICERS HAVE NOT ALLEGED A VIOLATION OF FOURTEENTH AMENDMENT DUE PROCESS.

In addition to naming three additional plaintiffs in the Amended Complaint, the Plaintiffs tacked on a baseless claim that the City violated their Fourteenth Amendment due process rights. In support, they assert that two specific provisions of the PPD's Social Media Policy—Police Department Directives 6.10(I) and 6.10(J)[34]—"are unconstitutionally vague and overbroad, as applied to the Plaintiffs' exercise of free speech activity in this case." Am. Compl. ¶ 297.[35]  In addition, they now claim that PPD discriminatorily enforces the Social Media Policy.  Both Fourteenth Amendment claims fail for the reasons that follow.

### A.  The Plaintiffs Have no Standing to Assert Vagueness.

Assuming for purposes of this Motion to Dismiss that each of the Plaintiffs were disciplined pursuant to these specific provisions (the City does not concede this), for the reasons discussed below, the Plaintiffs do not have standing to challenge the Social Media Policy as vague as applied to them.[36]  In the Amended Complaint, the Plaintiffs confusingly commingle

---

[34] The Amended Complaint inaccurately cites the Social Media Policy as Directive "6.01" instead of "6.10." *See* Am. Compl. Ex. A.

[35] Police Department Directives 6.10(I) and 6.10(J), as well as the entire Directive 6.10 will be referred to herein collectively as the "Social Media Policy" or "Policy."

[36] The Officers also claim that if they were disciplined pursuant to the Social Media Policy, "such action impermissibly infringes on the Plaintiffs' freedom of speech and otherwise violates their constitutional right under the Fourteenth Amendment due process clause." Am. Compl. at ¶ 298. To the extent this threadbare assertion could be construed as a properly drafted claim for violations of either procedural and substantive due process (it does not), both of these claims fail anyways.  Even if they properly invoked procedural due process, it is well established that police officers have ample civil service commission and collective bargaining protections.  In addition, the Plaintiffs cannot bring a substantive due process claim because their liberty interest is already

overbreadth and vagueness.  There is no such thing as an "as applied" overbreadth challenge as

the Officers plead.  *See Stoltzfoos v. Sec'y of Pa. Dep't of Corrs.*, 733 F. App'x 34, 39-40 (3d

Cir. 2018) (citing *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482-83 (1989)).  As

such, the City will only address the Officers' vagueness challenge.

 A vagueness challenge cannot be lodged vicariously and must be challenged "as applied"

to the Plaintiffs.  *Aiello v. City of Wilmington, Del.*, 623 F.2d 845, 850-51 (3d Cir. 1980) (in a

vagueness claim, the "litigant must demonstrate that the statute under attack is vague as applied

to his own conduct, regardless of its potentially vague application to others.").  Accordingly,

"when a litigant's conduct clearly falls within the permissible purview of the statute" that

individual lacks standing to challenge vagueness. *Rode*, 845 F.2d at 1200.

 Specifically, in the public employment context, "broad public employee dismissal

standards have passed muster" and are not void for vagueness "as long as ordinary persons using

ordinary common sense would be notified that certain conduct will put them at risk of

discharge." *Loscombe v. City of Scranton*, 902 F. Supp. 2d 532, 546 (M.D. Pa. 2012), *aff'd*, 600

F. App'x 847 (3d Cir. 2015); *see also Broadrick v. Oklahoma*, 413 U.S. 601, 607-08 (1973) (a

statute is impermissibly vague when people "of common intelligence must necessarily guess at

its meaning" and "even if the outermost boundaries of (the statute) may be imprecise," any such

uncertainty has "little relevance" where the conduct falls within the "hard core" of the statute's

proscriptions).

 Here, the Plaintiffs do not have standing to challenge the Social Media Policy for

vagueness because their Facebook posts fell within the "hard core" of the policy's targeted

---

redressed within their First Amendment claim.  *See Albright v. Oliver*, 510 U.S. 266, 273-74
(1994).

speech.  Despite their claims that the Social Media Policy "do[es] not reasonably inform the Plaintiffs of the speech activity that is proscribed" [Am. Compl. at ¶ 312], Section 6.10(I) is explicit in its prohibitions: officers cannot use "ethnic slurs, profanity, personal insults; material that is harassing, defamatory, fraudulent, or discriminatory, or other content and communications that would not be acceptable in a City workplace under City or agency policy or practice."  Am. Compl. Ex. A at p. 3.[37]

The Plaintiffs can find additional guidance in other portions of the Social Media Policy. *See Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F. 3d 153, 167 (3d Cir. 2008) (finding that vagueness cannot be deciphered viewing specific words or phrases in isolation, rather they must be viewed in context).  Namely, the "Background" section of Social Media Policy provides a sufficiently explicit base to inform the Plaintiffs what types of speech on their part could subject them to discipline.  It cautions against posts that have the "potential to impact the department" (Section 2.A) and confirms an officer's duty "to maintain public trust and confidence" (Section 2.B) in both official and individual capacities.  It is simply common sense that posts that call for the extermination of Muslims [Przepiorka 1 App'x at p. 2]; insinuate that non-whites are more prone to criminality than whites [Fenico App'x at p. 7]; and advocate misuse of force against protestors [McCammitt App'x at p. 2] easily fall within "discriminatory" and "harassing" speech. At the very least, each Plaintiff should have reasonably known that the vast majority of their Facebook posts would not be acceptable in a City workplace and would negatively impact the

---

[37]Although it is unclear why Plaintiffs are challenging Section 6.10(J), that provision is also specific in prohibiting "sexually explicit images, cartoons, jokes, messages or other material that would be considered in violation of the City Policy Preventing Sexual Harassment in City Government."

PPD and put them at risk of discharge, as outlined in and forewarned by in the Social Media Policy.

### B. The Plaintiffs cannot show that the PPD arbitrarily enforced the Social Media Policy.

In addition to alleging vagueness and overbreadth, the Plaintiffs claim that the PPD enforced the Social Media Policy "arbitrarily and capriciously" based on the viewpoint and race of the speaker. *Id.* at ¶ 313.[38] In support, the Plaintiffs point to four other PPD officers' Facebook posts that they deem "controversial" and that utilize "extremely foul, racist, and inflammatory language," [*id.* at ¶ 314], asserting that none of these posts were flagged by the Plain View Project and the PPD did not discipline any of these officers for these posts. First, because the PVP is not an entity affiliated with the City whatsoever, whether the PVP "singled out" the posts is wholly irrelevant to any claims against the City.

More importantly, even if these posts are authentic, they do not raise an issue of material fact because the Plaintiffs have not (and cannot) assert that the PPD or the City actually knew that these posts currently exist or existed at the time the City disciplined Plaintiffs/Officers. Knowledge of such disparate treatment is necessary to raise a genuine factual dispute, as the Third Circuit instructed in *Webb v. City of Philadelphia*, 562 F.3d 256, 262 (3d Cir. 2009). In *Webb*, a PPD officer sued the City for religious discrimination because PPD policy did not permit her to wear religious headwear. In asserting viewpoint discrimination, two officers alleged in affidavits that other police officers displayed other types of religious symbols with no disciplinary repercussions. *Id.* The Third Circuit noted that the officers never "presented any evidence of 'who' or 'when,' nor did either know whether the police department authorized *or*

---

[38] Because it is unclear whether this assertion is connected with the Officers' overbreadth or vagueness claims, or any other claim, the City addresses it separately in this section.

*was even aware of the alleged occurrences*." *Id*. It concluded that "[t]hese blanket assertions with no specific evidence do not create a genuine issue of material fact." *Id*. Here, while the Officers may have alleged "who" wrote the posts, without any evidence that the PPD knew about these posts. *Id*. The PPD cannot arbitrarily engage in viewpoint discrimination without evidence that they knew about the "new" posts alleged in the Amended Complaint. As such, their claim fails as a matter of law.

## VII.   <u>CONCLUSION</u>

Defendant City of Philadelphia respectfully requests that this Honorable Court grant this motion and dismiss the Plaintiffs' Amended Complaint with prejudice.

Respectfully Submitted,

CITY OF PHILADELPHIA
LAW DEPARTMENT

Date: <u>November 2, 2020</u>

BY:   <u>s/ Brian Matthew Rhodes</u>
Senior Attorney
Pa. Attorney ID No. 69716
City of Philadelphia Law Dept.
1515 Arch St., 16th Fl.
Philadelphia, PA 19102
215.528.9960
Brian.Rhodes@phila.gov

Meghan A. Byrnes
Deputy City Solicitor
Pa. Attorney ID No. 321316
City of Philadelphia Law Dept.
1515 Arch St., 17th Fl.
Philadelphia, PA 19102
215.683.5011
Meghan.Byrnes@phila.gov

Frank Wehr
Assistant City Solicitor
Pa. Attorney ID No. 318464
City of Philadelphia Law Dept.
1515 Arch St., 16th Fl.
Phone Number
Frank.Wehr@phila.gov

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | |
|---|---|
| **CHRISTIAN FENICO,** | : |
| **THOMAS YOUNG,** | : |
| **THOMAS GACK,** | : |
| **EDWARD McCAMMITT,** | : |
| **TANYA GRANDIZO,** | : |
| **ANTHONY ANZIDEO,** | : |
| **ANTHONY ACQUAVIVA,** | : |
| **KRISTINE AMATO,** | : |
| **JOSEPH PRZEPIORKA,** | : |
| **FRANCIS SHERIDAN,** | : |
| **WILLIAM BOWDREN, and** | : |
| **RAPAHEL MCGOUGH** | : |
| | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :      Civil Action No. 20-3336 (PBT) |
| | : |
| **CITY OF PHILADELPHIA,** | : |
| | : |
| Defendant. | : |

---

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date below, the foregoing Motion to Dismiss and

Memorandum of Law has been filed electronically and is available for viewing and

downloading.


Respectfully Submitted,

CITY OF PHILADELPHIA
LAW DEPARTMENT

Date: <u>November 2, 2020</u>          BY: <u> s/ Brian Matthew Rhodes</u>
Senior Attorney