## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CHRISTIAN FENICO, *et al*.,** | : | |
| | : | |
| **Plaintiffs,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 20-3336** |
| | : | |
| **CITY OF PHILADELPHIA,** | : | |
| | : | |
| **Defendant.** | : | |

### MEMORANDUM

**TUCKER, J.**                                                          **January 26, 2022**

Presently before the Court is Defendant City of Philadelphia's Motion to Dismiss

Plaintiffs' Amended Complaint (ECF No. 18), Plaintiffs' Response in Opposition (ECF No. 24),

and Defendant's Reply Brief (ECF No. 26). Upon careful consideration of the Parties'

submissions, exhibits, and for the reasons outlined below, Defendant's Motion is **GRANTED**,

and Plaintiffs' Amended Complaint is **DISMISSED WITH PREJUDICE**.

### I.    FACTUAL BACKGROUND[1]

This case is about public employees' social media use and a government entity's decision

to discipline their employees based on past Facebook posts. The Plaintiffs[2] here are a group of

current and former members of the Philadelphia Police Department ("the PPD") who were

reprimanded because of content they posted on their personal Facebook accounts. The posts in

question spanned a multitude of topics such as protestors and their treatment, the use of violence

---

[1] This section draws primarily from Plaintiffs' First Amended Complaint (ECF No. 5), Defendant's Motion to Dismiss ("Def.'s Br."), Plaintiffs' Response in Opposition ("Pls.' Resp."), and Defendant's Reply Brief ("Def.'s Reply").

[2] Plaintiffs are: (1) Christian Fenico, (2) Thomas Young, (3) Thomas Gack, (4) Edward McCammitt, (5) Tanya Grandizo, (6) Anthony Anzideo, (7) Anthony Acquaviva, (8) Kristine Amato, (9) Joseph Przepiorka, (10) William Bowdren, (11) Raphael McGough, and (12) Francis T. Sheridan.

against child molesters, Islam and its followers, refugees, police brutality, and much more.

Because of the PPD's discipline, Plaintiffs now allege Defendant violated their First and

Fourteenth Amendment rights as well as rights under the Pennsylvania Constitution.

### A.  The Plain View Project

In 2016, Emily Baker-White, a former Federal Community Defender Staff Attorney,

founded the Plain View Project ("Plain View"). Pls.' Amend. Compl. ¶ 2. Plain View "is a

database of public Facebook posts and comments made by current and former police officers

from several jurisdictions across the United States." THE PLAIN VIEW PROJECT,

https://www.plainviewproject.org/ (last visited January 24, 2022); *see also* Pls.' Amend. Compl.

¶ 2. Prior to its inception, the organization's lawyers determined that numerous local police

officers across the country had posted content which appeared to endorse violence, racism, and

bigotry;[3] thus, to shed a light on the issue, the Plain View was born. THE PLAIN VIEW PROJECT,

https://www.plainviewproject.org/ (last visited January 24, 2022); *see also Pace v. Baker-White*,

432 F. Supp. 3d 495, 499 (E.D. Pa. 2020).

The Plain View's website described its step-by-step methodology in obtaining and

compiling the posts. THE PLAIN VIEW PROJECT, https://www.plainviewproject.org/about (last

visited January 24, 2022); *see also Pace*, 432 F. Supp. at 499. First, it acquired eight

jurisdictions' publicly published police officer rosters and then searched Facebook for the

officers' names. *Pace*, 432 F. Supp. at 499. Next, it created a list and used several verification

processes to confirm that the profiles in question were maintained by an officers on the roster.

---

[3] "In some of these posts, officers commented that apprehended suspects—often black men— 'should be dead' or 'should have more lumps on his head.' In other Facebook conversations, officers advocated shooting looters on sight and using cars to run over protestors. Numerous posts deemed Islam 'a cult, not a religion' and referred to Muslims as 'savages' and 'goat-humpers.' In others, officers appeared to joke about beating and raping women. https://www.plainviewproject.org/about (last visited January 24, 2022); *Pace*, 432 F. Supp. at 499.

THE PLAIN VIEW PROJECT, https://www.plainviewproject.org/about (last visited January 24,
2022). The Plain View would then capture the screen with the verifying information and add it to
their files. *Id.*

The Plain View gathered these verified Facebook profiles and reviewed each post, image,
or comment to ensure it met their criteria.[4] THE PLAIN VIEW PROJECT,
https://www.plainviewproject.org/about (last visited January 24, 2022). Finally, it curated these
digital profiles and made them available on its website where visitors can find posts through a
searchable database. *Id.* In all, the Plain View captured public posts and comments that were
published on Facebook. *Id.*

**B. City of Philadelphia Police Department's Policies and Code of Ethics**

As with most institutions, the PPD possesses a Code of Ethics and a set of Directives that
all employees must, not only follow, but swear an oath to. A part of that Oath declares that the
officer's "fundamental duty is to serve the community; to safeguard lives; …to respect the
Constitutional rights of all persons to liberty, equality, and justice" and keep their lives
"unsullied as an example to all." *See* ECF No. 18-2, p. 4. The Oath goes on to state that
"[officers] will never act officiously or permit personal feelings, prejudices, animosities, or
friendships to influence my decision." *Id.* Officers further pledge that they "will enforce the law
courteously and appropriately…never employing unnecessary force or violence" *Id.* at 5. Finally,
Philadelphia Police Officers vow to "recognize the badge of [their] office as a symbol of public
faith, and [] accept it as a public trust to be held so long as [they are] true to the ethics of the
police service." *Id.*

---

[4] The Plain View's stated purpose is to assess whether the posts or comments could undermine the public's trust and
confidence in law enforcement officials. THE PLAIN VIEW PROJECT, https://www.plainviewproject.org/about (last
visited January 24, 2022).

Besides the Directives and Code of Ethics, the City also had a social media policy in effect at the time Plaintiffs were employed and created their posts. Pls.' Amend. Compl. ¶ 4. These directives are known as Directive 6.10, Social Media and Networking ("Social Media Policy"). *Id.* The Social Media Policy stated, in part:

> Employees who are off-duty and using privately-owned property to engage in the personal use of social media, do not represent the City of Philadelphia, the Philadelphia Police Department, or any official position maintained by either entity. Under such conditions, employees represent only themselves and their personal interests.

*Id.* It also prohibited the use of ethnic slurs, profanity, personal insults, material that is harassing defamatory, fraudulent, or discriminatory, or content and communications that would not be acceptable in a City workplace or under city agency, policy, or practice on social media. *See* Pls.' Amend. Compl. Ex. A. It specifically states:

> [A]s members of the Philadelphia Police Department, employees are embodiments of its mission. It is, thus essential, that each member accepts his or her role as an ambassador of the department. In doing so, each member must strive to maintain public trust and confidence, not only in his or her professional capacity, but also in his or her personal and on-line activities. Moreover, as police personnel are necessarily held to a higher standard than general members of the public the online activities of employees of the police department shall reflect such professional expectations and standards.

*Id.*; Directive 6.10-2(B).

To be sure, the Directive came with a warning, and informed employees that the "personal use of social media has the potential to impact the department as a whole, as well as individual members serving in their official capacity." Directive 6.10, § 2(A). It stressed that employees have "no reasonable expectation of privacy when engaging" in social media and that anything posted "may be obtained for use in criminal trials, civil proceedings, and departmental investigations." *Id.* at § 4(H).

Although the Policy detailed that any posts made while an employee was off duty did not represent the PPD, the Directive informed employees that they "conduct themselves as representatives of the department [at all times] and, accordingly, adhere to all department policies and standards of conduct, and observe conventionally accepted protocols and proper decorum." Directive 6.10, § 5(B)(2)(b)(2).

### C. The Plaintiffs and Their Posts

Each of the Plaintiffs are current or former police officers who have long served, at varying lengths of time, the great city of Philadelphia.[5] Each has won multiple awards documenting their service and commitment to the community, their heroics, and their skill in their field. Moreover, many of the Plaintiffs have never been disciplined by the PPD prior to their Facebook posts becoming public.

The PPD employed Christian Fenico from 2003 until July 17, 2019. Pls.' Amend. Compl. ¶ 26. During his seventeen-year career, he received twenty-three awards and honors, such as the ASIS International Award for Meritorious Service to the Greater Philadelphia area and Medal of Lifesaving for saving a six-year-old girl from fatally choking. *Id*. at ¶¶ 31-32.  The Amended Complaint goes on to list more medals, awards, and detail Plaintiff's enviable career. Fenico also had a "near spotless record" and only received one counseling memo, which the PPD did not consider as punishment or discipline. *Id*. at ¶ 53.

Plaintiff Thomas Young entered the police academy on November 20, 1989 and, upon graduation, served for approximately 30-years before to his eventual termination. Pls.' Resp. at

---

[5] This Court is highlighting each Plaintiffs' decorated careers because it underscores the difference in their online personas that engaged in racial, religious, or ethnic animus with that of police officers serving the community of Philadelphia. Plaintiffs' posts targeted certain groups that the officers are or were sworn to protect. Thus, although they are highly qualified and decorated officers, Plaintiffs' posts betrayed hard earned public trust, especially in a climate where the police are held to a higher standard, especially in the face of increasing public scrutiny.

6. Prior to his release from the Department, Young received two bravery Commendations for arresting suspects armed with firearms without firing his own weapon. Pls.' Amend. Compl. ¶ 74. Furthermore, the Amended Complaint stresses his character, ethics, and job performance; for example, the PPD only reprimanded Young once in his 30-years of service, in 2005, which was the "mildest form of discipline." *Id*. at ¶ 75.

The PPD hired Plaintiff Thomas Gack in 1993; he went on to serve for approximately 25 years, until August 16, 2019 when he was discharged. Pls.' Resp. at 7-8. Gack holds a certification in: (1) Major Incident Response Team; (2) biohazard response; (3) riot training; and (4) radiological detection. Pls.' Amend. Compl. ¶ 91. Like Fenico, Gack also received many awards and honors for his service. *Id*. at ¶ 92.

The City hired Plaintiff Edward McCammitt in 1986 as a police officer where he was initially assigned to the 22nd District, transferred to the 2nd District, and, finally, to the Traffic Division. Pls.' Amend. Compl. ¶¶ 110-111. Like his co-plaintiffs, McCammitt is certified in a multitude of skills, trainings, and programs and received medals and awards over the course of his 33-year career. *Id*. at ¶¶112-114.

The PPD hired Plaintiff Grandizo[6] in 1995 where she served the 18th District until her promotion in 2009 to Corporal. Pls.' Amend. Compl. ¶¶ 138-140. Upon her promotion, the PPD assigned Grandizo to the17th District where she worked in the Driver Training Unit and assisted the Training Bureau. *Id*.

Plaintiff Anzideo was hired in 2007 and assigned to the 3rd District of the South Division for a year prior to his eventual reassignment to the 17th District. Pls.' Amend. Compl. ¶¶ 153-

---

[6] Defendant's Motion and Plaintiffs' attached Appendix spells Plaintiff's name "Tanya Grandizio," ECF No. 5-3, p. 15, while the Amended Complaint and Response Brief spell it "Grandizo." Pls.' Resp. at 9; *see also* Pls.' Amend. Compl. ¶ 138. This Court will spell Plaintiff's name "Grandizio" as it appears on her Facebook and in the Appendix.

155. He is certified in First Aid/CPR training, Narcotic training, and other detective courses, and has secured thirteen awards and honors throughout as decorated career. *Id*. at ¶¶ 157-159. Moreover, Anzideo possessed a spotless record prior to the incident. Pls.' Resp. at 10.

The City hired Plaintiff Anthony Acquavia in 1990 and initially assigned him to the Northwest Division, in the 39th District, from 1991 to 1995 until his eventual transfer to the 2nd District. Pls.' Amend. Compl. ¶¶ 187-88. Prior to the discovery of his Facebook comments and posts, Acquavia was a model officer, consistently receiving positive feedback on his performance reports and numerous awards for his outstanding service. *Id*. at ¶¶ 189-191.

The PPD hired Kristine Amato as a police officer in 1990 and assigned her to Center District for three years before transferring her to the 9th District for an additional ten years. Pls.' Amend. Compl. ¶¶ 205-207. Amato was a highly decorated police officer during her 30-year career where she received multiple merit awards. *Id*. at ¶ 208.

Defendant hired Plaintiff Joseph Przepiorka in 1989 and assigned him to the 9th District of the Central Division. Pls.' Amend. Compl. ¶¶ 227-228. There, he worked a patrol wagon for seven years before he was promoted to Sergeant. *Id*. He was a highly decorated officer during his 30-year career and received numerous awards and honors. *Id*. at ¶ 229.

Plaintiff William Bowdren was hired in 1996 and worked as police officer until his promotion to Detective in 2012. Pls.' Amend. Compl. ¶¶ 257-60. Like the others, he too was awarded with multiple merit awards and medals. *Id*. at ¶¶ 261-62.

Defendant City hired Plaintiff Francis Sheridan in 1991 where he was assigned to the 18th District as a member of the Tactical Response Team and the Philadelphia Highway Patrol Unit. Pls.' Amend. Compl. ¶¶ 288-89. Plaintiff's career path continued to progress as he became an undercover officer in the Major Crimes Auto Division and was eventually promoted to

Detective. *Id*. at ¶¶ 290-92. Sheridan became a highly decorated police officer and received several awards and honors over the course of his 30-year career. *Id*. at ¶ 292.

Plaintiff Ralph McGough was hired by the City Defendant in 2003 and initially assigned to the 4th District before covering the 3rd District because of the 4th and 3rd's merger. Pls.' Amend. Compl. ¶¶ 273-74. He eventually was assigned to the 24th District and served as a Crime Scene Officer where his duties included fingerprinting, DNA retrieval, and community relation activities. *Id*. at ¶ 275. In 2018, McGough was promoted to detective and continued to enjoy a highly decorated career. *Id*. at ¶ 277.

All the Plaintiffs maintained a private Facebook account and engaged in social media activity. Pls.' Resp. at 5. They created or commented on posts that the Philadelphia Police Department viewed as insulting, derogatory, and violated the Department's Policies and Code of Ethics. Plaintiffs argue that their posts were protected under the First Amendment because they spoke as private citizens about terrorism, refugees, politics, and other matters of public concern.

### 1. Christian Fenico

Fenico created a Facebook account under the name of "Chris Joseph" where he engaged in social media activity. Pls.' Resp. at 5. In total, Plaintiffs' Amended Complaint includes eight posts/comments authored by Fenico.[7] Plaintiff alleges that his posts had to do with public concern. Specifically, he cites a YouTube video posted by Anthony Anzideo condemning the "Knockout Game,"[8] Pls.' Resp. at 5, however, Fenico comments, "You'd think after the Zimmerman incident people would learn." ECF No. 5-1, p. 5.

---

[7] Plaintiffs' Counsel has attached separate appendixes containing Facebook posts for each individual Plaintiff.
[8] The "Knockout Game" is a practice of assaulting people without warning. DEADLY "KNOCKOUT GAME": WHAT IT IS AND WHY TEENS ARE PLAYING IT. https://www.cbsnews.com/news/deadly-knockout-game-what-it-is/ (last visited January 24, 2022).

Another post discusses Muslim refugees and their refusal of food donations, with the caption "STOP ISLAM" under which Fenico commented "Good, let them starve to death. I hate every last one of them." ECF No. 5-1, p. 7. On a post of a news article titled, "Teen died from gunshot to right cheek…" Fenico commented, "I like the 'why is there no epidemic of white cops shooting white kids.' Ummm[.]" *Id*. at 6.

Finally, under another article titled "Police Brutality: Handcuffed Teen Boy's Face Smashed When Cops Taser Him," Fenico commented "Who cares, kid and mom are scumbags. Good job police." ECF No. 5-1, p. 5.

## 2. Thomas Young

Young possessed a Facebook account under the name "Tom Young." Many of his posts and comments revolved around police brutality, Muslims refugees, Islam, carrying out extrajudicial executions of alleged child molesters, and homophobia. *See* ECF No. 5-9. For example, under an image that showed the American flag burning with the words "Happy Ramadan from Salaam Mosque Detroit! Greetings from the religion of peace to all of America. Convert or die," Young commented "Ban Islam from all Western nations." ECF No. 5-9, p. 23.

In another post which could be deemed as homophobic, Young identified himself as a police officer. Specifically, under a news article titled, "Homosexuals Throw Human Excrement at Christians, and Wipe Their Anuses with Pages of the Bible," he said "…as a cop I've had the misfortune to detailed [sic] to events like this…" *Id*. at p. 18.

However, Young did not limit his posts to Muslims and feces; he also addressed the LGBTQ community and refugees. One of Young's friend authored a Facebook status that spoke about members of the LGBTQ community purchasing firearms. Young wrote under the status,

"[p]rotect us, under this president [Obama] they are working against us importing[9] thousands of Muslims into our country." ECF No. 19-11, p. 3.

Additionally, Young engaged in commentary about police officers and their use of force. In two separate posts, he: (1) demonstrated his support for the Italian Police "hav[ing] no mercy" as they interrupted a rally or protest; and (2) espoused that people should not resist even after the post showed officers breaking a man's leg after a traffic stop. *Id.* at p. 2, 5.

Finally, Young made numerous posts that touched on politics in both the United States and Europe, Muslim immigrants[10], and Muslim refugees.[11] *See* ECF No. 19-11. The posts warned of a religious takeover by Muslims.

### 3. Thomas Gack

Plaintiff Gack's posts addressed a host of issues and topics, some touching public concern; other posts were racist in nature, spirit, and intent. One such example was a meme[12] of four chimpanzees, two of which with their hands outstretched, with the label "Obama Voters," plastered across the bottom. ECF No. 19-2, p. 27. Another post Gack commented on, which was rooted in African American stereotypes, was an image of a car decal with a family; however, this decal showed the male figure behind bars as five infant babies and a dog stood next to the female figure. *Id.* at p. 29.

---

[9] Merriam-Webster's dictionary defines "importing" as "to bring (something, such as merchandise) into a place or country from another country or to transfer." https://www.merriam-webster.com/dictionary/importing?src=search-dict-box (last visited January 24, 2022).  This Court notes that there is undeniably a racist undertone when Young used the word "importing" to describing people immigrating, likening them to chattel and not humans.

[10] In one post, Young stated, "I hope the people of the West wake up to this Islamic Invasion before its [sic] too late!" ECF No. 19-11, p. 3.

[11] Young shared a link, titled "Muslim Refugees, Yes- Persecuted Christians…Christians are in imminent danger across the world…" with the comment "Islam on the march." ECF No. 19-11, p. 8.

[12] A meme is "an amusing or interesting item (such as a captioned picture or video) or genre of items that is spread widely online especially through social media" https://www.merriam-webster.com/dictionary/meme (last visited December 1, 2021).

Not to be outdone by Fenico and Young, Gack too posted material which ridiculed the Islamic faith. One such post was of a white female on a beach in a bikini leaning against a pig with the words "Happy Ramadan" across the top in an obvious attempt to mock Muslims' dietary restrictions preventing pork consumption, and traditional, conservative, Islamic garb. ECF No. 19-2, p. 8.

Plaintiff Gack did not limit his posts to racially motivated content; he also encouraged and supported the killing of pedophiles and rapists. He republished a meme that showed a gallows and noose with the words, "Bring Back Public hangings of Pedophiles and Rapists." ECF No. 19-2, p. 34. In another post, he shared an article titled "Serial Child Molester Arrested for the 29th Time, But his Mother Claims He's Just Wife-Hunting." *Id*. at p. 37. Here, Gack commented "[t]his POS needs to be beaten to death by the families of his victims!!!" *Id*.

Gack promoted police violence. He shared a meme that showed a solider clad in military gear, grabbing an individual in handcuffs by the neck, and moving him forward. The meme stated, "How to Handle Protesters Who Block Traffic and Vandalize." ECF No. 19-2, p. 15. Under a video titled "Attention U.S. Law Enforcement – This is How Spanish Police Deal with Antifa Terrorists," Gack wrote, "Hey Mayor Kenney! This is how police are suppose [sic] to deal with the domestic terrorists, AntiFa [sic]!!!" *Id*. at p. 27.

Finally, Gack posted memes that encouraged violence against transgendered individuals. One such meme said, "if you belong in this bathroom [an image of the men's room] and you follow my daughter or wife into [their bathroom], you're gonna [sic] need this [an image of a man in a wheelchair, known to signify a bathroom for people with disabilities." ECF No. 5-1, p. 3.

### 4.  Edward McCammitt

Plaintiff McCammitt shared Islamophobiac[13] content, his support and admiration for
excessive police force, violence, and police misconduct. The first four posts attached to
McCammitt's Appendix revolvde around the treatment of protestors. Plaintiff shared a video
titled, "Tulsa Officer Uses Car to Run Down Armed Suspect." ECF No. 5-2, p. 20. The next,
even more troubling, was of a meme of an officer pepper spraying a woman with the words
"Participation Trophies Now in Liquid Form!" *Id*. at p. 21. Edward McCammitt continued to
celebrate excessive police force and shared a video link titled "WATCH! Hamburg Officer Has
Had Enough of Antifa Obstruction – BAM!" ECF No. 5-3, p. 21. He suggested that protestors
should get run over by trains, motor vehicles, or be treated as speed bumps. *See id*. at p. 22; *see
also* ECF No. 5-3, p. 9.

Unfortunately, McCammitt's violent posts didn't stop there. He managed to combine his
disdain for protestors with transphobia when he posted a meme of an individual in agony, with
the caption, "when you get shot in the groin by a rubber bullet and your made-up gender doesn't
protect your willie[.]" ECF No. 5-3, p. 4. Plaintiff shared another meme that displayed a male
officer arresting and asking a female suspect whether he had her consent to search her. The
suspected responded that she wished to be searched by a female officer. The arresting officer
proceeded to state, "Lucky for you, I identify as a female." *Id*. at p. 14.

### 5.  Tanya Grandizio

The vast majority of Plaintiff Grandizio's posts could be broken down into two
categories: (1) whether Muslims are "good Americans,"[14] with no being the "apparent" answer in

---

[13] ECF No. 5-3, pp. 10-11.
[14] ECF No. 5-3, pp. 19, 21.

her view; and (2) the "disgusting" things Muslims do.[15] Essentially, Grandizio's posts and comments suggest that because Muslims do not drink alcohol, eat pork products, or believe in Jesus,[16] they inherently should not and cannot exist in this country. She also cites numerous shootings or attacks and links them to the Islamic faith to bolster her world view that Muslims are inherently bad.

### 6. Anthony Anzideo

Anzideo's Facebook comments and posts promoted violence and violations of basic principles of constitutional law. He encouraged police officers to "take [suspects] out" without following procedure including arrests and eventually, trial.  ECF No. 5-4, pp. 1- 2. He commented that it was a "good [idea]" that the Boston Marathon Bomber be killed in prison by other inmates, without going to trial and having his due process rights respected. *Id*. at p. 2. Anzideo also found comments that advocated for violence against people who participated in a "Knockout Game" amusing.[17] *Id*. at p. 24.

### 7. Anthony Acquavia

Many of Plaintiff Acquavia's posts reflected an anti-Muslim sentiment. One meme depicted a presumably Muslim man saying, "All I want to do is move to your country, rape your women, bomb your buses, riot in your streets, and demand that you accept my religion. Why can't you be more tolerant?" ECF No. 5-4, p. 7. He then compared Muslim women in black burqas to garbage bags. *Id*. at p. 8. One meme he shared depicted three Muslim women in burqas, with the message "[t]his has no place on American soil." *Id*. at p. 9-10. In another, he compared Muslims to Nazis. *Id*.

---

[15] ECF No. 5-3, p. 16.
[16] To be sure, Muslims do believe in Jesus.
[17] One of Plaintiff's friends wrote, "Hope one of these kids get [sic] shot in the face" in reference to a "Knockout Game" perpetrator, to which Anzideo laughed. ECF No. 5-4, p. 24

Through multiple Facebook comments and posts, Acquavia expressed a disdain for protesters and shared memes that targeted African Americans. First, he posted a meme that stated, "No one cares about your stupid protest." ECF No. 5-4, p. 4. Next, Acquavia posted an image of a Black bus passenger wearing what appears to be a diaper, with the caption "Thuggies." *Id*. at p. 16. Finally, he reshared a meme that showed two Black males with their boxers exposed with the caption "Punks on parade. Profiling makes sense." *Id*. at p. 3.

### 8.  Kristine Amato

Plaintiff Kristine Amato used Facebook under the name "Yo Stuff." Pls.' Resp. 13. Her Facebook comments focused on encouraging police violence. In one video that showed protestors in front of the home of a Philadelphia police officer who was charged with murder, Amato commented, "the neighborhood should've come out to face those savages," and "WE NEED TO START FIGHTING BACK." ECF No. 5-4, p. 24. In another video titled "Tulsa Officer Uses Car to Run Down Armed Suspect," Amato commented "Awesome…hopefully the wheels went over her scumbag ass." ECF No. 5-5, p. 4. She also managed to include anti-Muslim rhetoric when she commented on Fenico's posts about Muslim refugees refusing food donations. Amato stated, "send those ungrateful f*cks back." ECF No. 5-1, p. 7

### 9.  Joseph Przepiorka

Plaintiff Przepiorka maintained a personal Facebook in which he made numerous posts that the PPD disciplined him for as they deemed them violent, anti-Muslim, -Black, -Mexican, transphobic, and centered on prison rape. One such post was a video that celebrated an armored police vehicle running over civilians, with the caption "Knocking #antifa DOWN! #MAGA." ECF No. 5-5, p. 10. Przepiorka shared a news article titled, "White paedophile ring held girl hostage and forced her into prostitution." He commented, "These boys will learn Karma very

14

shortly[.] Bubba is waiting[,]" endorsing prison rape culture as well as using the stereotype of "Bubba." *Id*. at p. 12. He also shared a meme that iterated that "Islam is not a religion or a race…it is a cult that glorifies death." *Id*. at p. 18.

Further illustrating Przepiorka's theme of violence, he posted a meme that encouraged violence towards individuals who are a part of the transgender community. He posted an image of an elderly man dressed in female clothing and stated, "He said, if you don't let me pee with your daughter[,] I'll call you a bigot. I said, if you pee with my daughter[,] I'll call you an ambulance!" ECF No. 5-5, p. 20. He also encouraged running over protestors by purchasing a "protestor plow." *Id*. p. 24. Finally, he commented, "to[sic] bad the officers didn't kick their damn ass's[sic]," on a news article titled, "Officers attacked breaking up fight in Philadelphia." ECF No. 5-6, p. 6.

### 10. William Bowdren

Like Przepiorka, Plaintiff Bowdren utilized his Facebook account to promote violence against protesters and alleged suspects. Under a posted news article reporting that the Philadelphia Police Department was searching for a suspect, Bowdren commented, "What a P.O.S…I hope he has the audacity to walk back in the bar tonight. Lock the doors and let the firemen handle it." ECF No. 14-12, p. 6. Under a news article that reported Tennessee passed a bill that allowed people to hit protestors who blocked the roads, Bowdren implied that people should run-down the protestors, writing "vroom vroom." *Id*. at p. 7. Under another article titled, "10-year-old girl beaten, dragged by car; 4 charged," Plaintiff endorsed execution before the suspects could exercise their right to trial. Instead, he stated, "These 4 people need to be exterminated immediately." *Id*. at p. 16.

Bowdren also shared photos, posts, and memes that exhibited anti-Muslim sentiment. One image he posted showed a presumably Muslim man with two young girls, clearly under the age of twelve, wearing a burqa, with the caption, "Those are not his daughter[sic]- those are his wives- welcome to Islam." ECF No. 14-12, p. 11.

### 11. Francis Sheridan

Plaintiff Sheridan's posts celebrated vigilante justice such as prison rape and, like the others, promoted violence. Under an article titled, "Child Rapist Raped, Stitched by Meds…," Sheridan commented, "Thank God for Prison Justice!" ECF No. 5-9, p. 9. Plaintiff commented "…these assholes need to be exterminated!" under another article titled, "Teenager arrested for raping a baby will avoid prison." *Id*. at p. 8.

### 12. Ralph McGough

Of all the Plaintiffs, McGough's posts were ones that could be deemed to more closely concern matters of public interest. His posts were generally about politics, supporting police, an increase in murder rate on decreased police presence, and the death sentence of a convicted rapists in Ohio. ECF No. 14-8, p. 1-2 and 4. McGough, however, still engaged in violent rhetoric and made some posts that supported violence against "all leftists." Specifically, he stated that they should all be "eliminated." This is especially troubling as this would presumably include many citizens of the city of Philadelphia, members he swore to serve and protect. *Id*. at p. 3.

### D.  The Buzzfeed News Article

On June 1, 2019, Buzzfeed News, an internet media, news, and entertainment company, published a story titled "Cops Across the US Have Been Exposed Posting Racist and Violent Things on Facebook. Here's the Proof." Pls.' Amend. Compl. ¶ 1. The article was published in collaboration with Injustice Watch, a nonprofit newsroom "focused on exposing institutional

failures that obstruct justice and equality." *Id*. Plaintiffs complain that Injustice Watch and Buzzfeed News used the Plain View's database. *Id*.

The Buzzfeed News article identified around 300 current and former Philadelphia Police officers who posted troubling or questionable content. Def.'s Ex. A. The article further detailed the officers with one or more civil rights lawsuits filed against them, the City's settlements, or verdicts against them. *Id*.

**E.  The Article's Fallout and the PPD's Punishment**

After the Article's publication, the PPD and its Internal Affairs ("IA") Bureau began to conduct investigations into the named police officers in the news report. The PPD investigated the Plaintiffs' posts and comments to determine whether they violated the PPD's Codes, specifically, Article I, Conduct Unbecoming of an Officer, and Article V, Neglect of Duty. Def.'s Br. at 14; *see* Pls.' Amend. Compl. ¶¶ 54-58.

Each of the Plaintiffs in this suit met with either IA or with a supervisor where they were shown their social media posts and comments. *See* Pls.' Amend. Compl. ¶¶ 39, 77-78, 117. Upon review of said comments, the Plaintiffs were asked to confirm the posts were their own, that no one else had access to their account, and to initial next to each post. *Id*. The PPD summarily stripped most of the Plaintiffs of their duty, put them on inactive duty following the pendency of their investigation, and were asked to turn in their service weapon. *Id*. at ¶ 117.

Following the conclusion of the IA's investigation, all of the Plaintiffs were disciplined. The PPD's disciplines came in three forms: (1) suspension; (2) suspension and termination; and (3) being placed on the "Giglio List."[18] Most Plaintiffs were only suspended; however, some,

---

[18] Officers who are placed on the "Giglio List" are barred from testifying in court. Pls.' Amend. Compl. ¶ 197.

like McMCammit, requested early retirement and resigned to secure their benefits. Pls.' Amend. Compl. ¶ 264.

## II.     PROCEDURAL HISTORY

On June 8, 2019, Plaintiffs filed their initial Complaint. ECF No. 1.  On October 7, 2020, however, Plaintiffs filed a Motion to Amend and their First Amended Complaint. ECF Nos. 11 and 12. Plaintiffs' Amended Complaint brings three counts, alleging their discipline violated the: (1) First Amendment of the United States Constitution; (2) Pennsylvania's Constitution, Article I, § 7; and (3) Fourteenth Amendment's Due Process Clause. ECF No. 12, p. 46-52.

City Defendant filed their Motion to Dismiss on November 2, 2020. ECF No. 18.

## III.     STANDARD OF REVIEW

A Rule 12(b)(6) Motion to Dismiss seeks to test the sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). The touchstone of that pleading standard is plausibility.  *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations and quotations omitted). Facial plausibility requires more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* A plaintiff will not prevail if he provides only "labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007)). Instead, the plaintiff must detail "enough facts to raise a reasonable expectation that discovery will reveal evidence of 'each necessary element of the claims alleged in the complaint.'" *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556 (2007)).

The Third Circuit set forth a three-part test that district courts must apply when evaluating whether allegations survive a 12(b)(6) motion to dismiss. *Santiago v. Warminster Township*, 629 F.3d 121 (3d Cir. 2010). A court must: (1) identify the elements of the claim; (2) review the complaint to strike conclusory allegations; and (3) look at the well-pleaded components of the complaint and evaluate "whether all the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). If the complaint fails to do so, the motion to dismiss will be granted.

## IV.    DISCUSSION

Defendant argues that Plaintiffs publicly advertised beliefs on their respective Facebook accounts which was in direct conflict with the PPD's core values and negatively impacted its "ability, or the public's perception of [its] ability, to police equitably and carry out the PPD oath." Def.'s Br. at 10. The City asserts that Plaintiffs' posts were disruptive and its interest in both maintaining the police force's effectiveness and preserving the public trust outweighs the Plaintiffs' free speech rights. *Id.* Moreover, the Defendant contends that there is no recognized private cause of action for violating the Pennsylvania State Constitution; thus, that claim must fail. *Id.* at 10-11. Finally, Defendant argues Plaintiffs' Due Process claims are meritless because "they failed to plausibly allege viewpoint discrimination and they lack standing to attack the social media policy as vague." *Id.* at 11.

Plaintiffs argue Defendant's motion is procedurally premature. Pls.' Resp. at 2. They assert that nothing in the record, at this time can demonstrate which Facebook posts, if any, were the specific ones that the PPD based their disciplinary actions on. *Id.* Plaintiffs contend that several of their posts were not visible to the public and had not been for several years; thus, there can be no causal link between any alleged disruption, the Department's actions, and the

Plaintiffs' posts. *Id*. Finally, Plaintiffs assert that all their posts are protected by the First Amendment because they discuss matters of public concern. *Id*. at 11.

### A.  The Plaintiffs' First Amendment Claim

Defendant first contends that Plaintiffs are not entitled to First Amendment protections and, therefore, their Amended Complaint must be dismissed. The City argues Plaintiffs' posts are *per se* disruptive as they are "rife with statements that promote extrajudicial violence, vigilante justice, police brutality, and demonstrate a clear bias against African-Americans, Muslims, and members of the LGBTQ community;" thus, because of their disruptive nature, Defendant contends Plaintiffs were unable to effectively perform their crucial job and serve the City's diverse community. Defendant asserts it had a compelling interest in ensuring public trust in the PPD and promoting efficiency and the posts undermined that mission. *Id*. at p. 32. This Court agrees.

An individual's right to speech, especially one who serves the public, is not unlimited; instead, public servants "by necessity[,] must accept certain limitations on [their] freedom." *Palardy v. Twp. of Mullborn*, 906 F.3d 76, 81 (3d Cir. 2018) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (internal quotation marks omitted)). The Supreme Court has held that public employees are entitled to First Amendment protections in the workplace when "they speak out on a matter of public concern and their interest in speaking outweighs the government's interest in promoting workplace efficiency and avoiding disruption." *Id*. (citing *Connick v. Meyers*, 461 U.S. 138, 147 (1983) and *Pickering v. Bd. of Educ.*, 391 U.S. 563, 391 (1968)). Notably, however, while the First Amendment vests public employees with certain rights, it does not empower them to "constitutionalize the employee grievance." *Connick*, 461 U.S. at 154. In fact, there is a "common-sense realization that government offices could not

20

function if every employment decision became a constitutional matter," if an employee's speech was not regulated. *Id*. at 143.

Thus, to establish a First Amendment retaliation claim under 42 U.S.C. § 1983, a plaintiff must satisfy the "*Pickering* test." *Green v. Phil. House Auth.*, 105 F.3d 882, 885 (3d Cir. 1997) (citing *Pickering*, 391 U.S. at 568). First, a plaintiff must show that they spoke as a private citizen and not in their public capacity. *Hill v. Borough of Kutztown*, 455 F.3d 225, 241-42 (3d Cir. 2006) (quoting *Garcetti*, 547 U.S. at 418). Next, they must show that the speech in question is protected, or more accurately, involved a "matter of public concern." *See Baldassare v. New Jersey*, 250 F.3d 188, 195 (3d Cir. 2001). A matter of public concern "relat[es] to any matter of political, social, or other concern to the community." *Id*. Third, they must show that the plaintiff's interest in speaking outweighs the government's interest in regulating that speech. *Hill*, 455 F.3d at 241-42. Finally, the plaintiff must show that the government employer or entity did not have an adequate justification for treating the employee differently from any other member of the general public as a result of the statement [they] made. *Id*. (quotations omitted).

This Court finds that Plaintiffs have failed to establish a First Amendment retaliation claim. Although they spoke in their capacity as private citizens and some of their posts involve matters of public concern, Plaintiffs fail to show that their right to free speech outweighs the governments interest in regulating that speech.

### 1. Plaintiffs Spoke as Private Citizens and On Matters of Public Concern

For purposes of this Motion only, Defendant assumes that Plaintiffs spoke as private citizens and on matters of public concern. Def.'s Br. at 32. Plaintiff satisfies the first *Pickering* test. Most, if not all, of Plaintiffs' Facebook accounts are under pseudonyms and they do not

specifically identify themselves as Philadelphia City Police Officers. Although some Plaintiffs

did indicate that they are officers[19] and work in law enforcement, they spoke as private citizens.

Since Defendant assumes that Plaintiffs' speech involved matters of public concern and

does not question the second prong for purposes of this motion only, this Court will move on to

the third *Pickering* prong.[20]

### 2.   Plaintiffs Fail to Show that Their Interest Outweighs that of the City

The third *Pickering* prong requires this Court to determine whether: (1) Plaintiffs' interest

in speaking outweighs the City's interest in regulating that speech; and (2) the PPD possessed an

adequate justification for treating the employees differently from other members of the public

because of the statements or posts made. *Hill*, 455 F.3d at 241-42 (quotations omitted). A court

must weigh the employees' "First Amendment interest…against 'the interest of the State, as an

employer, in promoting the efficiency of the public services it performs through its employees.'"

*Guarnieri*, 564 U.S. at 386 (quoting *Pickering*, 391 U.S. at 568).

"On the employee's side of the scale, [the court] must consider the interests of both [the

plaintiff] and the public in the speech at issue." *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454,

472 (3d Cir. 2015) (quotations and citations omitted). "[T]he [c]ourt must address the

---

[19] Young commented "…as a cop I've had the misfortune to detailed [sic] to events like this…" ECF No. 5-9, at p. 18.

[20] This Court is not convinced that all of the Plaintiffs' posts involved matters of public concern. For example, Thomas Gack posted an image of a car decal image that showed a male figure behind bars, while a mother stood next to five infant babies and a dog. ECF No. 19-2. This post clearly did not serve or add to any public debate as it is steeped in racist rhetoric towards African Americans, the prison system, and single mothers with multiple children. McCammitt posted a transphobic meme about a police officer jokingly identifying as a female to search a female suspect. ECF No. 5-3, p. 14. Acquavia posted a meme that pictured a Black passenger on a bus wearing what appears to be a diaper, with the caption "Thuggies." ECF No. 5-4, p. 4. Przepiorka discussed protests which are matters of public concern, however, he encouraged running over protestors by purchasing a "protestor plow." ECF No. 5-5, p.24. Bowdren posted a picture of a presumably Muslim man with two young girls, clearly under the age of 12, wearing a burqa, with the caption, "Those are not his daughter- those are his wives- welcome to Islam." ECF No. 14-12, p. 11. Thus, this Court does not find that the above referenced posts concerned public matters. That said, this Court need not determine or resolve whether Plaintiffs satisfy the public concern test threshold, as this case turns primarily on the City's ability to prove an adequate justification.

government's legitimate and countervailing interest, as an employer, in promoting workplace

efficiency and avoiding workplace disruption.'" *Id*. (quoting *McGreevy v. Stroup*, 413 F.3d 359,

363 (3d Cir. 2005)). "The government need not show the existence of actual disruption if it

establishes that disruption is likely to occur because of the speech." *Id*. "While the inquiry varies

given the nature of the speech at issue, courts typically consider whether the speech impairs

discipline or employee harmony, has a detrimental impact on close working relationships

requiring personal loyalty and confidence, impedes the performance of the speaker's duties, or

interferes with the enterprise's regular operations." *Id*.

      Here, Defendant's interests can be narrowed to three compelling interests. The police

department has an interest in: (1) maintaining and preserving the public's trust and promoting a

diverse workforce; (2) efficient prosecution; and (3) maintaining orderly internal operations and

avoiding potential disruptiveness. Def.'s Br. at 36, 39-40.

      Defendant asserts that the Facebook posts were externally and internally disruptive to

police operations as it perpetuated the public's fears and concerns that the police department

could not serve the community in an unbiased or professional manner. Def.'s Br. at 35.

Defendant argues Plaintiffs' posts, which advocated for extrajudicial violence, punishment,

vigilantism, police abuse of force and power, were *per se* disruptive because they celebrated

harm to people at the hands of the police. *Id*. at 40.

      Specifically, the City, and by extension, the PPD, point to the current challenges they

face in today's climate. Defendant cites the "increased national and local scrutiny and outcry

against excessive force, police killings of unarmed Black men, and…call to 'defund' the

police[.]" Def.'s br. at 43. The City asserts that they should have broad discretion to discipline its

employees, especially with this increased spotlight and sensitivity, without fear that every decision will become a lawsuit. *Id.*

The City contends that the Plaintiffs "admit" harm to the PPD's criminal justice function as many of them were placed on the Giglio or Brady Lists. Def.'s Br. at p. 35. Their placement on such lists nullified the officers' ability to testify in criminal proceedings, which is a crucial part of their police function. *Id.* Defendant also asserts that defense attorneys would be able to cross-examine Plaintiffs and impugn their credibility based on their posts. Criminal defendants who claim excessive force, due process violations, or racial or ethnic profiling would use Plaintiffs' posts to bolster, if not prove, their accusations, thus impeding the City's ability to prosecute suspects in an efficient and fair manner. *Id.*

Plaintiffs counter that none of their speech resulted in any disruption and the Defendant's arguments are based on speculation and a hypothetical "can." Pls.' Resp. at 25. Specifically, Fenico and the other officers assert that their posts pre-dated the Plain View Project's database or the Buzzfeed article by several years. *Id.*

Plaintiffs also argue that there is no nexus between their Facebook posts and the claimed disturbance, which is an issue in the *Pickering* analysis. Pls.' Resp. at 26. They assert that in a First Amendment retaliation action, a court is required to look at the closeness in time between when a public employee participated in the protected activity and the adverse action. *Id.* Plaintiffs contend that because the article and the resulting disciplinary actions began in July of 2019, several years after Plaintiffs authored their posts, "the backdrop of events on the national stage must be factored into the evaluation and balancing of the *Pickering* analysis." *Id.* at 28-29.

After balancing the Plaintiffs' interest in expressing themselves against "any injury the speech could cause to the "interest of the [government], as an employer, in promoting the

efficiency of the public services it performs through its employees[,]"[21] this Court finds that the City had an adequate justification for treating the employees differently from other members of the public because of the statements or posts made. *Hill*, 455 F.3d at 241-42.

First, this Court addresses Plaintiffs argument that there is nothing in the record, at this juncture to demonstrate which, if any, of the Facebook posts were the specific ones which lead to the Plaintiffs' discipline. This Court finds that any and all the posts Plaintiffs provided in their Amended Complaint are sufficient to establish disciplinary action.

Second, Plaintiffs' argument that their posts were private and unviewable to the public and, thus, the PPD cannot discipline them, must also fail. The Plain View was able to compile their database through independent research and documenting these Facebook posts. In all, the Plain View was able to capture posts and comments that were published on online for any member of the public with a Facebook account to see. THE PLAIN VIEW PROJECT, https://www.plainviewproject.org/about (last visited January 24, 2022). The posts were also obtained by media sources published in a Buzzfeed Article. Thus, Plaintiffs' argument that their posts were unviewable to the public must fail.

Third, other circuits have held that racially charged comments receive less First Amendment protection. *See Locurto v. Giuliani*, 447 F.3d 159 (2d Cir. 2006) (holding that the defendant had a reasonable, clear motive for dismissing plaintiffs and that their interest outweighed plaintiffs' individual First Amendment rights in participating in a float that featured offensive African American stereotypes)*; see also Grutzmacher v. Howard Cty.*, 851 F.3d 332 (4th Cir. 2017) (determined that a fire department was allowed to terminate a supervisory employee because the plaintiff's speech on the department's social media policy and gun control

---

[21] *Waters v. Churchhill*, 511 U.S. 661, 668 (1994) (quoting *Connick*, 461 U.S. at 142).

were outweighed by the department's interests in limited dissension and discord, avoiding the appearance of racial bias, promoting community trust in enforcing department policies, and discouraging disrespect and insubordination).

Here, much of Plaintiffs' commentary revolved around others' race, ethnicity, and religion. *See* Appendix Pls.' Amend. Compl. As detailed at length above, Plaintiffs ridiculed and belittled members from the LGBTQ community, reportedly using individuals who are transgender as punch lines in their jokes, or worse, threatened violence against them. *See* ECF No. 5-1, p. 3; ECF No. 5-3, p. 4, 14. African Americans, Muslims, Mexicans, and foreign refugees were not spared as Plaintiffs played racist bingo, mocking as many ethnic or religious groups as possible. *See* Appendix Pls.' Amend. Compl. Thus, Plaintiffs' posts are afforded less First Amendment protection. *See Locurto*, 447 F.3d 159 (2d Cir. 2006)

Moreover, Defendant's Social Media policy explicitly states:

> [A]s members of the Philadelphia Police Department, employees are embodiments of its mission. It is, thus essential, that each member accepts his or her role as an ambassador of the department. In doing so, each member must strive to maintain public trust and confidence, not only in his or her professional capacity, but also in his or her personal and on-line activities. Moreover, as police personnel are necessarily held to a higher standard than general members of the public the online activities of employees of the police department shall reflect such professional expectations and standards.

*See* Pls.' Amend. Compl. Ex. A.; Directive 6.10-2(B). Plaintiffs knew of the policy and understood that by accepting a position as a police officer for the City of Philadelphia, they knowingly accepted that they would be "held to a higher standard than general members of the public." *Id*. Even with that knowledge in hand, however, Plaintiffs proceeded to violate the policy and make offensive, racist, and violent posts.

Fourth, as a law enforcement agency, Defendant must continuously deal with individuals from multiple walks of life, regardless of their race, sex, creed, or religion. Although Plaintiffs argue there was no "actual" disruption, some courts have determined that government entities may regard some expressive speech or activities as "disruptive" that "instantiate[s] or perpetuate[s] a widespread public perception of police officers …as racist." *Locurto*, 447 F.3d at 178 (2d Cir. 2006).

Plaintiffs' posts caused actual disruption. Many of the Plaintiffs were placed on the "Giglio List" which foreclosed them from testifying in criminal proceedings. This in effect stopped many of the officers from performing one of their essential duties. Next, the City and its police department, like other police departments across the country, face local and public pressure because of the increased attention regarding police shootings of unarmed African-American men. With that as a backdrop, after the Buzzfeed Article's publication cause the public to discover many of the Plaintiffs' posts, the Defendant and the PPD faced increased scrutiny. Like in *Locurto*, the public's perception that Philadelphia police officers are racist because of memes is disruptive. *Id*. Thus, Plaintiffs' arguments that there was no actual disruption must fail.

Finally, the Defendant's countervailing interest in promoting efficiency, mitigating the public's perception of excessive police force, preserving citizens' due process rights and rights to assemble, and discouraging ethnic and religious animus outweighs the Plaintiffs' right to free speech. Plaintiffs' activity receives less First Amendment protection because of the prejudiced and violent rhetoric it contained. As a governmental employer, Defendant can exercise broad discretion to ensure it maintains peace in its workforce as well as with the public it has sworn to protect. Thus, Plaintiffs have failed to satisfy the third *Pickering* prong. *See Hill*, 455 F.3d at 241-42.

### B.  Plaintiffs' Claims Under the Pennsylvania Constitution

Plaintiffs claim that the Defendant violated their free speech rights under the Pennsylvania Constitution. *See* ECF No. 12, p. 46-47. However, the Third Circuit has held that "[n]o Pennsylvania statute establishes, and no Pennsylvania court has recognized, a private cause of action for damages under the Pennsylvania Constitution." *Pocono Mtn. Carter Sch. V. Pocono Mtn. Sch. Dist.*, 442 F. App'x 681, 687 (3d Cir. 2011). Plaintiffs argue that although they are unable to seek compensatory damages, they may seek declaratory and injunctive relief. Pls.' Resp. at 29. Although true, Plaintiffs' Amended Complaint fails to state that they are seeking either of those reliefs. Instead, the Amended Complaint states they "continue to suffer economic and pecuniary damages…[and] are entitled to an award of compensatory damages." ECF No. 12, ¶ 308. Thus, Plaintiffs failed to plead injunctive or declaratory relief.

However, even if Plaintiffs had properly and sufficiently plead either declaratory or injunctive relief, their arguments would still fail. The Pennsylvania Constitution "contains no provision, express or implied, which creates a private right of action for violations of an individual's right to free speech." *Lees v. W. Greene Sch. Dist.*, 632 F. Supp. 1327, 1335 (W.D. Pa. 1986) (citing *Pendrell v. Chatham College*, 386 F. Supp. 341, 344 (W.D. Pa. 1974)). Additionally, the Pennsylvania Constitution does not provide greater rights and protections than that of the First Amendment. *Id*. Thus, Plaintiffs' claims under the state constitution would fail for the same reason they failed under this Court's First Amendment's analysis.

### C.  Plaintiffs' Alleged Due Process Claims under the Fourteenth Amendment

Plaintiffs allege that the City violated their Fourteenth Amendment rights because: (1) the PPD's social media policy is vague and overbroad, as applied to them; and (2) the PPD discriminatorily enforces the policy. Pls.' Resp. at 31. They argue that the Defendant "arbitrarily

and capriciously applied a double standard as to what speech is acceptable and what is not." *Id*. Their Response Brief and Amended Complaint lists multiple other Philadelphia police officers who either targeted white people or those who voted for former President Donald Trump. *Id*. at 32-34. Plaintiffs assert that while others could post and face no consequences, each of the Plaintiffs was charged with violating the Policies. *Id*. at 34.

Defendant first contends that the Plaintiffs lack standing to make the vagueness argument. The City asserts that Plaintiffs' posts fell within the heart of the Policy's targeted speech. Def.'s Br. at 45-46. Moreover, the City contends that the policy provided additional guidance in other portions of their policy and directives. *Id*. at 46. Second, Defendant argues that the Plaintiffs cannot show that the PPD arbitrarily enforced the Social Media Policy because they have not and cannot show that the PPD or City knew of other officer posts at the time they disciplined Plaintiffs. *Id*. at 47. The City concludes that it cannot arbitrarily engage in viewpoint discrimination without evidence that it knew about "new" posts.

The Court agrees with Defendant and finds that the Policy was not vague. A policy in the employment setting is not vague "so long as ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk of discharge." *Loscombe v. City of Scranton*, 902 F. Supp. 2d 532, 546 (M.D. Pa. 2012), *aff'd*, 600 F. App'x 847 (3d Cir. 2015).

The Supreme Court has explained that in each case, a "plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000). Moreover, when a defendant moves to dismiss a complaint and disputes whether the facts as pleaded create Article III standing, it is considered a facial standing challenge. *Kamal v. J. Crew Group, Inc.*, 918 F. 3d 102, 109 (3d Cir. 2019). To establish standing, a plaintiff must show that: (1) they suffered an injury; (2) the injury suffered

29

is fairly traceable to the defendant's challenged action; and (3) the chance of a favorable judicial decision is likely.  *Nicholas v. City of Rehoboth Beach*, 836 F.3d 275, 279-80 (3d Cir. 2016).

The Supreme Court has held that courts should consider "whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit[.]" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021). Courts must ask "whether plaintiffs have identified a close historical or common-law analogue for their asserted injury[.]" *Id*. The Supreme Court said that certain tangible harms, like physical or monetary harms, and intangible harms can satisfy the concreteness requirement.  *Id*.  "Only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id*. at 2205.

Here, Plaintiffs lack standing because the PPD's Social Media Policy is not unconstitutionally vague as applied to them. *See Collura v. Maguire*, 569 Fed. App.'x 114, 117 (3d Cir. 2014) (citing *Aiello v. City of Wilmington*, 623 F.2d 845, 850 (3d Cir. 1980)). As stated above, a policy in the employment setting is not vague "so long as ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk of discharge." *Loscombe v*, 902 F. Supp. 2d at 546. The PPD's policy prohibited the use of ethnic slurs, profanity, personal insults, material that is harassing defamatory, fraudulent, or discriminatory, or content and communications that would not be acceptable in a City workplace or under city agency, policy, or practice on social media. *See* Pls.' Amend. Compl. Ex. A. It specifically states:

> [A]s members of the Philadelphia Police Department, employees are embodiments of its mission. It is, thus essential, that each member accepts his or her role as an ambassador of the department. In doing so, each member must strive to maintain public trust and confidence, not only in his or her professional capacity, but also in his or her personal and on-line activities. Moreover, as police personnel are

30

> necessarily held to a higher standard than general members of the public the online activities of employees of the police department shall reflect such professional expectations and standards.

*Id*.; Directive 6.10-2(B).

The Directive also warned employees that the "personal use of social media has the potential to impact the department as a whole, as well as individual members serving in their official capacity." Directive 6.10, § 2(A). It further informed the employees that "[t]here is no reasonable expectation of privacy when engaging" in social media use and that anything posted "may be obtained for use in criminal trials, civil proceedings, and departmental investigations." *Id*. at § 4(H). The Plaintiffs all used ethnic slurs, profanity, personal insults, material that is harassing defamatory, fraudulent, or discriminatory, or content and communications that would not be acceptable in a City workplace. Because the policy is not vague as applied to their conduct, the Plaintiffs lack standing.

Plaintiffs cannot establish that the City arbitrarily enforced their Social Media Policy and violated their due process rights. Plaintiffs point to other police officers in the department to illustrate that the PPD cherry picked which posts and officers to punish based on the content of their speech. Pls.' Resp. at 33-35. However, as Defendant rightly points out, Plaintiffs failed to plead or allege whether the PPD or City was aware of these posts. The Defendant cannot engage in content specific or viewpoint discrimination without there being sufficient facts to show that the City knew of other posts that may have risen to the same level of discipline. Thus, Plaintiffs' claim of Fourteenth Amendment violations must also fail.

## V.      CONCLUSION

For the foregoing reasons, this Court grants Defendant's Motion to Dismiss.